```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
 2                     VALDOSTA DIVISION

 3             _____

     THE UNITED STATES OF AMERICA,  :
 4                   PLAINTIFF   : Case No. 7:14-CR-48(HL)
     VS                           :
 5                               :      January 12, 2015
     JUAN SANCHEZ HIDALGO, ANDREW  :
 6   D. CARTER, JUAN P. CUEVAS     :    Valdosta, Georgia
     JOSÉ A. MARTINEZ             :
 7                 DEFENDANT.   :
     _____
 8
                      DETENTION HEARING
 9
             BEFORE THE HONORABLE THOMAS LANGSTAFF
10          UNITED STATES MAGISTRATE JUDGE, PRESIDING

11   APPEARANCES:

12   FOR THE GOVERNMENT:          JULIA BOWEN, AUSA
                                  US ATTORNEY'S OFFICE
13                                P.O. BOX 1702
                                  MACON, GA 31202-1702
14

15   FOR DEFENDANT JUAN S. HIDALGO:   NATHANIEL HAUGABROOK
                                      102 E. ADAIR STREET
16                                    VALDOSTA, GA 31601

17   FOR DEFENDANT ANDREW CARTER:     NICOLE WILLIAMS
                                      323 PINE AVE, STE 203
18                                    ALBANY, GA 31701

19   FOR DEFENDANT JOSE A. MARTINEZ:  ROBERT WALKER
                                      P.O. BOX 247
20                                    OCILLA, GA 31774

21   FOR DEFENDANT JUAN P. CUEVAS:    RICKY COLLUM
                                      P. O. BOX 1867
22                                    MOULTRIE, GA 31776

     ELECTRONICALLY RECORDED
23   _____
                 TAMMY W. FLETCHER   USCR
24                  P. O. BOX 539
                 MACON, GA 31202-0539
25                  (478-752-3497)
```

1               I N D E X

2

3                  STRIPLING LUKE

4    DIRECT EXAMINATION

5       BY MS. BOWEN. . . . . . . . . . . . . . .        11

6    CROSS EXAMINATION

7       BY MS. WILLIAMS . . . . . . . . . . . . .        68

8    CROSS EXAMINATION

9       BY MR. WALKER . . . . . . . . . . . . . .        80

10   CROSS EXAMINATION

11      BY MR. HAUGABROOK . . . . . . . . . . . .        91

12   REDIRECT EXAMINATION

13      BY MS. BOWEN. . . . . . . . . . . . . . .        117

14   RECROSS EXAMINATION

15      BY MR. HAUGABROOK . . . . . . . . . . . .        129

16

17

18

19

20

21

22

23

24

25

                    P R O C E E D I N G S

January 12, 2015

     THE COURT:   Good afternoon to everyone.

     ATTORNEYS COLLECTIVELY:  Good afternoon.

     THE COURT:   Let's see, today is Monday, January

12th, 2:00 o'clock PM.  One case, four Defendants on the

calendar.  We will start with the first Defendant who is

just here for an initial appearance and arraignment today.

(RECESS)

     THE COURT:  Now that brings us to the other

three Defendants that are present.  The Court now calls

the case of United States of America versus Andrew David

Carter, Junior, José Alfredo Martinez and Juan Sanchez

Hidalgo being case number 7:14-CR-48.

     These Defendants have had their initial

appearance and been arraigned.  They are back this

afternoon for a scheduled detention hearing.  Ms. Bowen,

is the government ready to proceed?

     MS. BOWEN:   We are, Your Honor.

     THE COURT:   And Ms. Bowen is here on behalf of

the government.  Ms. Williams is here on behalf of Mr.

Carter.  Ms. Williams, are you ready to proceed on behalf

of Mr. Carter?

     MS. WILLIAMS:   I am.

     THE COURT:   And Mr. Walker is here on behalf of

1    Mr. Martinez.  Mr. Walker, are you ready to proceed?

2          MR. WALKER:    Yes, sir, Your Honor.

3          THE COURT:  Mr. Haugabrook is here on behalf of

4    Mr. Hidalgo.  Mr. Haugabrook, are you ready to proceed?

5          MR. HAUGABROOK:    I am, Your Honor.

6          THE COURT:  I'll ask the marshals to allow the

7    Defendants, if there is room, if it's all right with the

8    marshals, to sit with their counsel for the hearing.

9          Of course, the interpreter is here for Mr.

10   Sanchez Hidalgo.  This is Ms. Dorminey for the record.

11   She's already been sworn in.

12          Mr. Haugabrook and Ms. Dorminey if any witness

13   or the lawyer or Judge forgets that we have an interpreter

14   working, please notify us and we'll slow down.

15          All right, it looks like we are ready.  Any

16   preliminary matters before we begin?

17          MS. BOWEN:    Your Honor, the government would

18   ask to invoke the rule as to any witnesses remaining in

19   the courtroom.

20          THE COURT:  All right.  Counsel, any witnesses

21   that you may call this afternoon for the hearing?  This

22   applies to the government and any Defendant, please ask

23   those witnesses to remain outside until they are called.

24          Any preliminary matters from any of the defense

25   counsel?

1          MS. WILLIAMS:   None for myself.

2          MR. WALKER:    Not on behalf of Mr. Martinez,

3    Your Honor.

4          MR. HAUGABROOK:   Just briefly, Judge, if I may

5    address one issue as it relates to the immigration matter

6    in my client's case.  And I'll briefly bring to the

7    Court's attention on Friday, Your Honor, we filed a brief

8    in opposition to the detention motion that was filed by

9    the government.  I made reference in that brief, Your

10   Honor, that immigration had rescinded the detainer that

11   had been issued against my client back on December 29th,

12   2014.  I believe that Mr. Howell received a copy of that

13   rescinded detainer.

14          As I was leaving to come over here today, Your

15   Honor, I learned that that detainer may have been

16   reinstated.  As I was traveling, Your Honor, I did call

17   the Agent whose number is listed in the original detainer,

18   as well as the rescinding detainer.  And I will state in

19   my place, as an officer of the Court, Your Honor, that

20   that officer was unaware that the detainer had been

21   reissued.  And apparently it was reissued, according to

22   him, he believes out of Atlanta.  Right now there is, I

23   presume, a detainer that is in place that's dated with the

24   original date.

25          And what I would ask the Court, at this time, as

1    it relates to the detainer in my conversations with the

2    immigration officer who rescinded the detainer.  Your

3    Honor, as I mentioned last week there is no basis for any

4    immigration proceedings, ie no deportation proceedings at

5    this time.

6              That officer has confirmed that as about an hour

7    ago.  The position that he is taking is what immigration

8    would likely do in this case -- and I think it's important

9    for the Court to know this.  That if the Court would grant

10   bond for my client immigration would or may take him into

11   custody, that is Mr. Hidalgo, but that they would

12   immediately release him because he has not been convicted

13   of any felony.

14             I think, Your Honor, for the Court's purposes,

15   because there appears to be something that has been at

16   work to have this retainer reinstated by someone other

17   than the officer who would be in charge of taking my

18   client into custody, from immigration standpoint.

19             It may behoove the Court, and I would certainly

20   respectfully ask the Court to allow Mr. Howell an

21   opportunity to go back and contact the officer, who

22   rescinded that detainer, to confirm and to be able to

23   report to this Court that if bond is granted that they

24   would either one, take Mr. Hidalgo into custody and

25   immediately release him.  And if they would give him a

1   bond it would be an OR bond.  There is a great likelihood,

2   according to Mr. Skipwood, that they would not even pick

3   him up.

4        And I bring that to the Court's attention

5   because I do think it would bear on the Court's decision

6   whether or not to grant my client a bond.

7        And I also bring it to the Court's attention

8   because I believe it's a little ironic, it's a little odd,

9   Your Honor, that the bond or the detainer would be

10  rescinded Friday and all of a sudden this morning it's now

11  reinstated by an office different than the original

12  issuing office and officer.  And so for that reason, Your

13  Honor, I would respectfully ask the Court -- -if the Court

14  would be so kind as to allow Mr. Howell, because I do

15  believe Mr. Howell talked with the officer on Friday to

16  confirm and actually received an actual copy of the

17  detainer that was rescinded.  And just so that the Court

18  would have that information, if the Court would consider

19  it in this case.

20        THE COURT:  Thank you, Mr. Haugabrook.

21        MS. BOWEN:  May I be heard as to that issue,

22  Your Honor?

23        THE COURT:  Sure.

24        MS. BOWEN:  In reply to that, it is correct

25  that the detainer was made inactive on Friday.  I received

1  the response Mr. Haugabrook makes reference to.  I called

2  the Agent who issued the original detainer, whose name is

3  on it and that is Agent Payne, because I wanted to inquire

4  as to the merit and the basis of the detainer on Mr.

5  Hidalgo.

6         Following that conversation the detainer that

7  was originally issued, by Agent Payne, was modified by

8  Agent Payne to reflect that Mr. Hidalgo had been charged

9  with a felony offense.  That is a basis to detain Mr.

10 Hidalgo.

11        Now, the government does not rely solely on ICE

12 detainer to keep Mr. Hidalgo in custody.  The government

13 will present evidence in conjunction with this detainer as

14 to his risk of flight and his danger to the community.

15        I believe it is relevant to the Court's analysis

16 that Mr. Hidalgo is not a citizen of the United States.

17 While he may have obtained permanent residency, he first

18 illegally entered this country and upon conviction, should

19 we reach that stage of this crime, which is an aggravated

20 felony under Title Eight, USC 1101(a)(U)(43), he will be

21 subject to deportation.  So I put that in the context of

22 this detainer is active and he will be taken into ICE

23 custody.

24        Now, what the officials -- and I believe he

25 would go to Stewart to determine what to do with him, that

1    is within their discretion.

2           However, as I have represented to this Court,

3    both in my reply to the defenses brief and in the detainer

4    which was attached, this is an active detainer and will be

5    used in conjunction with the other evidence presented.

6           THE COURT:  Is there any dispute -- let me tell

7    you the Court's understanding.  I understand there was a

8    detainer, it was rescinded, now the detainer is back in

9    play.  Am I right so far?  Everybody agrees.

10          MR. HAUGABROOK:   Yes, Your Honor.

11          THE COURT:  Mr. Howell, do you have any contrary

12   information?

13          MR. HOWELL:  No, sir.  The only other point for

14   me that hasn't been put on the table already is, at the

15   instruction of the government, I came and met with her and

16   reviewed the updated one and she put that individual on

17   the phone.  She made a phone call to the person that

18   initiated the second one and he verified that yes, there

19   was, in fact, a second one.  And there was some discussion

20   if there was a need to potentially update the document

21   that reflected a more current date than that December 29

22   date they could do that.  But there was, in fact, a new

23   detainer in place.

24          THE COURT:  All right. The Court understands

25   where we are.  Let me just, for counsel's benefit -- so

1    that you can direct the focus of the hearing, it may

2    assist you a little bit.  The Court doesn't put a lot of

3    stock in the fact that the Department of Homeland

4    Security, if this Court ordered release, may pick up the

5    Defendant.  I think they've got 48 hours that he can be

6    held before he's released because of the detainer.  To me

7    that doesn't really impact flight risk, the fact that

8    there may be a detainer now.  What does impact flight

9    risks to the Court is the fact that if the Defendant is

10   convicted then my understanding is he could be deported.

11          That's the only relevance of all this to me and

12   it's an argument that, you know, counsel can make.

13   Obviously, he hasn't been convicted.  There's only

14   probable cause for the offense.  If he is convicted my

15   understanding is that could lead to deportation.

16          As of now, the way we currently accept, this

17   detainer is neither here nor there as to flight risks, as

18   far as I'm concerned it's an administrative matter.

19          All right.  So I think we are all on the same

20   page, hopefully now, or at least we know what the Court is

21   going to consider.

22          All right, then, which just for the record again

23   we will do the detention hearing for all three Defendants

24   at the same time.  I will, as I typically do, go down the

25   order that they are listed in the indictment when I ask

1    for them to put up their case or cross examination.

2           All right, even though the government has said

3    that it has the rebuttable presumption as to all three the

4    government still has the ultimate burden in the case.  So

5    that being said, Ms. Bowen you may call your first

6    witness.

7           MS. BOWEN:   The government would call Agent

8    Stripling Luke.

9                        **STRIPLING LUKE**

10    Witness, having first been duly sworn, testified on

11                       DIRECT EXAMINATION

12   BY MS. BOWEN:

13   **Q.**    Good afternoon, sir?

14   **A.**    Good afternoon.

15   **Q.**    Will you, please, state your name for the record?

16   **A.**    Stripling Luke. My first name is Stripling,

17   S-T-R-I-P-L-I-N-G (spelling).  Last name is Luke, L-U-K-E.

18   (Spelling).

19   **Q.**    And where do you work, sir?

20   **A.**    Employed with the Georgia Bureau of Investigation.

21   **Q.**    And how long have you been so employed?

22   **A.**    I've been employed with the Georgia Bureau of

23   Investigation for approximately seven years, up in the

24   Sylvester office for the last six years.

25   **Q.**    And what kind of cases do you work on for the GBI?

1    A.    My primary focus is drug enforcement.

2          THE COURT:  Hold on one second Agent Luke.  Mr.

3    Lawrence, can we help him out with that microphone and get

4    it closer to him.

5          THE WITNESS:  I can scoot towards it Judge, but

6    the chair does not move.

7          THE COURT:  No, you are looking at counsel and

8    this is kind of -- I don't know, this is the first time

9    we've had this come up.

10   BY MS. BOWEN:

11   Q.    In the course of your duties, did you participate in

12   an investigation involving Andrew Carter, José Martinez

13   and Juan Sanchez Hidalgo?

14   A.    Yes, ma'am.

15   Q.    And do you see those three individuals in the

16   courtroom here today?

17   A.    Yes, ma'am.

18   Q.    And will you, please, individually identify them by

19   an article of clothing they are wearing?

20   A.    Well, they're all wearing a red jump suit.

21   Q.    Perhaps you can identify them by their seating

22   position?

23   A.    Mr. Sanchez is the first beside Mr. Haugabrook.  Mr.

24   Martinez is by Mr. Walker and Mr. Carter is beside Ms.

25   Williams.

1   Q.    Thank you.  Agent Luke, did you work this case by

2   yourself or did you have other agencies that worked with

3   you?

4   A.    There were other agencies involved to include the

5   Drug Enforcement Administration, (inaudible) Narcotics

6   Task Force and several sheriff's offices in the south

7   Georgia area.

8   Q.    And as part of this investigation of the individuals

9   you just identified, did you obtain court orders to

10  intercept telephone calls?

11  A.    Yes, ma'am.

12  Q.    And is that what is commonly known as a wiretap?

13  A.    Yes, ma'am.

14  Q.    Before this investigation, have you previously

15  worked cases involving wiretaps?

16  A.    Yes, ma'am.

17  Q.    And is it common, based on that experience, in

18  wiretap investigations for drug traffickers to use coded

19  language?

20  A.    Yes, ma'am.

21  Q.    Or code words?

22  A.    Yes, ma'am.

23  Q.    Before we talk about any intercepted communications,

24  were confidential sources used in this investigation?

25  A.    Yes, ma'am.  In January of 2014 I received

1    information that Andrew Carter was distributing multiple

2    kilograms of cocaine and identified his residence as 6147

3    Futch Road, Hahira, Cook County, Georgia, which is on the

4    Cook/Lowndes County line.

5         These sources of information also identified José

6    Martinez as his supplier of cocaine.

7    **Q.**    And were examinations of the refuse at the address

8    you've just listed, 6147 Futch Road, belonging to Andrew

9    Carter conducted?

10   **A.**    Yes, ma'am.

11   **Q.**    What items were located pursuant to these

12   examinations?

13   **A.**    Yes, ma'am.  In March and April 2014, we recovered

14   several items that would indicate to me distribution of

15   narcotics to include drug ledgers.  The drug ledgers had

16   totals to $39,000.  It also listed several aliases or

17   nicknames in the drug ledgers and probably what they owed.

18   We also located cocaine, packaging material and minute

19   cards or cell phone minute cards in the trash.

20        THE COURT:  Agent Luke, Ms. Dorminey, just at

21   any time, because you are kind of in my view but no one

22   else's view, you just raise your hand if the witness is

23   going to fast.

24        MS. DORMINEY:  Yes, sir.

25        THE COURT:  And I will see you.

1    BY MS. BOWEN:

2    Q.    And was surveillance conducted throughout this

3    investigation?

4    A.    It was.

5    Q.    And relevant to Andrew Carter, what did surveillance

6    observe on March 27th, 2014?

7    A.    Yes, ma'am.  On March 27, 2014 we observed Andrew

8    Carter in his front yard, and this is the 6147 Futch Road

9    address, and he was working under the hood of a white in

10   color Jeep Cherokee.

11        It appeared that he was doing mechanical work on the

12   vehicle, just based on my surveillance.  He got in the

13   vehicle and he appeared to be driving the vehicle around

14   the area of his residence to see if the vehicle was

15   functioning properly, it seemed to me.  He was gone for

16   approximately five minutes and returned.  There was two

17   Cook County Sheriff's deputies who were following him.  At

18   least one of them had his emergency lights activated.

19   Q.    Agent Luke, I think when you are turning to face me

20   your voice is going in and out over the mike.  So while it

21   is a little awkward posture if you'll make sure you stay

22   as close to the mike as possible.

23   (Aside)

24   BY MS. BOWEN:

25   Q.    Due to the in and out of your voice, will you please

1    repeat the date that you observed this activity taking

2    place at Mr. Carter's front yard at 6147 Futch Road?

3    A.    Yes, ma'am.  As I was saying it was March 27, 2014.

4    Andrew Carter was working on a white in color Jeep

5    Cherokee in his front yard.  It appeared to be that he was

6    doing mechanical work.  He closed the hood and drove and

7    left his residence.  It appeared to me that he was test

8    driving the car to see if the mechanical problems the car

9    was having if he had fixed them.  He returned a short time

10   later followed by two Cook County Sheriff's deputies.  At

11   least one of the deputies car lights are activated.  The

12   white Jeep Cherokee arrives at the house and pulls behind

13   the house and the driver flees on foot.

14        Based on my communication with the Cook County

15   Sheriff's office I learned that an individual who lives in

16   the area of 6147 Futch Road had reported a suspected

17   burglary at her residence.  And I observed a suspicious

18   vehicle in the area to just being this white Jeep

19   Cherokee.

20        When I learned of -- that's the reason the Cook

21   County Sheriff's office was at Andrew Carter's house.  I

22   felt confident that he didn't have any responsibility in

23   the burglary of this individual's house and I requested

24   that the Cook County Sheriff's office stop their search

25   for him.  But he did flee in the woods on foot because he

1    thought law enforcement was chasing him.

2    Q.    And did the color of this Jeep later change?

3    A.    It did.  It was painted later to blue.

4    Q.    You earlier testified that José Martinez was

5    identified as a supplier of cocaine to Andrew Carter.  Did

6    your investigation confirm that information?

7    A.    Yes, ma'am.

8    Q.    Will you, please, briefly tell us about that?

9    A.    Yes, ma'am.  We would observe José Martinez or José

10   Martinez's vehicle both being a white in color Dodge

11   Durango and a gold in color Chevrolet Tahoe at the time,

12   drive or travel to 6147 Futch Road.  Sometimes we would

13   not see the driver of the vehicle but other times we would

14   see José Martinez meeting with Andrew Carter exchanging

15   items.

16   Q.    And you mentioned that one of these days was April

17   10, 2014?

18   A.    That was one of the days, yes, ma'am.

19   Q.    And did surveillance capture still images of the

20   meeting between José Martinez and Andrew Carter on that

21   date?

22   A.    We did.

23          MS. BOWEN:   Your Honor, may I approach the

24   witness?

25          THE COURT:   Tell me again what that date was.

```
1              MS. BOWEN:    April 10, 2014.

2              THE COURT:    Yes, ma'am, you may.

3              MS. BOWEN:    And before I do so I'm going to

4    show to defense counsel what I've marked for

5    identification as Government's Exhibit 6, 2 through 10.

6    BY MS. BOWEN:

7    Q.    Agent Luke, do you recognize what's identified as

8    Government's Exhibit 10?

9    A.    I do.

10   Q.    And what is it?

11   A.    It's a photograph of Andrew Carter exiting his

12   residence.  I don't know if you can tell it in this

13   photograph but in his left hand he is carrying a bag or

14   package of some type.  In his right hand he was carrying

15   an AR-15 type assault weapon.

16   Q.    And before you go any further than that, is it a

17   fair and accurate depiction of the events captured?

18   A.    It is.

19             MS. BOWEN:    Your Honor, I'd like to tender them

20   as Exhibit 10.

21             THE COURT:    Any objection?  Ms. Williams?

22             MS. WILLIAMS:    No objections to the photos.

23             THE COURT:    Mr. Walker?

24             MR. WALKER:    No objection, Your Honor.

25             THE COURT:    All right.  Government's 10 is
```

1   admitted.

2   BY MS. BOWEN:

3   Q.     Agent Luke, I believe you were testifying as to what

4   is depicted by Government's Exhibit 10.  Will you, please,

5   continue that explanation?

6   A.     Yes, ma'am.  You can vaguely see it, I believe,

7   in the far corner photograph.  And I don't know if it's

8   representation of it or not, but Andrew Carter is

9   walking to the gold in color Tahoe that we observed at

10  José Martinez's residence of 128 Meadows Drive.

11  Q.     And what is he carrying in his hands?

12  A.     He is carrying like a bag of some type in his left

13  hand and then an AR-15 type assault weapon in his right

14  hand and he gets inside this vehicle and the vehicle

15  leaves.

16  Q.     And the still photographs were, where they captured

17  the event that you described taking place on May 11th,

18  2014, that meeting between Andrew Carter and José

19  Martinez?

20  A.     Yes, ma'am.

21          MS. BOWEN:   Your Honor, may I approach the

22  witness again?

23          THE COURT:   You may.

24          MS. BOWEN:   And I will provide copies.

25

BY MS. BOWEN:

Q.    Agent Luke, do you recognize what's marked as Government's Exhibit 11?

A.    Yes, ma'am.  Government's Exhibit 11 is a photograph of José Martinez receiving a shoebox size package from Andrew Carter at 6147 Futch Road.

Q.    And is it a fair and accurate depiction?

A.    Yes, ma'am.

        MS. BOWEN:    Your Honor, I tender Government's Exhibit 11.

        THE COURT:    Any objection?

        MR. WALKER:   No objection for Mr. Martinez.

        MS. WILLIAMS:   No objection for Mr. Carter.

        MR. HAUGABROOK:   No objection from Mr. Hidalgo.

        THE COURT:   Thank you Mr. Haugabrook.  If I leave out any of the Defendants feel free to step up if you do have an objection, but normally I'll just ask the ones that are immediately relevant.  All right. Government's Exhibit 11 is admitted.

BY MS. BOWEN:

Q.    In the same fashion that surveillance captured the meeting between Andrew Carter and José Martinez on April 10th, 2014 and May 11th, 2014, similarly was there footage captured of the meeting between them on August 11th, 2014?

A.    Yes, ma'am.  This is a representative sample of

1    meetings.  August 11th is another meeting but there are

2    several meetings that occur in between this period of

3    time.

4              MS. BOWEN:    May I approach the witness, Your

5    Honor?

6              THE COURT:    You may.

7              MS. BOWEN:    And, Your Honor, I also have

8    copies for the Court if you would like them at this time?

9              THE COURT:    10 and 11?

10             MS. BOWEN:    Yes.  And what I have marked now

11   as Government's 12.

12             THE COURT:    That one hasn't been admitted yet,

13   has it?

14             MS. BOWEN:    No, sir.  I was going to leave

15   them on the bench so that you could have them.  That will

16   be the last photographs for the next little bit.

17             THE COURT:    All right.  You can go ahead and

18   hand up 10 and 11 and put the others on the side.

19   BY MS. BOWEN:

20   Q.    Agent Luke, do you recognize what's marked as

21   Government's Exhibit 12?

22   A.    Yes, ma'am.

23   Q.    And what is it?

24   A.    Again it's a surveillance photograph or surveillance

25   depicting Andrew Carter, who is driving the green in color

1    Chevrolet Tahoe or GMC Tahoe at 1569 Georgia Avenue, which

2    is going to be the residence of his mother, Sarah Carter,

3    meeting with an individual driving a white in color Ford

4    F-250 four door displaying a temporary tag.  This occurred

5    on August 11th.  Now, at this time on August 11th José

6    Martinez --

7    Q.    And before you go any further is it a fair and

8    accurate depiction of that event?

9    A.    Yes, ma'am.

10            MS. BOWEN:    Your Honor, I tender Government's

11   12.

12            THE COURT:   Any objection?

13            MS. WILLIAMS:   No, Your Honor, not from Mr.

14   Carter.

15            MR. WALKER:    No objection for Mr. Martinez,

16   Your Honor.

17            MR. HAUGABROOK:   No objection.

18            THE COURT:    12 is admitted.

19            MS. BOWEN:    Thank you, Your Honor.

20   BY MS. BOWEN:

21   Q.    Agent Luke, if you would continue your explanation

22   as to the Ford F-250 and Mr. Martinez?

23   A.    Yes, ma'am.  It's displaying a temporary drive out

24   tag.  Now that vehicle was observed before this day on

25   surveillance.  Not on August 11th but around this time at

1    128 Meadows Drive, which is the residence of José

2    Martinez.  Subsequently a vehicle similar to this one has

3    a permanent tag on it that was observed driven by José

4    Martinez on a daily basis.

5    **Q.**    Shortly thereafter did you obtain a court order to

6    intercept telephone calls?

7    **A.**    We did.

8    **Q.**    And did you obtain this wiretap order on telephones

9    used by Andrew Carter?

10   **A.**    Yes, ma'am.

11   **Q.**    And through the interception of these communications

12   were you further able to confirm and identify the sources

13   of cocaine for the Carter/Martinez drug trafficking

14   organization?

15   **A.**    Yes, ma'am.

16   **Q.**    And who were they?

17   **A.**    Yes, ma'am.  Andrew Carter's immediate source of

18   supply for cocaine was José Martinez whose lives in the

19   Omega, Georgia area.  In Atlanta, Georgia where the

20   cocaine was coming from were, I believe to be two Hispanic

21   males one known by the alias of "Fatboy" or "Fatman" and

22   the other known by the alias of Skinny.

23            THE COURT:   What was the last alias?

24            WITNESS LUKE:   Skinny.  Two different people,

25   Judge.

1    BY MS. BOWEN:

2    **A.**    THE WITNESS:  They were receiving kilogram size

3    quantities of cocaine anywhere from 5 to 15 kilograms and

4    distributing them in the south Georgia area.  The cocaine

5    would be sold as powdered cocaine and also manufactured

6    into crack cocaine for sale.

7    **Q.**    And you mentioned a source of cocaine for these

8    individuals as "Fatboy" through the course of the

9    investigation.  And later on were you able to identify who

10   "Fatboy" is?

11   **A.**    Yes, ma'am.

12   **Q.**    And I will ask you about that in just a minute.

13        MS. BOWEN:    Your Honor, may I approach the

14   witness again?

15        THE COURT:    You may.

16        MS. BOWEN:    Your Honor, if I could ask the

17   Court's indulgence I'm going to hand out the copies of the

18   aids, the transcripts that I'm going to ask the Agent

19   about.  But I'm going to pass them out to the defense and

20   it may just take a minute because there are a number of

21   them.

22        THE COURT:    Sure, absolutely.

23   BY MS. BOWEN:

24   **Q.**    Agent Luke, do you recognize items that I have just

25   handed you?  The disk being Government's Exhibit Number 1

1    and the transcriptions as Government's Exhibit 2 through

2    9?

3    A.    Yes, ma'am.

4    Q.    I'm asking you first about Government's Exhibit 1.

5    Are you familiar with the contents of that disk?

6    A.    Yes, ma'am.

7    Q.    And are the calls exact recordings of the

8    conversations between the participants?

9    A.    Yes, ma'am.  The calls are located on this disk.

10          MS. BOWEN:   Your Honor, I request permission to

11   tender and publish, throughout the testimony of Agent

12   Luke, Government's Exhibit 1.

13          THE COURT:   Any objection?

14          MS. WILLIAMS:   I would object to the

15   transcripts.

16          THE COURT:   She hadn't moved on those yet, have

17   you?  Just 1, the disk?

18          MS. BOWEN:   Yes, sir.

19          THE COURT:   Any objection to the admission of

20   the disk which is Government's 1?

21          MS. WILLIAMS:   Will she be playing the disk in

22   its entirety?

23          MS. BOWEN:    All the calls that are on that

24   disk, yes.

25          MS. WILLIAMS:   You will play that entire disk?

 1              MS. BOWEN:    That is my intention, yes.

 2              MS. WILLIAMS:    Okay.

 3              MR. WALKER:    And may I inquire, Your Honor, is

 4    that portions of telephone calls that are just selected

 5    and placed on that disk?

 6              MS. BOWEN:    They are complete calls.  However,

 7    I cannot play all of the calls taken from the wires at

 8    this hearing.  So what I have done is I have selected

 9    relevant telephone calls to the testimony of Agent Luke.

10    So the call will be played in its entirety.

11              MR. WALKER:    I guess my concern there would be

12    the call in its entirety as it relates to who may have

13    received this telephone call or what came after that

14    telephone call, Your Honor, as not being the total

15    transcript or recordings.  Your Honor, that cause me

16    concerns that I would object to them in relation to that.

17              THE COURT:    I understand your objection but you

18    will be able to explore that on cross examination with the

19    Agent.

20              MR. HAUGABROOK:    Your Honor, I think in

21    addition to that argument as well, in my conversations

22    with Agent Luke right before we started proceedings, my

23    understanding is that he only listened to that portion of

24    calls that's pertinent to his testimony.  So, unless he's

25    listened to it -- You're shaking your head.  So if that's

1    not the case I would certainly be concerned as to the same

2    objection, whether or not there's information before the

3    calls, after the calls, that may shed a different light on

4    what we have been presented today.

5            THE COURT:   I think I see your point with Mr.

6    Walker.  In other words, if we're talking about baking

7    powder in a vacuum then maybe the call before that it

8    was about going to the grocery store would make it

9    innocuous.

10           MR. HAUGABROOK:  Absolutely.

11           THE COURT:   Benign.  So I understand that

12   argument.  I don't know that that's going to make these

13   calls inadmissible. I would say that they would come in

14   but obviously if there's nothing linking them to direct

15   drug activity then I certainly will consider your points

16   that it could have been benign conversations.  But I think

17   I will let you explore that on cross.  Government's 1 is

18   admitted.

19           MS. BOWEN:    Thank you, Your Honor.

20   BY MS. BOWEN:

21   Q.    Speaking now of Government's Exhibits 2 through 9.

22   Agent Luke, did you prepare or cause to have be prepared

23   transcriptions of the calls that are contained on

24   Government's Exhibit 1?

25   A.    Yes, myself or members of the team that were

1    listening to the calls prepared these transcripts and I've

2    reviewed them.

3    **Q.**    And you reviewed them.  And those are -- when you

4    make that transcription you listen to the call and then it

5    is taken down based on what's heard on that telephone

6    call?

7    **A.**    Yes.

8            MS. BOWEN:    Your Honor, I would tender

9    Government's Exhibits 2 through 9.  I note they are an aid

10   to the call itself which is the evidence; however they aid

11   the listener in hearing that evidence.

12           THE COURT:    Agent Luke, does 2 through 9

13   purport to be the transcription in its entirety of disk 1?

14           WITNESS LUKE:  Yes, sir.

15           THE COURT:    Any objection?

16           MR. WALKER:    No objection from Mr. Martinez.

17           THE COURT:    Of course, as counsel knows the

18   evidence will be the actual call and to the extent the

19   transcription doesn't match with the call, by all means

20   counsel, point that out to the Court and an adjustment

21   will be made.  I'll take the transcription as an aid but

22   obviously it will make my review easier if it does match

23   up with the disk.  All right.  Government's 2 through 9

24   are admitted.

25           MS. BOWEN:    Your Honor, may I retrieve the

1    disk?

2            THE COURT:    Yes.

3            MS. BOWEN:    Your Honor, if I may request,

4    Government's Exhibits 2 through 9 they have been tendered.

5    Would Your Honor like a copy of those transcriptions?

6            THE COURT:    Please, ma'am.

7    BY MS. BOWEN:

8    Q.    Agent Luke, I'll direct your attention to August

9    31st, 2014.  Was a telephone call intercepted between

10   Andrew Carter and José Martinez at approximately 5:50

11   p.m.?

12   A.    Yes, ma'am.  It's session number 505.  And that

13   session number is a reference to each incoming or outgoing

14   conversation, has a unique identifier or number and this

15   is session number 505.  It's an incoming call from what we

16   believe is José Martinez to Andrew Carter.

17   Q.    And before we listen to session 505, I think it's

18   already been alluded to.  Would you please place the

19   communications of this call in context with the activity

20   that you had gathered through your investigation on this

21   particular date?

22   A.    Yes, ma'am.  José Martinez had flown to somewhere in

23   Texas to ascertain a new source of supply of cocaine.

24            MS. BOWEN:    And, Your Honor, if you will bear

25   with me one second I'm going to attempt to use the speaker

1    to make it so that everyone can hear.

2           THE COURT:   All right.  Before you do that, I

3    just noticed something in looking through these

4    transcriptions.  Some of them have a synopsis -- one of

5    them has a synopsis that is blacked out.  The synopsis, I

6    take it, is a conclusion either made by this witness, the

7    transcriber or government counsel about the interpretation

8    of the phone calls; am I right?

9           MS. BOWEN:   Yes, Your Honor.  The synopsis is

10   inputted by the reviewer.

11          THE COURT:   It's not the government's position,

12   is it, that the Court should consider the synopsis as part

13   of these exhibits, is it?

14          MS. BOWEN:   No, Your Honor.  And I did not

15   take the opportunity to present the ones with the synopsis

16   entirely removed.  Your Government's Exhibit 7 does have

17   the synopsis removed.  I was one copy short on that.  If

18   you would like one with the synopsis I believe Agent Luke

19   can let you borrow his copy.  However, if you would like

20   me to tender the transcriptions with no synopsis I have

21   also prepared them.  So, I went either way because I was

22   worried if I didn't do it they would object and if I did

23   do it there would be objections.  So, I have it both

24   ways.

25          THE COURT:   All right.  Well, let me state

1   this for defense counsel's clarification and I'll do what

2   -- I don't think it's appropriate for the Court to

3   consider the synopsis and I'm not going to consider it.

4   The copies I've been provided that have been admitted have

5   unredacted synopsis.  It sounds like Ms. Bowen is prepared

6   to hand me something else.  So maybe the safest thing is

7   just to make that change, Ms. Bowen.

8           MS. BOWEN:   Okay.

9           THE COURT:   That way I don't have to worry

10  about looking at it, defense counsel doesn't have to worry

11  about me reading it.  So I'm going to give you back 2

12  through 9.

13          MS. BOWEN:   Your Honor, it appears I'm missing

14  number 6 without the synopsis.  If you will just bear with

15  me for a moment.  I thought I had them all out on the

16  table there.

17          THE COURT:   It's all right.

18          MS. BOWEN:   It's eluding me.  I'll note for the

19  record that 5, the synopsis is the transcription so it's

20  just in a different place and that's why that one is

21  unredacted.

22          THE COURT:   The Agent has 6 that's been

23  redacted if you want to --

24          MS. BOWEN:   I gave it to you.  Thank you.

25          THE COURT:   Of course, the Court won't

1    shortchange the Agent's opinion as to what any

2    conversation means but I would rather hear his

3    interpretation from the stand as opposed to looking at the

4    transcript.

5           MS. BOWEN:   Thank you.

6           THE COURT:   All right.  The Court now has 2

7    through 9.  The synopsis has been redacted on all of these

8    exhibits so the Court could just have a transcript of

9    Government's Number 1 which is the disk.  All right.  Ms.

10   Bowen, you may proceed.

11          MS. BOWEN:   Okay, Your Honor.  At this time I'm

12   going to play the session we've been talking about prior

13   to handing out all the transcriptions, which is session

14   505 that took place on August 31, 2014.

15   (Audio playing at this time)

16          THE COURT:   Ms. Bowen, hold on one moment.

17   Have you got an extra copy of these exhibits.

18          MS. BOWEN:   Yes, sir, I believe that I do.

19   Would you like me to get them to --

20          THE COURT:   I was thinking of our interpreter,

21   it might make her job a lot easier.  It doesn't matter if

22   it has the synopsis on it or not.  It would make it easier

23   for her to follow along with the tape.  Thank you, Ms.

24   Bowen.  You may proceed.

25          MS. BOWEN:   Thank you, Your Honor.

1    BY MS. BOWEN:

2    **Q.**    Agent Luke, where was José Martinez located when you

3    made this call to Andrew Carter?

4    **A.**    On --

5    **Q.**    What state?

6    **A.**    Texas.  And he makes indication that he is near his

7    kinfolk.

8    **Q.**    And the reference, based on your training and

9    experience and your knowledge of the investigation,

10   "You've got a half left", what is that referring to?

11   **A.**    Yes, ma'am.  They are talking about a half a

12   kilogram of cocaine.

13   **Q.**    It appears there's some conversation about, "You

14   know they good though."  What is this referring to?

15   **A.**    Yes, ma'am.  During the course of this wire we were

16   receiving cocaine that was of poor quality and Andrew

17   Carter is trying to determine if this cocaine is of good

18   quality.  When you manufacture powder cocaine into crack

19   cocaine if the cocaine is not of the right quality people

20   will have trouble manufacturing it into crack cocaine and

21   thus Andrew Carter will receive complaints.  And in this

22   case, he did receive complaints about the quality of

23   certain types of cocaine.

24   **Q.**    And would Andrew Carter's statement "As long as they

25   don't look like powdery like chalk", would be a reference

1    to a quality of cocaine?

2    A.    Yes, ma'am.

3    Q.    Now, I believe we heard some conversation by José

4    Martinez about having to give information about family,

5    his partner, ID, I guess personal information.  What is

6    the significance of that?

7    A.    Yes, ma'am.  He is having to give -- I call it

8    identification data on Andrew Carter's family and his

9    family in case they are to receive this large shipment of

10   cocaine that they discuss in this conversation.

11        MR. WALKER:   I hate to interject but I would

12   object to that on the conclusion that part of this witness

13   stating what these people on this recording may be

14   referring to and what they may be (inaudible) from the

15   conversation, Your Honor.

16        MS. BOWEN:   Your Honor, the Agent can

17   certainly testify based upon his training and experience.

18   He's testified that he's worked in drug investigations for

19   seven years.  He previously worked in wiretaps.  He's also

20   been the lead case agent in this case.  So certainly the

21   Court can weigh the interpretation of the Agent, however,

22   you have heard the call.

23        And he's also testified that drug traffickers

24   sometimes use coded language or coded words to avoid

25   detection by law enforcement.  So, on that basis I believe

1    that Agent Luke should be allowed to, I think that has

2    already been alluded to, put this call in context.

3              THE COURT:   Well, the Court is aware it is the

4    Agent's interpretation of the substance of the wiretap.

5    I'll overrule the objection.

6              MS. BOWEN:    Thank you, Your Honor.

7    BY MS. BOWEN:

8    Q.    The comment by José Martinez, "Good 31".  The number

9    31 what is it in reference to?

10   A.    Yes, ma'am.  31 is a reference to $31,000.  His

11   price for a kilogram of cocaine or 2.2 pounds.

12         In this case we learned that a kilogram was costing

13   anywhere from 36,000 to 39,000.  And this price of 31,000

14   would be a significant decrease in price.

15   Q.    But, in conjunction with that was there also some

16   requirement of bulk?

17   A.    Yes.

18   Q.    Based upon this conversation?

19   A.    Yes, ma'am.  They are discussing at the bottom of

20   that page, you know, we could do 10 or 15 but they're

21   wanting to send us 50 to 100.  And they are both, José

22   Martinez and Andrew Carter do not want to be responsible

23   for 50 to 100 kilograms of cocaine.  It would be why you

24   would want somebody's identification data.  If, you know,

25   they didn't pay the money, they would know who to come

1    talk to in order to see about getting their money if they

2    are putting this kind of trust with 50 to 100 kilograms of

3    cocaine in anybody's custody.

4    Q.    And towards the end of the call there is some

5    conversation about how many Andrew needs.  Is this in

6    reference to kilograms of cocaine?

7    A.    Yes, ma'am.  He indicates that he wants four

8    kilograms of cocaine.

9    Q.    All right.  Agent Luke, before we move off session

10   505, the call that took place between José Martinez and

11   Andrew Carter on August 31st, 2014.  You've testified that

12   some bona fides or personal information would be required

13   to, I guess, secure a transaction.  Is this particularly

14   relevant in light of an incident that took place in 2004?

15   A.    Yes, ma'am.

16   Q.    And what was that incident and would you, please,

17   describe it for the Court?

18   A.    Yes, ma'am.  In 2004 José Martinez and others were

19   arrested in Lee County, Georgia with approximately 1

20   kilogram of cocaine.  As a result of this arrest, based on

21   the investigation at the time, José Martinez's sister,

22   Aracley Rivera -- I believe I'm pronouncing her first name

23   correctly -- was kidnapped.  She was kidnapped by two

24   other Hispanic males that were flown in, I believe, from

25   Texas and taken to Atlanta, Georgia.

1          Based on the investigative efforts at the time, she

2     was recovered either that evening or the next day.  But it

3     was during her kidnapping, the two guys that were

4     kidnapping her were asking where is José?  Where is

5     Sergio?  Where is the money?  Something along those

6     lines.

7     Q.    And who is Sergio?

8     A.    José Martinez's brother.

9     Q.    Was another call between José Martinez and Andrew

10    Carter intercepted on September 2nd, 2014 at approximately

11    7:48 PM?  I believe this would be Government's Exhibit 3?

12    A.    Yes, ma'am.

13    Q.    And what was the session number for this call?

14    A.    The session number is 939.  It's an incoming call

15    from José Martinez and Andrew Carter on September 2nd,

16    2014.

17    (Audio playing at this time).

18    BY MS. BOWEN:

19    Q.    Agent Luke, again based on your training and

20    experience and your knowledge of this investigation, the

21    reference to "having another 11 in another hour", what is

22    that referring to?

23    A.    They are making a reference to 11 -- reference to

24    manufacturing powdered cocaine into crack cocaine.  They

25    are saying they took 11 grams of good product and

1    manufactured it and it came back to be 19 grams.  So it

2    increased in product.  As you increase your product you

3    increase your profitability.

4    Q.    And was that due to better quality cocaine?

5    A.    Yes.

6    Q.    And was that discussed between them on this call?

7    A.    It was.

8    Q.    Now, the reference that José Martinez makes to his

9    paw-in-law depositing money into his account, during your

10   investigation, were you able to identify the individual to

11   whom José Martinez referred to as his paw-in-law?

12   A.    Yes, ma'am.

13   Q.    And is this the only call on which José Martinez

14   refers to his paw-in-law?

15   A.    No, ma'am.

16   Q.    And when he references his paw-in-law is it within

17   the context of either funding or moving drug proceeds or

18   drugs?

19   A.    Yes, ma'am.

20         MR. HAUGABROOK:  I'm going to object to that,

21   Your Honor.  Your Honor, I think what counsel is asking

22   this agent to testify about is speculative in this case.

23   We're looking at the transcript, we just heard the

24   conversation.  This transcription said that he borrowed

25   some money from paw-in-law to put into an account.  This

1    Agent has been talking about or testifying about cash

2    money.  Cocaine that has been sold for cash.  Nothing

3    about an account.  So I think for him to now speculate

4    about money he got from paw-in-law to put in an account is

5    certainly speculative.  If we're going to buy cocaine

6    we're not putting it on a credit card.  We're not putting

7    it on a debit card.  So I think at this point that's very

8    speculative, Your Honor, as to what putting it into an

9    account means.

10              MS. BOWEN:    Your Honor, may I rephrase the

11   question?

12              THE COURT:    Sure.

13   BY MS. BOWEN:

14   Q.    Agent Luke, I'm not asking you to interpret this

15   particular phrase, "my paw-in-law to deposit into my

16   account".  Throughout your investigation, surveillance,

17   the intercepted communications as a whole, did you

18   intercept or other agents intercept communications or

19   surveil activities of José Martinez and Juan Sanchez

20   Hidalgo or paw-in-law in the context of funding or moving

21   proceeds and drugs?

22   A.    We did.  To include -- I know there is one

23   conversation where money was being taken to an account by

24   José Martinez in Cordele, Georgia.  I have not been able

25   to identify if that's an actual bank account or if the

1    term account refers to somebody's stash of money.  I'm not

2    sure.

3    Q.    Okay.  I'm going to direct your attention to a call

4    that took place -- rather ask you, did another call take

5    place and was intercepted between José Martinez and Andrew

6    Carter on September 4th, 2014 in the afternoon at

7    approximately 2:39 PM?

8    A.    Yes, ma'am.

9    Q.    And what is the session number for this call?

10   A.    The session number is 1355.  It is an incoming call

11   from José Martinez to Andrew Carter.

12   (Audio playing at this time).

13          MS. BOWEN:    Your Honor, I'm going to pause the

14   call.  There may be a problem.

15          THE COURT:   I'm having trouble -- I'm looking

16   at Government's Exhibit 4, right, the transcript?

17          WITNESS LUKE:  If I might Judge?

18          THE COURT:   Yes, sir.

19          WITNESS LUKE:   On the synopsis both parties

20   conversations pick up in a minute and that's when the

21   transcriber started transcribing the call.

22          THE COURT:   We haven't gotten to it yet?

23          WITNESS LUKE:   Yes, sir, I think if you let it

24   play for --

25          THE COURT:   All right.  Go ahead.

1    (Audio playing at this time)

2    BY MS. BOWEN:

3    Q.    Agent Luke, for clarification is there a portion of

4    the start of the call in which Andrew Carter's voice is

5    the only voice audible?

6    A.    Yes, ma'am.  There's a malfunction in the system

7    where it's not picking up the other line and then it picks

8    it up part of the way through the call.

9    Q.    And it picks up when José Martinez is asking Andrew

10   Carter about how much he's got left?

11   A.    Yes, ma'am.

12   Q.    And what was he referring?

13   A.    How many kilograms he has left and he indicates that

14   he has one and a half.

15   Q.    And that was also several numerical references, I

16   believe, 34, 44 and 6,000 and 1,100.  What are these

17   references to?

18   A.    Yes, ma'am.  The 34 is in reference to $34,000.

19   Now, the 1,100 and 1025 they are discussing Andrew Carter

20   is planning on selling an ounce of cocaine for $1,100

21   which is a common value for an ounce of cocaine.  But due

22   to its poor quality he was selling some for 1025 or $1,025

23   and was thus going to take a loss of $6,000 off the

24   cocaine they had.

25   Q.    And based on your surveillance and investigation at

1  this point why were José Martinez and Andrew Carter

2  gathering up money?

3  A.    They were trying to purchase more cocaine.

4  Q.    Moving forward to September 10, 2014, what events

5  occur on this day relevant to these three individuals and

6  the drug trafficking organization?

7  A.    Yes, ma'am.  On September 10th we received

8  intercepted calls that James Waters was traveling from

9  Atlanta, Georgia from picking up a large quantity of

10 cocaine.  We established surveillance on the interstate

11 and believe that James Waters would be traveling down and

12 we knew what his vehicle was.  We also --

13          THE COURT:   Who was?

14          WITNESS LUKE:   James Waters. James Waters is a

15 -- father-in-law would not be the right word.  But he is

16 the father of Latoris Waters who is the girlfriend of

17 Andrew Carter.

18 BY MS. BOWEN:

19 A.    During the intercepted calls we also learned -- and

20 this was between José Martinez and Andrew Carter -- that

21 José Martinez's father-in-law was following James Waters.

22 He was complaining or the father-in-law was complaining

23 about how James Waters was driving thus relaying it back

24 to Andrew Carter, so Andrew Carter to relay it back to

25 James Waters.

1          We established surveillance on the timeline based on

2     what James Waters was telling Andrew Carter on the phone.

3     We did identify James Waters traveling south on the

4     interstate, and we were looking for the vehicles following

5     James Waters.  Well, a vehicle following James Waters was

6     a light blue Honda Odyssey minivan driven by an older

7     Hispanic male.  This is the same minivan that we later

8     encountered multiple times during this investigation.

9     Q.    And I believe you mentioned this just a moment ago,

10    but the intercepted communication surveillance were

11    consistent with this delivery of cocaine from Atlanta down

12    to the Tifton, Georgia area?

13    A.    Well, they traveled to 1211 CS Powell which is

14    Omega, Colquitt County, Georgia, the residence of Maurice

15    Todd Carter.  Based on the surveillance that we had at the

16    time Andrew Carter was present, Maurice Todd Carter was

17    present and José Martinez indicated on the phone call that

18    he would be on his way over.

19         Well, in regards to that timeframe a black Chevrolet

20    Spark or a small car like a Chevrolet Spark arrived and we

21    knew that vehicle to be utilized by José Martinez and it

22    was parked at his residence.  The car arrives and pulls

23    behind the rear trailer of 1211 CS Powell.

24         Now, at 1211 CS Powell there are two trailers at

25    this residence.  The front trailer I would say is the

1    living quarters of Maurice Todd Carter.  It's furnished,

2    there are beds and there are people leaving there.  The

3    rear trailer is near the wood line and it is unfurnished

4    and is in poor shape, to say the least.  But inside that

5    trailer, when we subsequently did our search warrants and

6    our intercepted communications indicated this, along with

7    intelligence we were receiving, we found where they were

8    breaking down kilograms of cocaine at this rear trailer.

9         Now, I say that to -- the black Chevrolet Spark that

10   arrived at 1211 CS Powell pulled to the rear of this

11   trailer.  So we couldn't see who was driving but they went

12   to the rear trailer and stayed there for a period of time.

13   Q.   One of those calls that I think you just testified

14   to, in connection with that pattern of activity, took

15   place on September 11th, 2014 in the afternoon.  If my

16   military time is correct, about 1:30.  What is that

17   session number?

18   A.   Yes, ma'am.  Government's Exhibit 5, session number

19   3033.  It's an incoming call from José Martinez to Andrew

20   Carter and it occurred at 1:29 PM or 1329.

21        THE COURT:   Ms. Bowen, just for clarification

22   and the record, before we leave Government's 4,

23   Government's 4 consists of four pages but the transcript

24   as it relates to Government's 1 discovered the first page

25   and a half of Government's Exhibit 4; is that correct?

```
 1          MS. BOWEN:   Yes, I believe that is correct, if
 2    I understand you correctly, sir.
 3          THE COURT:   Well, the Court will not consider
 4    the rest of about two and a half pages of Government's 4?
 5    Does everybody follow that?  Wait a minute, the Agent has
 6    told me it's the same.  Well, the one difference I see is
 7    there is some parenthetical that looks to me to be more
 8    conclusory.  It's not in the first page and a half.  So to
 9    put everybody's mind at ease the Court will just consider
10    the first page and a half.
11          MS. BOWEN:   And, Your Honor, I appreciate you
12    helping me get that sorted.  While we have a break in the
13    testimony of Agent Luke I believe (inaudible) are in need
14    of a break.
15          THE COURT:   Sure.  Let's see, it's 3:30. I
16    guess we've been going an hour and a half.  Let's try to
17    limit it to five, six or seven minutes but we will recess
18    for six or seven minutes.
19    (RECESS)
20          THE COURT:   Ms. Bowen, I'm just looking at my
21    documents.  I've got 5, 6, 7 and 9.  I don't seem to have
22    8.
23          MS. BOWEN:   Okay.  I'll have to rectify that.
24    I have copious copies, hopefully of the right document.
25          THE COURT:   All right, I think we've got
```

1    everybody back.  Ms. Bowen, you may proceed.

2            MS. BOWEN:   Your Honor, I believe we were just

3    about to play Government's Exhibit 5 which is call session

4    3033, at this time.

5    (Audio playing at this time)

6    BY MS. BOWEN:

7    Q.    Agent Luke, at the beginning of that call both

8    Andrew Carter and José Martinez refer to 5, a quantity of

9    5.  Based on your experience and your knowledge of this

10   case what are they referring to?

11   A.    Yes, ma'am.  Like I previously testified to on

12   September 10th we received a shipment of cocaine that

13   James Waters drove.  They are referring to he had sold 5

14   kilograms of cocaine.  José Martinez was astonished,

15   that's why he said "God dog".  That's a reference to 5

16   kilograms of cocaine being sold.

17   Q.    And resulting in 5 kilograms of profits from the

18   sale?

19   A.    Yes, ma'am.

20   Q.    And is there some discussion about money being, I

21   guess, sent up the road?

22   A.    Yes, ma'am.

23   Q.    And who was going to do this and to whom were they

24   going to be delivering this drug money, if you know?

25   A.    Yes, ma'am.  That call indicates that José Martinez

1    states that he's going to send the money with his

2    paw-in-law and it's going to Fatman or Fatboy.

3    **Q.**    And I believe there is some conversation about the

4    wrapping of I guess -- well, rather I should ask you, what

5    was going to be wrapped in these wrappers?

6    **A.**    Yes, ma'am.  Kilograms of cocaine.  Just outside

7    this case and inside this case you'll have a trademark or

8    some kind of marketing on the kilogram of cocaine so you

9    can know what the quality of that cocaine is.  In this

10   instance that are referring to 1 kilogram that has gold,

11   one has Adidas and one has a scorpion.  The conversation

12   indicating the gold kilogram is the one they want, it's

13   the better quality.  And we heard that several times

14   during the course of the wire intercepts, that the gold

15   kilogram or the kilogram that had the gold marking on it

16   was the good cocaine.

17   **Q.**    Did you also obtain a court order for José

18   Martinez's text messages?

19   **A.**    I did.

20   **Q.**    And were any of those text messages relevant to José

21   Martinez's father-in-law and his activity in this drug

22   trafficking organization?

23   **A.**    Yes, ma'am.  We received a window of text messages

24   associated with José Martinez's phone.  His telephone

25   number is 256-307-3559.  On September 10th, 2014 at 11:22

1    -- now this text message was in Spanish and has been

2    translated, but it was from a number that we associated

3    with Fatboy/Fatman.  And the text message states -- this

4    is from Fatman --

5            MR. HAUGABROOK:   Your Honor, before we move any

6    further with his testimony have we been provided a

7    transcript of what the Agent is referring to?

8            MS. BOWEN:   There isn't going to be any

9    transcription offered of this.  It's going to be the

10   testimony of the Agent as to the contents of the text

11   message relevant to the conduct of this Defendant, that

12   being Juan Sanchez Hidalgo.  And really José Martinez and

13   Andrew Carter.

14           MR. HAUGABROOK:  Well, if I understand the

15   Agent's testimony is it's -- the text messages were in

16   Spanish?

17           WITNESS LUKE:   They were.

18           MR. HAUGABROOK:   And I don't believe this Agent

19   transcribed any text messages from his testimony.

20           THE COURT:   Well, he's testifying, I suppose,

21   based on what he has been told by another agent or an

22   interpreter.

23           WITNESS LUKE:   That's correct, Judge.

24           THE COURT:    I'll allow it.

25           MS. BOWEN:   Thank you, Your Honor.

1   BY MS. BOWEN:

2   A.    Again, this was a text message on September 10th at

3   11:22.  It's stating this is from Fatboy or a telephone

4   number we believe associated with Fatboy, to let him know

5   when his father-in-law leaves.  In reference to let Fatboy

6   know when José Martinez's father-in-law leaves.

7   Q.    And that was during the timeframe that you just

8   previously testified to when we played, I believe, call

9   sessions 1355 and 33 for the Court?

10  A.    Yes, ma'am.  It was -- additionally it would be

11  September 10, 2014 surveillance of James Waters and Juan

12  Hidalgo Sanchez following James Waters back from Atlanta,

13  Georgia.

14  Q.    I'm going to direct your attention forward a little

15  bit in time to September 17th, 2014.  Was another phone

16  call intercepted between José Martinez and Andrew Carter

17  on that date?

18  A.    September 17th?

19  Q.    Yes, sir.

20  A.    Yes, ma'am.

21  Q.    And what's the session number of that call?

22  A.    Government Exhibit 6, session number 4360 occurred

23  on 8:32 AM.  It is an outgoing call from Andrew Carter to

24  José Martinez.

25  (Audio playing at this time)

BY MS. BOWEN:

Q.    Agent Luke on this call session 4360, Government's Exhibit 6, the reference again on numerical to eight-and-a-half to nine-and-a-half.  Based on your experience and knowledge in the case, do you know what José Martinez was referring to?

A.    Well, they are talking about getting that quantity of cocaine back.  They're talking about eight-and-a-half, nine-and-a-half kilograms of cocaine.

Q.    Later in the call there is a statement by José Martinez that says he said he needs for us to send two tomorrow, man.  Is that again a reference to two kilos of cocaine?

A.    No, ma'am.  It's a reference to sending the money for two kilograms of cocaine.

Q.    And who is going to be sent with that money?

A.    José Martinez's paw-in-law, his father-in-law is going to deliver the money.

Q.    And before we get to them, was there subsequently, I believe on the day of September 19th, two calls close in time in the morning hours between José Martinez and Andrew Carter related to getting together the money for two kilos of cocaine to be sent to Atlanta?

A.    Yes, ma'am.  There is one call that is session number 4803 and it occurred at 8:38 AM on 9/9/2014 and was

1    followed up by session number 4811 that occurred on 9/19

2    (inaudible) at 9:00 AM.  In essence this is two

3    communications between Andrew Carter and José Martinez

4    about 22 minutes apart.  The first call and then a second

5    call.

6    Q.    And before we play call 4811, the government is not

7    going to play call 4803.  I'm going to ask Agent Luke a

8    couple of questions that will put that call into context.

9    Agent Luke, math is certainly not my strong suit but does

10   the call session 4803 put into context perhaps the money

11   that was going to be put in, if you will, by paw-in-law to

12   make that two kilo price?

13   A.    Yes, ma'am.  That call is 4803 that occurred at 8:38

14   AM was between Andrew Carter and José Martinez.  And

15   Andrew Carter is saying he gave him 30, in reference to

16   30,000 dollars.  And José Martinez saying, you know, I got

17   17 or 18,000.  He refers to the term 17 or 18 as a

18   numerical value.  I'm just saying, you know in call 4811

19   that we'll hear in just a minute, they are trying to get

20   their money up for two kilograms of cocaine.

21         Subsequently when I interviewed José Martinez and

22   Andrew Carter a kilogram of cocaine was costing José

23   Martinez $36,000.  A kilogram of cocaine was costing

24   Andrew Carter $39,000.  So if you take José Martinez's

25   kilogram price of $36,000 and times it by two you end up

1   with $72,000.  Well, if you take Andrew Carter's $30,000

2   he's giving, José Martinez's 17 or 18 -- we'll say in this

3   case $18,000 that he is giving -- and so you have a

4   difference of 24,000 that was unaccounted for.

5   Q.    And I believe how that difference is made up will be

6   eliminated by playing Government's Exhibit 7 which is

7   called 4811.  Will you, please, tell the Court the time

8   and date of that session call?

9   A.    Yes, ma'am.  It session number 4811.  Again it's

10  September 19th, 2014 at 9 AM.  It's an incoming call from

11  José Martinez to Andrew Carter.

12  Q.    And before I play this call; the call that you just

13  testified to in regards to Andrew Carter having 30 and

14  José Martinez having 17 or 18 was call 4803.  And when did

15  that call occur in relation to call 4811?

16  A.    8:38 AM or 22 minutes prior.

17  (Audio playing at this time)

18  BY MS. BOWEN:

19  Q.    Moving forward in time approximately a week to

20  September 24th and 25th, what activities were taking place

21  based upon your investigation, surveillances and

22  intercepted communications among these three individuals

23  in the drug trafficking organizations?

24  A.    Yes, ma'am.  On September 19th, if I could add

25  something to that call?

1    Q.    Yes.

2    A.    On September 19th, based on this intercepted

3    communication, we had established -- and others -- we

4    established surveillance on Juan Hidalgo Sanchez's

5    residence and his blue in color Honda Odyssey minivan.

6    And we knew that it was going to be traveling to Atlanta

7    based on these calls.  So we observed this vehicle leave

8    it's residence there on Highway 125 in Tifton, Georgia and

9    traveled to Omega to 128 Meadows Drive, the residence of

10   José Martinez.  It stopped for a period of time and then

11   traveled back to his residence before traveling towards

12   the interstate.  When Juan Hidalgo Sanchez, who we

13   identified him as the driver, stopped on the on ramp to

14   get on the interstate he sat on the side of the road for

15   approximately five minutes, for a short period of time.

16   And to me he could have been texting or could have been

17   doing anything, but it was a way to determine if

18   surveillance officers were following him.

19          MR. HAUGABROOK:  Objection, Your Honor.  I'm

20   going to object.  Now, I understand this Agent's past

21   history and experience in training, but to speculate as to

22   why someone pulled to the side of the road and may have

23   been doing, Your Honor, I think is a stretch.

24          THE COURT:   Sustained.

25   BY MS. BOWEN:

1    A.    He traveled, he left Tifton, Georgia traveling north

2    on I-75.  In the Atlanta, Georgia area the surveillance

3    team that was following him lost him.

4    Q.    Thank you.  Now moving forward to September 24th and

5    25th, I believe you were about to tell us about what the

6    investigation revealed of the activities that were taking

7    place between those two dates?

8    A.    Yes, ma'am.  On September 24th and 25th Andrew

9    Carter was trying to provide money to José Martinez.  They

10   were gathering up their funds to make additional purchases

11   of cocaine from Fatboy in Atlanta, Georgia.

12   Q.    And do Government's Exhibits 8 and 9 eliminate this

13   activity?

14   A.    Yes, ma'am.

15   Q.    And will you, please, identify the two session

16   numbers by date and time and session number of both calls?

17   A.    Yes, ma'am.  Government's Exhibit Number 8 is

18   session number 5673. It occurred on September 24, 2014

19   at the 1741, which is 5:41 PM.  Government's Exhibit

20   Number 9 at session number 5728, that occurred on

21   September 25th, 2014 at 11:07 AM.  It is an incoming

22   call from José Martinez to Andrew Carter.  And just

23   for clarity, session number 5673 that occurred on

24   September 24th is an incoming call from José Martinez

25   to Andrew Carter.

1   Q.      Thank you.  Could we play those calls now.

2   (Audio playing at this time)

3   BY MS. BOWEN:

4   Q.      Agent Luke, before listening to session 5728, the

5   discussion about my paw-in-law's paper money and then my

6   paw-in-law and then, "we threw with him".  The phrase

7   "threw with him" can you add any additional relevance

8   pertinent to what was going on at this time in that

9   phrase?  I believe it's spelled in the transcription

10  T-H-R-E-W, is it.  And if the answer is no -- My question

11  was not very articulately phrased, however, I'm just

12  curious about that phraseology?

13  A.      The conversation is saying mine and my paw-in-law

14  talking about José and his paw-in-law, had they got their

15  money together, their paper money and he's fixing to send

16  it on to Fatboy.  There is also conversation where José

17  Martinez saying his driver, which is different than his

18  paw-in-law, won't be able to go to get the cocaine back

19  and was asking Andrew Carter if his father-in-law if he

20  can come and bring the cocaine back.

21  Q.      Thank you for answering my poorly phrased question,

22  I appreciate that.  So, we've already established 5728

23  that call and listen to it which is Government's Exhibit

24  9, your father-in-law's description.

25  (Audio playing at this time).

BY MS. BOWEN:

Q.    Agent Luke, that call we were just listening to, the transcription which is Government's Exhibit 9, session number 5728, that took place on the morning of September 25th, 2014?

A.    Yes, ma'am.  That call was at 11:07 AM.

Q.    And was surveillance established on José Martinez and Juan Sanchez Hidalgo that morning as well?

A.    It was.

Q.    And what did surveillance show in relation to this call and the activity?

A.    Yes, ma'am.  Surveillance indicated José Martinez and Jessica Tellez they were located at Flash Foods gas station in Tifton, Georgia in a white in color Ford F-250, at approximately 11:50.  Or prior to 11:50, Juan Hidalgo Sanchez arrives at the Flash Food gas station in a blue in color Honda Odyssey minivan, the same one we had previously observed during this surveillance.  Jessica Tellez obtains a bag from the white F-250 and puts it in the vehicle of Juan Hidalgo Sanchez, the blue Honda Odyssey.  Both vehicles were observed departing around 11:50 AM from the Flash Foods and traveling towards the interstate to travel north on I-75.

Q.    And did surveillance follow them as well?

A.    Yes.

1          MS. BOWEN:  Your Honor, may I approach the

2    witness?

3          THE COURT:   You may.

4    BY MS. BOWEN:

5    **Q.**    Agent Luke, do you recognize what I just handed you

6    and marked Government's Exhibit Number 13?

7    **A.**    Yes, ma'am.  Government's Exhibit Number 13 is a

8    photograph depicting José Martinez and Jessica Tellez in

9    the white F-250 as the vehicle is right now being driven

10   by José Martinez and it's being followed by the blue in

11   color Honda Odyssey van driven by Juan Hidalgo Sanchez.

12   This is right at the interstate on ramp traveling north on

13   I-75.

14   **Q.**    And is it a fair and accurate depiction of those

15   events that you just recounted?

16   **A.**    Yes, ma'am.

17          MS. BOWEN:   Your Honor, I tender Government's

18   Exhibit 13.

19          THE COURT:   What was the date of the

20   photograph?

21          WITNESS LUKE:  September 25th about 11:52.

22          THE COURT:   Any objection?

23          MS. WILLIAMS:  No objection.

24          MR. HAUGABROOK:  No objection, Your Honor.

25          MR. WALKER:   No objection, Your Honor.

```
 1              THE COURT:   Government's 13 is admitted.
 2    BY MS. BOWEN:
 3    Q.    Agent Luke, in Government's Exhibit 13 we see that
 4    the Ford F-250 you indicated was occupied by José Martinez
 5    and Jessica Tellez and the blue Odyssey minivan occupied
 6    by Juan Sanchez Hidalgo is in the back.  Is the position
 7    or are the drivers of those vehicles changed?
 8    A.    Yes, ma'am.  Before José Martinez's vehicle, I
 9    guess, probably left the city limits of Tifton, Georgia on
10    the interstate it pulled over on the side of the road off
11    an off ramp and the drivers changed.  Jessica Tellez got
12    in the driver's seat and José Martinez got in the
13    passenger's seat.  And then both vehicles traveled north
14    on the interstate with Juan Hidalgo Sanchez's vehicle
15    being the lead vehicle and now José Martinez's vehicle
16    being the follow vehicle or the second vehicle.
17    Q.    And were traffic stops eventually executed on both
18    of those vehicles?
19    A.    Yes, ma'am.
20    Q.    And was Mr. Juan Sanchez Hidalgo the sole occupant
21    of the blue mini Odyssey van?
22    A.    Yes, ma'am.
23    Q.    And what was inside of the van?
24    A.    Yes, ma'am.
25              THE COURT:   For clarity this is the traffic
```

1    stop that took place on September 25?

2             WITNESS LUKE:  Yes, sir.

3    BY MS. BOWEN:

4    **A.**    THE WITNESS:  This is surveillance -- we surveilled

5    them leaving Tifton, Georgia.  The wire intercepts

6    indicated they were traveling to Atlanta, Georgia to make

7    payment for cocaine.  And we surveilled them to Crisp

8    County, Georgia and initiated a traffic stop around exit

9    92 on I-75 northbound.  Inside of Juan Hidalgo Sanchez's

10   vehicle there was approximately $225,973 and two cellular

11   phones.  This US currency was in a duffel bag in the

12   vehicle.

13   **Q.**    Before we talk about the occupants and the contents

14   of the Ford F-250, containing the two other individuals,

15   I'm going to ask you about another exhibit.

16             MS. BOWEN:  If I may approach, Your Honor?

17             THE COURT:  Yes.

18   BY MS. BOWEN:

19   **Q.**    Agent Luke, do you recognize what's marked for

20   identification as Government's Exhibit 14?

21   **A.**    Yes, ma'am.  Government's Exhibit 14 is a photograph

22   of the interior of Juan Hidalgo Sanchez's Honda Odyssey

23   minivan that depicts a duffel bag in the center console

24   area that contained the US currency.

25   **Q.**    And is that photograph a fair and accurate depiction

of the contents of Mr. Hidalgo's minivan at the time of
the traffic stop on September 25th, 2014?

A.    Yes, ma'am.

Q.    And that is a duffel bag that was given to him by
Jessica Martinez earlier that day at the Flash Foods?

A.    Well, it's a duffel bag similar to the bag that we
saw.  It's the only bag we located in the vehicle.  So I
believe it is, yes, ma'am.

Q.    And it contained, to be precise, the $225,973?

A.    Yes, ma'am, I believe so.

Q.    What was seized from the vehicle, the Ford F-250,
that white truck?

A.    Yes, ma'am.  There was approximately $4,855 of US
currency in the vehicle, a small amount of cocaine.  I'll
say an eight ball or less -- An eight ball is 3.5 grams --
and four electronic devices to include cellular phones and
one iPad, I believe.

Q.    And who were the occupants of that vehicle?

A.    The driver was Jessica Tellez and the passenger was
José Martinez.

Q.    And after José Martinez and Juan Sanchez Hidalgo
were taken into custody was Andrew Carter also arrested
later that date?

A.    He was.

Q.    And how did he react upon encountering law

1  enforcement?

2  **A.**    Yes, ma'am.  The deputy at the Tift County Sheriff's

3  office approached Andrew Carter at the Love's gas station

4  there in Tifton, Georgia, which Love's is a truck stop gas

5  station.  As they approached Andrew Carter he fled on foot

6  from his vehicle and he ran through the entrance of the

7  gas station, ran through the exit of the gas station, kind

8  of like he was running straight through, and was

9  apprehended behind the store after fleeing.  Located on

10  his person was approximately 28 grams of powder and crack

11  cocaine, two cellular phones were recovered.  I believe

12  one on his person and one in the path that he ran through

13  the store, and approximately $2,730 in cash was recovered.

14  **Q.**    After he was arrested did Mr. Martinez make any

15  statements to you?

16  **A.**    He did.

17  **Q.**    What do those statements say relevant to the

18  activities taking place on these three individuals and the

19  drug trafficking organization?

20  **A.**    Yes, ma'am.  He indicated he wanted to cooperate

21  with our investigation.  He stated that he believed there

22  was 150 to $180,000 in US currency in Juan Hidalgo

23  Sanchez's vehicle.  The money was payment for cocaine

24  (unintelligible) "Fatboy".  He provided additional

25  identifiers of Fatboy.  He said that a kilogram of cocaine

1    cost him 36,000 to $36,500.  Juan Hidalgo Sanchez was sent

2    last week to carry currency to Atlanta, Georgia.  Juan

3    Hidalgo Sanchez usually drives the money to Atlanta, or

4    wherever they transport cocaine, back to southwest

5    Georgia.  He indicated there was a half a kilogram of

6    cocaine at Maurice Todd Carter's residence which was 1211

7    CS Powell Road and that Andrew Carter currently owed him

8    money, approximately 14 to $15,000.

9    Q.    Did he also mention, that being Mr. José Martinez,

10   did he mention Tyler Johnson?

11   A.    No.  He mentioned an individual named Tyler.  I

12   asked him a question about firearms, does he know where

13   members of the corridor (phonetically) organization

14   maintains their farms.  And he directed my attention to an

15   individual name Tyler which I was previously aware of.

16   Tyler Johnson was a victim of a homicide, a drug-related

17   homicide in February 2014, if I recall correctly.  Tyler

18   Johnson lived catty cornered from 1569 Georgia Avenue

19   Omega, Georgia, which is the residence of Sarah Carter.

20        He indicated that during that time the firearms were

21   being maintained in the attic or the roof of this

22   residence.

23   Q.    Did he also provide you with, I guess, the hierarchy

24   that would determine his supplier of cocaine?

25   A.    Yes, ma'am.  He indicated that there were at least

1    two individuals above Fatboy or Fatman, one individual

2    named Texas and the other individual named Poncho.  We

3    recorded phone calls to Fatman, to delay the delivery of

4    the US currency that was traveling northbound.  And during

5    that recorded conversation we told him we'll bring him the

6    money on September 26th, 2014.

7    **Q.**    And on September 26th, 2014 did members of law

8    enforcement make contact with an individual known as

9    Fatboy who was later identified as Juan Pubalo Cuevas?

10   **A.**    Yes, ma'am.  At the time we believe we knew the

11   location of his residence.  José Martinez provided us

12   with the actual apartment number where he lived at.  So

13   agents in Atlanta made contact and obtained consent to

14   search his residence.  During the search of his residence

15   approximately $10,000 of US currency were recovered.

16   A handgun and a vacuum sealer, scales or a scale, a

17   digital scale, and a large number of small rubber bands

18   similar to the wrappings of US currency in the drug

19   trade.

20   **Q.**    And did Mr. Cuevas also provide law enforcement with

21   a false or an alias --

22   **A.**    He did.

23          MS. BOWEN:  Your Honor, may I approach the

24   witness?

25          THE COURT:   You may.

1   BY MS. BOWEN:

2   Q.   Agent Luke, do you recognize what's marked for

3   identification as Government's Exhibit number 15?

4   A.   Yes, ma'am.

5   Q.   And what is it a photograph of?

6   A.   It's a photograph of items that were removed from

7   Fatman's apartment on September 26th, 2014.

8   Q.   And is it a fair and accurate depiction of the items

9   or at least some of the items that were removed from Mr.

10  Cuevas's apartment?

11  A.   Yes, ma'am.  It depicts a handgun, a scale, and

12  rubber bands and a roll of vacuum sealed plastic.

13        MS. BOWEN:  Your Honor, if I've not done so

14  already, I'd like to tender 13, 14 and 15.

15        THE COURT:   13 has been admitted.  Any

16  objection to 14 or 15?

17        MS. WILLIAMS:  No, Your Honor, not to Mr.

18  Carter.

19        MR. HAUGABROOK:   No, Your Honor.

20        MR. WALKER:   No, Your Honor.

21        THE COURT:   14 and 15 are admitted.

22  BY MS. BOWEN:

23  Q.   Okay.  Following the contact with Mr. Cuevas, were

24  search warrants executed after that, on the day prior

25  during the evening hours of September 25th, 2014 on

1  residences of Andrew Carter and José Martinez?

2  **A.**   Yes, ma'am.  Multiple search warrants in multiple

3  counties were executed on September 25th, 2014.  One of

4  the search warrants was located at 186 Lenox Crosland

5  Road, Omega, Colquitt County, Georgia.

6          THE COURT:   Hold on one second, Agent Luke.

7          WITNESS LUKE:   Yes, sir.

8          THE COURT:   If you can speak up just a little

9  bit. Go ahead.

10          WITNESS LUKE:   I'm sorry.

11          THE WITNESS:   Go ahead.

12  BY MS. BOWEN:

13  **A.**   THE WITNESS:   186 Lenox Crosland Road, Omega

14  Colquitt County, Georgia.  This is the residence or

15  primary residence of Andrew Carter and Latoris Waters.

16  Located at this residence law enforcement recovered a

17  handgun, additional scales, kilogram presses.  Inside of

18  the vehicle in the yard, which was a white in color Dodge

19  dually pick up truck, approximately 2 kilograms of cocaine

20  were recovered, material to manufacture powder cocaine

21  into crack cocaine and approximately $18,000 of US

22  currency.  There was also a stolen four wheeler that was

23  recovered on the property.

24          MR. HAUGABROOK:  A stolen what?

25          WITNESS LUKE:   Four wheeler.

1    BY MS. BOWEN:

2    Q.    And was José Martinez's house also searched?

3    A.    It was.

4    Q.    A search warrant, and what items were recovered?

5    A.    Yes, ma'am.  Four vials of steroids and a vacuum

6    sealer.

7    Q.    Similarly to Mr. José Martinez, did Andrew Carter

8    make any statements to you?

9    A.    Yes, ma'am.

10   Q.    And what were those statements in relation to his

11   profit cost of cocaine?

12   A.    Yes, ma'am.  Well, Andrew Carter indicated to me

13   that his primary source of supply was José Martinez but he

14   had -- there were two sources of suppliers that José

15   Martinez had contact with, communication with in Atlanta,

16   Georgia known by the aliases of Skinny and Fatman.  He

17   provided me with directions to both of their locations

18   which fit what we had learned in the investigation.  He

19   indicated he was paying $39,000 for a kilogram of cocaine.

20   And from the sale of 10 kilograms of cocaine approximately

21   $20,000 would be made in profit.  Out of those $20,000,

22   $6,500 of this money would be given to José Martinez and

23   José Martinez's driver would obtain 1 to $3,000.  He

24   indicated that José Martinez's father-in-law, who drives a

25   light in color blue minivan, mostly transports money,

currency, but has transported cocaine and charges 500 to
$600 per kilogram of cocaine when he has transported
cocaine.

Andrew Carter indicated that José Martinez was
heading to Atlanta to give US currency to Fatman.  He
believed it to be about $155,000 of US currency.  He said
the week prior he had sent $130,000 dollars of US currency
to Fatman through José Martinez.

Q.    Following his arrest and housing at the Tift County
jail did Mr. Carter make use of the jail telephone?

A.    He did.

Q.    And were these telephone calls recorded?

A.    They were.

Q.    And what did you learn from these calls pertinent to
the investigation?

A.    Yes, ma'am.  He was directing Latoris Waters, his
girlfriend, to obtain US currency from customers of the
organization who were not arrested.  There were
individuals who owed him money from the sale of cocaine
and he was directing her to their location to retrieve
that money.

Q.    Did you also subpoena bank records related to
accounts held by Mr. Juan Sanchez Hidalgo?

A.    Yes, ma'am.  When we arrested Juan Hidalgo Sanchez
on his person or in his wallet there were several deposit

1    slips or ATM cards or debit cards.  I subpoenaed those

2    records and learned that at least two of the accounts were

3    located in El Paso, Texas.

4              MS. BOWEN:  That's all the direct examination I

5    have for Agent Luke, Your Honor.

6              THE COURT:  All right.  Then we'll begin cross

7    examination.  Ms. Williams, we'll start with you on behalf

8    of Mr. Carter.

9                         CROSS EXAMINATION

10   BY MS. WILLIAMS:

11   Q.    Agent Luke, you indicated that you work with GBI?

12   A.    Yes, ma'am.

13   Q.    But that there were other individuals and other

14   agencies involved with this investigation?

15   A.    Yes, ma'am.

16   Q.    I think you stated DEA?

17   A.    Yes, ma'am.

18   Q.    And could you tell me the name of the other

19   organization, if I could get those?

20   A.    Yes, ma'am.  Mid South Narcotics Task Force which is

21   a task force -- which is an individual Sheriff's deputies

22   made up of Turner, Crisp and Tift County.  The Tift County

23   Sheriff's office, the Cook County Sheriff's office, the

24   Colquitt County Sheriff's office, I believe is the

25   agencies that participated in the case.

1    Q.    And you stated that this investigation began about

2    January of 2014; is that correct?

3    A.    Yes, ma'am.

4    Q.    That you had received a tip from a confidential

5    source?

6    A.    Yes, ma'am.

7    Q.    And at that point you set up surveillance; is that

8    right?

9    A.    Yes, ma'am.

10   Q.    I wanted to ask you a couple of questions about

11   Exhibit 10 and 11.  They are still photos.  Now, are there

12   any videos associated with Exhibits 10 or 11?

13   A.    Yes, ma'am.

14         MS. WILLIAMS:  And if I may -- May I approach

15   the witness so I can show him the exhibits?

16         THE COURT:   You may.

17         WITNESS LUKE:   There are, yes, ma'am.

18   BY MS. WILLIAMS:

19   Q.    So are these photographs from the video?

20   A.    Yes, ma'am.

21   Q.    So there should be some surveillance video

22   associated with this investigation?

23   A.    Yes, ma'am.

24   Q.    And with respect to Exhibit Number 11, I think you

25   gave a date of May but I didn't get the --

1    **A.**     I think May the 11th.

2    **Q.**     May 11th?

3    **A.**     Yes, ma'am.

4    **Q.**     And there should be a video that corresponds with

5    this?

6    **A.**     Yes, ma'am.

7    **Q.**     And I believe you stated that this would have been

8    surveillance of -- is this the Futch Road residence?

9    **A.**     Yes, ma'am.

10   **Q.**     And the photo is a little blurry. Is it because it's

11   actually coming off of a video as opposed to being an

12   actual camera photograph?

13   **A.**     I've already answered it's on video, yes, ma'am.

14   **Q.**     Okay.  Now, would this surveillance have been done

15   by someone involved with DEA or the Mid-South Narcotics?

16   **A.**     Which one.

17   **Q.**     From Exhibit 11?

18   **A.**     I believe it was myself or Agent McCook who works in

19   my office.

20   **Q.**     So you would have been somewhere in the vicinity

21   watching and recording this?

22   **A.**     Yes, that's an accurate statement.

23   **Q.**     So during the course of this investigation someone

24   with the various agencies actually set up surveillance and

25   recorded several -- over the course of several days; is

1    that correct?

2    A.    Yes, ma'am.

3    Q.    Could you estimate about how much surveillance video

4    there may be in this case?

5    A.    There is a lot.

6    Q.    When you say a lot, would that be a couple of hours

7    or are we talking about hundreds of hours?

8    A.    Hundreds of hours.

9    Q.    Okay.  So you would have done the video surveillance

10   first, that was the beginning of this investigation; is

11   that correct?

12   A.    No, ma'am.  I mean, there are several steps I can

13   take in an investigation.  I probably wouldn't have done

14   the video surveillance first.

15   Q.    Okay.  Well, what was the beginning of this

16   particular investigation then?

17   A.    Yes, ma'am, like I told you, we received information

18   that Andrew Carter was distributing large amounts of

19   cocaine and that was the beginning of this investigation.

20   Q.    Did you record -- once you received that tip did you

21   meet with individuals or are there any kind of

22   confidential sources that are involved with any hand to

23   hand transactions with this case?

24   A.    Not at my direction.

25   Q.    But there may be with respect to some other officer

1    or agent's direction?

2    **A.**    No, ma'am.

3    **Q.**    Now you stated that there are some CIs in this case,

4    correct?

5    **A.**    Yes, ma'am.

6    **Q.**    But they wouldn't have been involved in hand to hand

7    transactions?

8    **A.**    Not at my direction.

9    **Q.**    So they would have just been giving historical

10   information?

11   **A.**    Yes, ma'am.

12   **Q.**    Now, after several hundred hours of surveillance

13   video you actually requested permission to obtain the

14   wiretap; is that correct?

15   **A.**    That's correct.

16   **Q.**    And the wiretap would have began when?

17   **A.**    End of August, 2014.

18   **Q.**    End of August.  And how long did it run for?

19   **A.**    Right under 30 days. 28 -- It ran for 30 days.  It

20   ran for 30 days or the normal timeframe.

21   **Q.**    And today we had an opportunity to actually listen

22   to some of the calls?

23   **A.**    Yes, ma'am, a small portion of the calls.

24   **Q.**    Now, with respect to the calls, I note that they

25   have session numbers.  Government's Exhibit Number 2, the

1    session number is identified as 505.  What does that

2    mean?

3    **A.**    Yes, ma'am.  Every time a call comes in or a call

4    goes out or a text message comes in or a text message goes

5    out it has a unique identifier.  And that is a unique

6    identifier for that conversation.

7    **Q.**    So that doesn't necessarily mean that that was the

8    five hundredth and fifth phone call or anything?

9    **A.**    No, ma'am.

10   **Q.**    Is there any way to determine the order of the phone

11   calls?

12   **A.**    The order?  Yes, ma'am.  A, they are in session

13   numbers 1 through 30,000, whatever the end number is would

14   be one.  Two, there is a date and time for every call on

15   the sheet or on the call itself.

16   **Q.**    But the session number, whether it's smaller or

17   larger doesn't necessarily correspond with the order of

18   the call?

19   **A.**    Yes, ma'am, it does.  The larger number, the later

20   in date.  Like call 507 occurred after this call.  Call

21   15,000 occurred sometime after this call or whatever the

22   numbers may be.

23   **Q.**    But it doesn't necessarily mean that that was the

24   five hundredth and fifth call?  Or as Government's Exhibit

25   Number 3, 939 doesn't necessarily mean that it was the

1    nine hundred and thirty-ninth?

2    A.    That's correct, yes, ma'am.  When you change -- I'm

3    not an expert with the technology but I think when you

4    change cell phone towers on your phone it gives you

5    another number.  It is bouncing but that is something that

6    is above my pay grade.

7    Q.    Now, did you have an opportunity to listen to all of

8    the calls associated with this wiretap for the 30 days?

9    A.    I've listened to a large majority of them.  I have

10   not listened to all of them.

11   Q.    And how did you determine which calls you listened

12   to?

13   A.    Well, there are certain calls that would be

14   monitored whether it was me or anybody who was on my team

15   would mark as pertinent.  And it's based on their training

16   and experience, if they think the communication is

17   relevant to drug trafficking.  If they think it is

18   communication relevant to buying milk and groceries they

19   would listen to a portion of the call and then minimize

20   the call or stop listening to the call for a period of

21   time.  And then after that period of time they can start

22   back listening to the call to determine if the

23   conversation has changed to say -- the first of the call

24   was talking about cookies and milk and stuff from the

25   grocery store but the end of the call was talking about

1    drugs.  So they would spot check or spot monitor the call

2    and if it's still talking about groceries or anything

3    that's non-criminal the call would be minimized.

4    Q.    Now, with respect to the calls that were not

5    minimized, have you had an opportunity to listen to all of

6    those?

7    A.    Calls that were not minimized or otherwise we would

8    call them pertinent.

9    Q.    Pertinent, correct?

10   A.    All of them?  No ma'am.  A large majority?  Yes,

11   ma'am.  But I have not listened to all of them.

12   Q.    And my question to you is, how did you determine

13   which calls you have listened to?

14   A.    Well, it depended on if I was on surveillance or not

15   and I had other monitors telling me what was going on in

16   the call.  You know, I can come back and listen to them,

17   you know.  The calls are saved and so I can come back and

18   listen to them.  So if the monitors at the time indicated

19   that that call, call 505 they believed it was a relevant

20   call I would have an opportunity to go back and listen to

21   it.

22   Q.    Now were there times that you were actually one of

23   the individuals assigned to monitoring the calls?

24   A.    Yes, ma'am.

25   Q.    And so was that assignment an assignment that

1   rotated with the individuals involved with the

2   investigation?

3   A.      That's correct.

4   Q.      Now, you stated that on September the 25th, I

5   believe, you or an agency actually conducted a search of a

6   resident in Omega?  Or I think there were actually several

7   searches on the 25th; is that correct?

8   A.      Yes, ma'am, there were.  Several in Omega too.

9   Q.      And, in particular, you indicated that there was a

10  search of 186 Lenox Crosland Road, Omega?

11  A.      186 Lenox Crosland Road.

12  Q.      And you stated that you attributed that residence to

13  Mr. Carter; is that right?

14  A.      Yes, ma'am.

15  Q.      And you did that based on your surveillance?

16  A.      Surveillance.  The power records, I believe, were in

17  his name.  The property records, I believe, were in his

18  name or his immediate family's name or a combination of.

19  Q.      And you did, in fact, go to a magistrate judge and

20  have a search warrant signed for that residence; is that

21  correct?

22  A.      I went to a federal magistrate judge, yes, ma'am,

23  and obtained the search warrant.

24  Q.      And conducted a search of that residence. You

25  indicated that you found one handgun; is that right?

1    A.    Yes, ma'am.

2    Q.    Were there photographs taken of the items that were

3    located at the residence?

4    A.    Yes, ma'am.

5    Q.    We just don't have them here today?

6    A.    No, ma'am.  We didn't introduce them here today.

7    Q.    And I believe you said -- so it was just the one

8    handgun in that residence?

9    A.    Yes, ma'am.  One hand gun at that -- now, there was

10   another handgun -- there was an AR-15 rifle located at

11   6147 Futch Road which is Andrew Carter's previous address.

12   That address is a Hahira, Cook County address.  But at

13   that residence only one firearm.

14   Q.    And do you recall the type of firearm of whether it

15   was --

16   A.    It was a handgun, a semi automatic handgun.

17   Q.    Was there anyone at the residence at the time the

18   search warrant was conducted?

19   A.    No, ma'am, I don't believe so.

20   Q.    Did you actually participate in that search?

21   A.    I went to the house after the search warrant had

22   been complete, while it was still in law enforcement

23   custody.  But, no, ma'am, was I a part of the team that

24   did the initial search?  No, ma'am.

25   Q.    And I think you also said that a press was found?

1    A.    Yes, ma'am.

2    Q.    And approximately $18,000?

3    A.    Yes, ma'am.

4    Q.    Now, you stated that 2 kilograms of cocaine was

5    found outside the residence; is that correct?

6    A.    Yes, ma'am.  There were several vehicles outside.

7    One of the vehicles was a Dodge dually truck, white in

8    color.  Inside that vehicle was a back pack that contained

9    the cocaine.

10   Q.    Do you know who that truck is registered to?

11   A.    Yes, ma'am.  It was registered to individuals in

12   Grady County, Georgia who indicated to me they had sold

13   the truck several months prior to a person in Tifton,

14   Georgia.  I think they told me a used car dealer in Tifton

15   -- or Georgia.

16   Q.    So it was not, in fact, registered to Mr. Carter?

17   A.    No, ma'am.

18   Q.    Now, you stated that Mr. Carter was arrested at a

19   gas station in Tifton; is that correct?

20   A.    Yes, ma'am.

21   Q.    Were you present at the time of his arrest?

22   A.    No, ma'am.

23   Q.    And I think you said that -- was it Tift County

24   Sheriff's?

25   A.    Yes, ma'am.

1    **Q.**    So they had an active arrest warrant for him?

2    **A.**    No, ma'am.

3    **Q.**    They did not?

4    **A.**    No, ma'am.

5    **Q.**    So they did not have an arrest warrant for him at

6    the time?

7    **A.**    They did not.

8    **Q.**    They simply were approaching him to speak with him?

9    **A.**    No, they were approaching him to arrest him.

10   **Q.**    Now were they uniformed officers?

11   **A.**    There was a marked patrol car that pulled up behind

12   this vehicle and there was a plain clothes officer that, I

13   believe, had his badge around his neck, approaching him.

14   **Q.**    So Mr. Carter was driving in his vehicle and they

15   performed a traffic stop?

16   **A.**    No, ma'am.  He was stopped at the gas pump is what

17   I'm led to believe.

18   **Q.**    So was he there pumping gas or you don't know?

19   **A.**    I believe he was there pumping gas but I'm not 100

20   percent sure.  But he was there at the gas pumps.

21   **Q.**    Was there anyone else in the vehicle with him?

22   **A.**    I don't believe so.

23   **Q.**    And so were there two different vehicles that

24   actually pulled up?

25   **A.**    Yes, ma'am.  There was a plain clothes officer who

1    approached from the far side of the gas pumps on foot and

2    while he was approaching there was a marked patrol car

3    that approached from the rear of Mr. Carter's vehicle.

4    Q.    And that marked patrol car, did they activate their

5    blue lights?

6    A.    I'm not sure, ma'am.

7    Q.    They approached him and told him that he was under

8    arrest or you're not sure?

9    A.    I'm not sure of what they told him.  I know he fled.

10   But I don't know if they said stop Andrew Carter or you're

11   under arrest.  I'm not sure of their commands.

12   Q.    Okay.  So you don't have any additional detail with

13   respect to his arrest?

14   A.    No, ma'am, that's it.  He fled from both of those

15   officers.  What they said to him, I'm not aware.

16          MS. WILLIAMS:   I have no further questions of

17   this witness.

18          THE COURT:   All right.  Mr. Walker on behalf of

19   Mr. Martinez.

20          MR. WALKER:   Yes, sir, Your Honor.  I have just

21   a few.

22                       CROSS EXAMINATION

23   BY MR. WALKER:

24   Q.    Agent Luke, we've met before on this case?

25   A.    Yes, sir.

1  **Q.**    I believe in State Court with Mr. Martinez; is that

2  correct?

3  **A.**    That's correct.

4  **Q.**    And as I understand it, and correct me if I'm wrong,

5  you were present when the initial stop was made on Mr.

6  Martinez's automobile on 75?

7  **A.**    I was.

8  **Q.**    And who else was present during that time?

9  **A.**    Well, for me to give you a complete list I'll have

10  to review my report.  But off the top of my head it was

11  two Crisp County deputies, Jessica Tellez, Shane Mims and

12  Chris Ledger (phonetically).

13  **Q.**    And during that time period you had already done an

14  investigation on Mr. Martinez; is that correct?

15  **A.**    Yes, sir.

16  **Q.**    And you had done background information as it

17  relates to his family; is that correct?

18  **A.**    Yes, sir, some.

19  **Q.**    And are you from the Tifton area?

20  **A.**    What's your definition of Tifton area?

21  **Q.**    Do you live in Tifton?

22  **A.**    Is that appropriate?

23      MS. BOWEN:  Your Honor, I'm not sure that's

24  relevant to whether or not these three Defendants would be

25  factors under the bond statute.

1          MR. WALKER:   I'll move on, Your Honor.

2          WITNESS LUKE:  I'm from south Georgia.

3     BY MR. WALKER:

4     Q.    Are you familiar with the Martinez family prior to

5     this investigation of Mr. José Martinez?

6     A.    Yes, sir, I am.

7     Q.    And would it be fair to say that they are a large

8     family in the Tifton area?

9     A.    There are several brothers I'm aware of.

10    Q.    Somewhere around 11, 10 to 11 brothers and sisters

11    of Mr. José Martinez?

12    A.    I know there are several.  I've had encounters with

13    at least two of them.  Whether there is 11 or not, but I

14    will agree there are several brothers.

15    Q.    And they are a part of the community that they work

16    there in the Tifton area; is that correct?

17         MS. BOWEN:   Objection, Your Honor.  I don't

18    know if Agent Luke can testify to what they do or where

19    they work or how much they are a part of the community if

20    he's not aware of even how many there are or to whom it's

21    being referred.  So it's speculative.  Unless he knows.  I

22    mean, if he knows.

23    A.    I know certain -- I have arrested one of the

24    brothers, Anrekia Martinez.  He was selling stolen

25    firearms and sold us a stolen sawed off shotgun.  I've had

1    contact with Sergio Martinez as a result in that case to

2    turn over his property to him.  I know there is one or two

3    houses in between Omega and Norman Park, Georgia on 319

4    that several of them reside at, several of the Martinez

5    family.  How many reside there I'm not sure.  I believe

6    the father resides at one of the houses.

7    **Q.**    Aracley Riviera, you're familiar with her, are you

8    not?

9    **A.**    Yes, sir, I am.

10   **Q.**    And you investigated her during this investigation

11   of Mr. Martinez and Mr. Carter?

12   **A.**    I spoke with her.

13   **Q.**    You spoke with her?

14   **A.**    Yes, sir.

15   **Q.**    You went to her place of employment, did you not, in

16   Sumter County?

17   **A.**    I did.

18   **Q.**    And during that time period you basically told her

19   employers that she was a member of the Martinez family and

20   a drug cartel; is that correct?

21   **A.**    Yes, sir.

22   **Q.**    And you have no evidence that Ms. Riviera is a part

23   of any cartel, do you?

24   **A.**    Well, Ms. Riviera has provided me with non-truthful

25   statements in reference to her vehicle.  The vehicle was

1    being utilized by José Martinez. I don't know what

2    property or items of value she is maintaining in her

3    custody for members of that family.

4    Q.    And you're familiar with Mr. Martinez's wife, Ms.

5    Tellez, are you not?

6    A.    Yes, sir, I am.

7    Q.    And she has two children that attend school in

8    Tifton, Tift County?

9    A.    I know they have young children.  I think there are

10   three children.  Maybe an older child.

11   Q.    They attend school there, do they not?

12   A.    Yes, sir.

13   Q.    And Mr. Sergio Martinez he works throughout the

14   Tifton area in agriculture, does he not?

15   A.    He works in agriculture.  Where he works at I'm not

16   sure.

17   Q.    And are you familiar -- I think you testified

18   earlier about Mr. José Martinez being involved in a case

19   in (unintelligible) County; is that correct?

20   A.    That's correct.

21   Q.    And during that time period did you investigate

22   whether or not he was granted a bond while he was -- those

23   charges were pending?

24   A.    I did not.

25   Q.    And based on your investigation did you ascertain

1    whether or not he appeared for his court appearance?

2    A.    I did not.

3    Q.    And during your investigation did you ascertain

4    whether or not he was actually tried in that case?

5    A.    Tried or pled guilty.  I know what the criminal

6    history says.

7    Q.    I believe you stated earlier that there were some

8    firearms found in this investigation; is that correct?

9    A.    That's correct.

10   Q.    None of the firearms listed in this investigation

11   were found in José Martinez's possession, were there?

12   A.    That's correct.  None were found in his possession.

13   Q.    And during the traffic stop which led to the

14   recovery, I believe you said, of an eight ball of cocaine,

15   there was not a gun in that vehicle, was there?

16   A.    No, sir.

17   Q.    And there was not any cash or any type of proceeds

18   in that vehicle either, was there?

19   A.    Well there was 4,800 and some odd dollars in that

20   vehicle.

21   Q.    And who did you take that from?

22   A.    It was taken from inside the vehicle.

23   Q.    Do you recall where at, if it was on Mr. Martinez's

24   person?

25   A.    It wasn't on his person.

1    Q.    Do you recall where it was located?

2    A.    I do not.

3    Q.    And during your surveillance did you have or

4    ascertain any knowledge that a large amount of cash would

5    be on Mr. Martinez's person that day?

6    A.    Yes, sir.

7    Q.    And you didn't find any cash on Mr. Martinez other

8    than that 4,000; is that correct?

9    A.    Well because it was -- a bag was taken out at the

10   Flash Foods.  But no, sir, I did not.

11   Q.    And as it relates to that bag, you state that it was

12   a bag similar to the photograph that was presented here

13   today that was found in Mr. Sanchez's vehicle; is that

14   correct?

15   A.    Yes, sir.

16   Q.    Was there, in fact, another bag in the vehicle that

17   was driven by Ms. Tellez?

18   A.    Another bag in the vehicle?

19   Q.    Yes, sir.

20   A.    Yes, sir, there were several bags in their vehicle.

21   Q.    Several bags that resembled the bag that was found

22   in Mr. Sanchez's automobile?

23   A.    I can't say.

24   Q.    You can't say?

25   A.    Well, I think there were purses.  Do they resemble a

1    duffel bag?  I can't say.

2    Q.    Well, were they black in color?

3    A.    I don't recall.

4    Q.    You don't recall those but you recall the one that

5    you say apparently was the bag that Ms. Tellez gave to Mr.

6    Sanchez; is that right?

7    A.    Yes, sir.  The surveillance office at the time

8    indicated a duffel bag was exchanged and that that duffel

9    bag had a large amount of currency in it.  It matched the

10   information that we were receiving from the wire

11   intercepts.

12   Q.    Was there a video of that bag, the exchange of that

13   bag?

14   A.    No, sir.

15   Q.    Do you recall what color the bag was?

16   A.    I didn't.  I did not see it.

17   Q.    And as it relates to these wiretaps who is S.

18   Gonzales?

19   A.    Snally (phonetically) Gonzalez.  She is a Tift

20   County Sheriff's office deputy.

21   Q.    Who is S. Sims?

22   A.    Shane Mimbs.  He is a Tift County Sheriff's office

23   deputy and also a task force officer with the Drug

24   Enforcement Administration.

25   Q.    And as it relates to the -- I think you testified

1    about some text messages that maybe were transcribed or

2    interpreted in Spanish; is that right?

3    A.    Yes, sir.

4    Q.    And what is the origin of those text messages?  What

5    phone do they generate from, do you know?

6    A.    Yes, sir, from the telephone number we had

7    associated with José Martinez.

8    Q.    And do you have in your -- throughout your

9    investigation you have a copy of those text messages?

10   A.    Yes, sir.  I wrote a search warrant, applied for it

11   in this court, provided it to Verizon and they sent me

12   back a copy.

13   Q.    And I believe you stated at some point in time that

14   during one of these wiretaps that Mr. José Martinez

15   located to Texas; was that correct?

16   A.    Yes, sir.  We only had one wiretap during the

17   timeframe of the wiretap.  He was located in Texas.

18   Q.    And how did you ascertain that he was located in

19   Texas?

20   A.    Based off his communications.

21   Q.    During your investigation did you ascertain whether

22   or not Mr. Martinez was a United States citizen?

23   A.    I believe he is.

24   Q.    You believe he is?

25   A.    Yes, sir.

1    Q.    He has a GED; is that correct?

2    A.    I know I gathered that information when I provided

3    people with Miranda and I believe that's what he gave me.

4    Q.    And that he went to Tift County schools; is that

5    correct?

6    A.    That's correct.

7    Q.    And he lived predominantly in Tifton, Georgia the

8    majority of his life?

9    A.    I would be led to believe that since he went to Tift

10   County schools, except for the timeframe from 2004 until

11   2011 that he was in the custody of the Department of

12   Corrections?

13   Q.    During the investigation do you ascertain whether or

14   not Mr. Martinez had a passport?

15   A.    I have not.

16   Q.    As it relates to -- I don't know if you have a copy

17   of the exhibits there?

18   A.    I do.

19   Q.    Exhibit Number 10?

20   A.    Yes, sir.

21   Q.    And that is, to my understanding, that's from the

22   video.  That's a still shot, correct?

23   A.    That's correct.

24   Q.    And Mr. Martinez is not anywhere in that photograph

25   is he?

1    A.    His vehicle is right to the right of it.

2    Q.    And --

3    A.    That's where Andrew Carter is walking towards but

4    he's not in the video -- or not in the picture, I don't

5    believe.

6    Q.    And the video itself, have you reviewed that video?

7    A.    I have.

8    Q.    And at any time during that video do you see Mr.

9    Martinez?

10   A.    No, sir, you do not.

11   Q.    And so did you see -- I think you said it was a

12   gold Dodge Durango that was pulled up in that photograph;

13   is that correct?

14   A.    No, sir, I'd did say that. I said it was a gold

15   Tahoe.  Now he also has a white Dodge Durango that has

16   been observed going to that residence.  But at this time,

17   on this date, it was a gold Tahoe.

18   Q.    But you can't visibly see or testify that Mr.

19   Martinez was there during this time period?

20   A.    I don't know who the driver of the vehicle was.

21   Q.    And as it relates to Government's Exhibit Number 12,

22   you're referring to the F-250 or 150?

23   A.    I believe it looks like an F-250 to me.

24   Q.    And did you determine whose vehicle that was at any

25   time during your investigation?

1    A.    Ms. Riviera's vehicle.

2    Q.    And that's the same vehicle in Government's Number

3    13?

4    A.    Yes, sir.

5    Q.    And as it relates to Government's Number 12, you

6    never saw Mr. Martinez in that vehicle, did you?

7    A.    No, sir.  I don't know who the driver was.

8          MR. WALKER:   That's all I have at this time,

9    Your Honor.

10          THE COURT:  All right.  Mr. Haugabrook on

11   behalf of Mr. Sanchez Hidalgo.

12          MR. HAUGABROOK:  Thank you, Your Honor.

13                    CROSS EXAMINATION

14   BY MR. HAUGABROOK:

15   Q.    Good afternoon, Agent Luke.

16   A.    Good afternoon.

17   Q.    Please keep that smile on your face.  Let me clear

18   up a couple of things as it relates to when your

19   investigation began.  As I understood it, on cross

20   examination, you said January of 2014?

21   A.    Yes, sir.

22   Q.    I notice that the indictment says that the

23   conspiracy though is from January of 2013?

24   A.    Yes, sir.

25   Q.    Was there anything going on in the calendar year of

1    2013 that was being investigated?

2    A.    Oh, there was plenty of stuff that was being

3    investigated in calendar year 2013.

4    Q.    As it relates to Mr. Hidalgo or any of the other

5    codefendants in this case?

6    A.    There was.

7    Q.    The investigation that was going on in the year

8    2013, is there surveillance?

9    A.    There is.

10   Q.    I presume that it must not have been pertinent since

11   you didn't prepare to testify to that on today?

12   A.    Yes, sir.  There's several people in this

13   conspiracy.  It has to do with other members of the

14   conspiracy.

15   Q.    Let me ask it this way.  Your investigation of 2013

16   or the calendar year 2013 does not involve Mr. Hidalgo,

17   does it?

18   A.    No, sir.

19   Q.    Your investigation that you've testified that began

20   here -- today -- began in January of 2014, that was the

21   result of a confidential informant providing some

22   information; is that correct?

23   A.    That's correct.

24   Q.    And that information did not pertain to Mr. Hidalgo,

25   did it?

1    A.    That's correct.

2    Q.    And he was not the target of your investigation in

3    this case, was he?

4    A.    No, sir.  No, sir.

5    Q.    You and I have spoke about this case probably

6    several times over the past two, three weeks; is that

7    correct?

8    A.    It's been a pleasure.

9    Q.    Thank you.  And I think you and I last spoke this

10   past Friday, correct?

11   A.    That's correct.

12   Q.    And each of our conversations you have described Mr.

13   Hidalgo's role in this as just a money courier, correct?

14   A.    He's mainly a money courier, yes, sir.

15   Q.    There is no evidence that you have that he actually

16   transported any cocaine or crack in this case, it is?

17   A.    Well, there's some statements that allude to that

18   fact.  Now, cocaine, I don't know anything about crack.

19   But the currency that one is shipping from the sale of

20   cocaine to me is just like shipping cocaine.

21   Q.    My question though is that there is no evidence that

22   Mr. Hidalgo has transported any cocaine in this

23   conspiracy?

24   A.    There are indications of it through witness

25   interviews that I provided on direct.

1    Q.    And I think your testimony was that you interviewed

2    Andrew Carter?

3    A.    Yes, sir.

4    Q.    Mr. Carter never told you that Mr. Hidalgo

5    transported any cocaine, did he?

6    A.    He gave me a price on what he would charge per

7    kilogram.

8    Q.    My question though is very specific, Agent.  He

9    never told you that Mr. Hidalgo transported any cocaine,

10   did he?

11   A.    I didn't bring his debriefing with me.  I think his

12   statements were he mostly transports currency --

13   Q.    And that's what you and I discussed on Friday?

14   A.    That's correct.

15   Q.    And you never said anything about Mr. Carter telling

16   you that Mr. Hidalgo transported any cocaine, did you?

17   A.    Well, I told you about the price that he gave me.

18   Q.    Again, actually transporting and what someone may

19   charge to transport --

20   A.    Right.

21   Q.    -- are two different things, aren't they?

22   A.    Right.  I was led to believe that he had in the past

23   based on the price frame.

24   Q.    Did Mr. Andrew Carter tell you that he and Mr.

25   Hidalgo have had any dealings in this case?

1    A.    Dealings, I don't think so.

2    Q.    So how is it that Mr. Carter would know whether or

3    not Mr. Hidalgo transported any cocaine?

4    A.    I would assume from his conversations with José

5    Martinez.

6    Q.    But that's another assumption?

7    A.    That's correct.

8    Q.    No evidence, no surveillance to confirm that?

9    A.    No, sir.

10   Q.    And as it relates to transporting any currency in

11   this case, certainly we have the stop on September the

12   25th, 2014, up in the Cordele area, correct?

13   A.    That's correct.

14   Q.    And there was a duffel bag of money that was in Mr.

15   Hidalgo's vehicle?

16   A.    That's correct.

17   Q.    And that money was placed in the vehicle, I believe,

18   by Ms. Tellez?

19   A.    Yes, sir.

20   Q.    Other than on the 25th of September, there's no

21   actual evidence that Mr. Hidalgo transported any money to

22   the Atlanta area, is there?

23   A.    I think there is.

24   Q.    What you're referring to is the wiretaps of

25   conversations between Mr. Martinez and Andrew Carter?

1    A.    Along with surveillance.

2    Q.    Was there -- is there any surveillance video or

3    otherwise that shows Mr. Hidalgo with cash?

4    A.    Not in possession of cash, no, sir.  Not holding a

5    bag of cash, no, sir.

6    Q.    So the only evidence that we have that Mr. Hidalgo

7    transported any currency to Atlanta is on -- allegedly is

8    November -- September the 25th, 2014?

9    A.    No, sir.

10   Q.    The others are conversations between Mr. Martinez

11   and Mr. Carter, correct?

12   A.    That's correct.

13   Q.    When you interviewed Mr. Hidalgo -- I'm sorry -- Mr.

14   Martinez, did he tell you that Mr. Hidalgo had transported

15   cash on any other occasion?

16   A.    Yes.

17   Q.    Did he give you the dates of that -- those

18   transportations?

19   A.    I think he told me a week prior.

20   Q.    So we're talking about the 19th, roughly?

21   A.    Yes, sir, if that's the week prior.

22   Q.    So those are the only two, because you and I talked

23   about this on Friday; did we not?

24   A.    We did.

25   Q.    And the two dates that we know of is the 25th where

1    the two hundred twenty-five, twenty-six thousand was

2    seized, correct?

3    A.    That's correct.

4    Q.    And possibly that Mr. Hidalgo transported some cash

5    on the 19th of September, the week before, correct?

6    A.    That's correct.  We also have September the 10th,

7    2014, and this is the surveillance that we're observing

8    him traveling behind James Waters.  I believe there's

9    communications that would indicate the father-in-law

10   transported currency at that time.

11   Q.    I don't believe any of the interviews that you've

12   conducted of the codefendants in this case indicated that

13   Mr. Hidalgo has transported any currency, as it relates to

14   your investigation that began in January of 2014; is that

15   correct?

16   A.    I thought I just answered that question.  I don't

17   know him transporting in January of 2014, but I know of

18   him transporting currency in September of 2014.

19   Q.    But no dope at that time?

20   A.    Will you ask your question again, Mr. Haugabrook, so

21   I can understand it correctly?

22   Q.    None of the codefendants that you've interviewed

23   indicated or stated that Mr. Hidalgo transported any

24   drugs?

25   A.    Their common statement is he's mostly a --

1    Q.    Money?

2    A.    -- currency courier.

3    Q.    Okay.  As it relates to this investigation, there is

4    no indication or suggestion that Mr. Hidalgo is the one

5    that is arranging these drug transactions are there?

6    A.    No.  They're believed to be arranged by José

7    Martinez.

8    Q.    Nothing to suggest that he introduced Mr. Martinez

9    to Fatboy or Skinny in Atlanta, is there?

10   A.    Not at this time.

11   Q.    Nothing to suggest that he was sort of a middle man

12   for anybody, is there?

13   A.    I guess it would depend on your definition of a

14   middle man.

15   Q.    You've been in this business a long time and you

16   understand what a middle man is, right?  Someone who

17   actually --

18   A.    Are you speaking of --

19   Q.    -- puts a deal together?

20   A.    -- a broker?

21   Q.    A broker?

22   A.    No, sir.

23   Q.    No?

24   A.    No, sir.

25   Q.    On the date that Mr. Hidalgo was arrested, I presume

1   the vehicle was just intercepted somehow or blue lighted

2   and pulled over?

3   A.    We were surveilling him, but we requested the

4   assistance of a marked patrol car to pull him over.  So

5   does that answer your question?

6   Q.    Yes.  And he pulled over willingly, correct?

7   A.    He did.

8   Q.    Didn't try to run?

9   A.    He didn't.

10  Q.    Once he was stopped, didn't provide any aliases

11  (inaudible)?

12  A.    Not that I'm aware of.

13  Q.    Didn't provide any false or fake ID, did he?

14  A.    Not that I'm aware of.

15  Q.    And the items that you found on his person, I think

16  you testified that you found a wallet?

17  A.    We did.

18  Q.    Was there a driver's license in that wallet?

19  A.    I believe there was two driver's license in that

20  wallet.

21  Q.    And where were those driver's license issued, which

22  state?

23  A.    They were both Georgia.  One had probably his old

24  address on it, but they were both Georgia driver's

25  license, if I recall correctly.

1    **Q.**    And they had his name on it?

2    **A.**    They did.

3    **Q.**    Didn't have any other aliases or anything like that?

4    **A.**    That's correct.

5    **Q.**    Could one of them have been a Georgia identification

6    card as opposed to a driver's license?

7    **A.**    Possible.

8    **Q.**    Do you have anything to indicate that he was in

9    possession of two driver's license, which is illegal?

10   **A.**    No.  I wasn't trying to indicate that.

11   **Q.**    Okay.  And he also had -- I believe you indicated

12   during our conversation on Friday there were two debit

13   cards?

14   **A.**    There were two debit cards and several bank deposit

15   slips in his wallet.

16   **Q.**    I think your testimony on direct that there were

17   several cards though, and I just want to be sure that I

18   understand that it was just two debit cards.

19   **A.**    Two debit cards and several deposit slips, deposits

20   to Wells Fargo.

21   **Q.**    And those debit cards were issued by some financial

22   institution.  I think you told me --

23   **A.**    I think --

24   **Q.**    -- out of Texas?

25   **A.**    I think they were all Wells Fargo accounts.  There

1    were -- some of the accounts were owned by an individual

2    in El Paso, Texas.

3    Q.    The accounts were?

4    A.    Yes, sir.

5    Q.    They were not in Mr. Hidalgo's name?

6    A.    That's correct.

7    Q.    And I think during our conversation you told me just

8    a small amount of money had been placed on those cards?

9    A.    Yeah.

10   Q.    A couple of hundred dollars, I think?

11   A.    Less than a thousand.  It was not a large sum of

12   money.

13   Q.    You didn't find any large sums of money on Mr.

14   Hidalgo when you stopped him, outside of the bag?

15   A.    No, sir.

16   Q.    Based on your investigation and what you know thus

17   far about Mr. Hidalgo, you have not found any sort of out

18   -- off shore accounts in his name, have you?

19   A.    I have not.

20   Q.    Haven't found that he's been in possession

21   personally of any large sums of money, outside of the bag

22   that was found in his vehicle, correct?

23   A.    Outside of him getting US legal counsel, no, sir.

24         MR. HAUGABROOK:  Your Honor, I'm going to object

25   and ask the witness to answer the question.

```
 1              WITNESS LUKE:  No, sir.
 2              MR. HAUGABROOK:  Of course, I know that that was
 3   a smart remark.
 4              WITNESS LUKE:  No, sir.
 5   BY MR. HAUGABROOK:
 6   Q.    You haven't found that he owns any property outside
 7   of Tifton, have you?
 8   A.    I have not.
 9   Q.    Outside of the United States, have you?
10   A.    I have not.
11   Q.    You haven't discovered that Mr. Hidalgo has been
12   paid any large sums of money by any codefendant in this
13   case, have you?
14   A.    I have not.
15   Q.    In fact, I think when you and I spoke the other day
16   the average for someone that transports money is a few
17   hundred dollars, four, five, $600, correct?  Based on your
18   experience?
19   A.    It can vary.
20   Q.    No other hidden accounts or anything like that, with
21   the money that are attributable to Mr. Hidalgo, have been
22   found or located, have they?
23   A.    Not that I've found.
24   Q.    And there's nothing to suggest that the $226,000
25   that was in this duffel bag in his car belonged solely to
```

1   him?

2   **A.**    Not solely to him, no, sir.

3   **Q.**    Did you all find any passport that belonged to Mr.

4   Hidalgo?

5   **A.**    Not that I recall.

6   **Q.**    And as far as you know he doesn't own a passport,

7   does he?

8   **A.**    I do not know.

9   **Q.**    You're not aware of Mr. Hidalgo traveling outside of

10  the United States regularly, are you?

11  **A.**    I don't know.

12  **Q.**    Have you done any investigation on Mr. Hidalgo?

13  **A.**    I have done investigations on Mr. Hidalgo.

14  **Q.**    Have you done any background check on Mr. Hidalgo?

15  **A.**    I've done some.

16  **Q.**    And by some you've certainly investigated the debit

17  card and the accounts on which they were drawn?

18  **A.**    That's correct.

19  **Q.**    Have you done any investigation in terms of people

20  in the Tifton area, law enforcement, as it relates to Mr.

21  Hidalgo?

22  **A.**    Law enforcement?

23  **Q.**    Find out about him?

24  **A.**    I have inquired when we were trying to determine who

25  he was.  I don't know anything negative or positive.

1  **Q.**    No one has indicated to you that he lives any sort

2  of extravagant lifestyle, have they?

3  **A.**    No, sir.

4  **Q.**    That he carries large sums of money?

5  **A.**    Nobody's told me.

6  **Q.**    And you have a number of photographs that are

7  involved in this case in surveillance.  None of the

8  surveillance showed him in possession of any weapons?

9  **A.**    They do not.

10 **Q.**    You have no reason to believe that he owns any

11 weapons, do you?

12 **A.**    I don't know.  I have not queried any databases to

13 see if he owns any firearms.

14 **Q.**    You didn't find any firearms in the vehicle when he

15 was stopped, correct?

16 **A.**    That's correct.

17 **Q.**    Have you done any investigation to determine where

18 he lives?

19 **A.**    I have.

20 **Q.**    And you're aware that he lives in a trailer, mobile

21 home, in Tifton, correct?

22 **A.**    That's correct.

23 **Q.**    Has any search warrant been obtained to search that

24 residence?

25 **A.**    There was.

1    Q.    Was there any guns found in that residence?

2    A.    No, sir.

3    Q.    Was there any cocaine or crack or heroin or any

4    other drug found in that residence?

5    A.    No, sir.

6    Q.    Anything to suggest that at some point in the past

7    that Mr. Hidalgo owned a weapon?

8    A.    I do not know of any paperwork being located.

9    Q.    Based on what you know about Mr. Hidalgo at this

10   point, you have no reason to believe that he's been a

11   violent person in the past, have you?

12   A.    I do not.

13   Q.    You've looked at his criminal history?

14   A.    I have.

15   Q.    In fact, you went over that with me on Friday; did

16   you not?

17   A.    I did.

18   Q.    As I understand it that he has a DUI back in 2004,

19   correct?

20   A.    That's correct.  In El Paso, Texas.

21   Q.    There was no failure to appear on his record, was

22   there?

23   A.    Not that I saw.

24   Q.    No bench warrant?

25   A.    Not that I saw.

1    Q.    No violent past at all as far as you're aware of at

2    this point?

3    A.    That law enforcement is aware of.

4    Q.    Do you have any reason to suspect that he's been

5    violent in the past?

6    A.    Oh, no, sir.

7    Q.    And when he was stopped on September the 25th, he

8    cooperated with law enforcement; did he not?

9    A.    I guess it would depend on your definition of

10   cooperated.

11   Q.    Didn't try to provide you with any false information

12   about who he was, did he?

13   A.    Not that I'm aware of.

14   Q.    Didn't try to flee, did he?

15   A.    He did not.

16   Q.    You have not received any report from either the

17   Tift County jail or the jail in Pelham that he's been

18   unruly, have you?

19   A.    I have not.

20   Q.    You haven't received any information from any law

21   enforcement that Mr. Hidalgo has been uncooperative,

22   combative, or anything along those lines, have you?

23   A.    Uncooperative in the sense of not being combative,

24   no, sir.

25   Q.    As it relates to part of why we're here today, and

1    that is to address one of the issues, is the issue of

2    bond.  There's no reason that you can think of or provide

3    to this Court that if bond is granted that he would

4    intimidate any witnesses?

5    A.    I do not know.

6    Q.    There's no reason for you to provide -- or you don't

7    have any information as it relates to Mr. Hidalgo that if

8    he got bond he would obstruct justice?

9    A.    I do not know.

10   Q.    That he would threaten anybody in the community?

11   A.    I do not know.

12   Q.    That he would destroy or damage any property in the

13   community?

14   A.    I do not know.

15   Q.    You have no reason to suspect that if he gets bond

16   that he would engage in any criminal activity, do you?

17   A.    I do not know.

18   Q.    And criminal activity?  I mean sell drugs?

19   A.    I do not know.

20   Q.    As far as you know he has not sold any drugs in this

21   case?

22        MS. BOWEN:  Your Honor, I'm going to --

23   BY MR. HAUGABROOK:

24   Q.    Him personally?

25   A.    I do not know.

1    Q.    You're one of the lead investigators in this case,

2    correct?

3    A.    I am.

4    Q.    Has there -- is there any report suggesting that he

5    has personally sold any drugs in this case?

6    A.    I guess it would be a definition of the sale of

7    drugs.  His role in this case has been a courier --

8    Q.    Again, my question --

9    A.    -- of money.

10   Q.    -- is very clear.  Agent Luke, you're one of the

11   lead investigators?

12   A.    I am.

13   Q.    Has there been any report generated, any discussion

14   between you and other law enforcement that Mr. Hidalgo has

15   sold someone any drugs?

16   A.    I don't think so.

17   Q.    As far as you know, Mr. Hidalgo has not been

18   involved in any other conspiracy to traffic drugs, has he?

19   A.    I do not know.

20   Q.    You don't have any reason to suspect that, do you?

21   A.    I do not.

22   Q.    And one of the things that you and I talked about on

23   Friday, you had some concerns about if bond is granted

24   that he might flee the jurisdiction; is that correct?

25   A.    Yes, sir.

1   Q.    But you would agree in this case he does not have

2   any history of fleeing from the Court?

3   A.    I think his track record is small.  I can't make an

4   adjustment one -- one way or the other.

5   Q.    And when you talk about his track record you're

6   talking about his encounters with the law as it relates to

7   the DUI charge?

8   A.    That's correct.

9   Q.    And there's nothing to suggest that he did not abide

10  by the Court's instructions in that case, is there?

11  A.    No, sir.

12  Q.    Nothing to suggest that he violated any probation in

13  that case, is there?

14  A.    I do not know.

15  Q.    You looked at his criminal history.  Is there any

16  revocation of probation noted on his criminal history?

17  A.    There is not.

18  Q.    You said that there was a search warrant issued for

19  the residence where he lives?

20  A.    That's correct.

21  Q.    Describe that mobile home for the Court, would you?

22  A.    It's a mobile home.  I did not go inside the mobile

23  home.

24  Q.    Is it a newer mobile home or is it old?

25  A.    I would say more older than newer.

1    Q.    Have you discovered any vehicles that were

2    registered in Mr. Hidalgo's name?

3    A.    There were two vehicles that were also parked at the

4    residence.  I want to say one of them was registered in

5    his name, which would have been a smaller, like, an

6    S10-type truck, if I recall correctly.

7    Q.    And that S10 truck that you're referring to, I think

8    -- I hope I'm not attributing this to you incorrectly, but

9    I think it's a 1985 S10 truck?

10   A.    I don't know.  It's an older --

11   Q.    But it's a much older truck though?

12   A.    It's an older truck.

13   Q.    Other than that S10 truck you don't have any reason

14   to believe that he has any other vehicles, do you?

15   A.    That he owns or access to?

16   Q.    That he owns any other vehicles?

17   A.    I do not.

18   Q.    Do you have any reason to believe that he has access

19   to some other vehicle?

20   A.    Well, there were two other vehicles maybe at his

21   house.  There was a -- a extended cab Chevrolet truck that

22   had a Texas plate on it, and I believe that was it.  There

23   was at least one other vehicle at his house.

24   Q.    And he's not the only person that lives at that

25   residence, is he?

1    A.    I don't think so.

2    Q.    In fact, his sister lives there?

3    A.    I'm not sure.

4    Q.    Do you know if whoever else lived there owned any of

5    those vehicles?

6    A.    I do not know.

7    Q.    You just know that there was another couple of other

8    vehicles there?

9    A.    I know there was one other female who lived there

10   because I have observed her leaving the residence early in

11   the morning during surveillance.

12   Q.    If you would look at Exhibit 10, I believe that

13   photograph is one that you described as containing a gold

14   Tahoe?

15   A.    The photograph itself does not contain it, but

16   that's what is there.  If you could see another foot on

17   the other side of the photograph, you could see the gold

18   Tahoe.  That's where Andrew Carter is walking towards.

19   Q.    I probably could better ask you a question this way.

20   The vehicle that Mr. Hidalgo is generally associated with

21   is not at that location?

22   A.    I did not see it.  No, sir.

23   Q.    And in Exhibit 11, Mr. Hidalgo is not in that

24   photograph, is he?

25   A.    He's not the two people depicted in that photograph,

1    no, sir.

2    Q.    You have no reason to believe that he was there or

3    nearby, do you?

4    A.    I do not.  I don't know who was all in Mr. Martinez'

5    vehicle, but I have no reason to believe that he was in

6    the vehicle.

7    Q.    As it relates to Exhibit 2, the transcript, I

8    believe you testified that Mr. Martinez was in Texas?

9    A.    Yes, sir.  That's what the calls would indicate.

10   Q.    There's nothing to indicate or even suggest that Mr.

11   Hidalgo was in Texas at that time, is there?

12   A.    I do not have any knowledge of him being in Texas at

13   that time.

14   Q.    There's nothing, as it relates to that conversation,

15   that references Mr. Hidalgo is there?  That call is

16   between --

17   A.    I don't think so.  Not in that conversation.

18   Q.    I think it's between Mr. Martinez and Mr. Carter,

19   right?

20   A.    Yes, sir.  I believe is to be correct.

21   Q.    Now, in reference to September the 10th, 2014, I

22   believe you testified that Mr. Waters was transporting a

23   large quantity of cocaine?

24   A.    Yes, sir.

25   Q.    And they went to some location in the Tifton area?

1    A.    They traveled to Dunwoody, Georgia.

2    Q.    Is that where they supposedly or allegedly got the

3    cocaine?

4    A.    Yes, sir.  That's -- that would be the residence of

5    Fatman or Fatboy.  And then they traveled back to 1211

6    C.S. Powell, which is an Omega, Tift -- or Colquitt

7    County, Georgia.  It's on the Tift/Colquitt line.

8    Q.    That's not a residence owned or lived in by Mr.

9    Hidalgo, is it?

10    A.    That's correct.  No, sir.

11    Q.    And you talked about you all had surveillance.  So I

12    presume you followed Mr. Waters to that location?

13    A.    We did.

14    Q.    And Mr. Hidalgo was not there, was he?

15    A.    We didn't follow him, no, sir.

16    Q.    He didn't go to that location, did he?

17    A.    He did not.

18    Q.    As it relates to Exhibit Number 7, I think this is a

19    conversation, again, between Mr. Carter and Mr. Martinez;

20    is that correct?

21    A.    Is that session number 4803?

22          THE COURT:  4811.

23    A.    4811.  Yes, sir.

24    Q.    That's a conversation between Mr. Martinez and Mr.

25    Carter?

1    **A.**    It is.  It's an incoming call from José Martinez to

2    Andrew Carter.

3    **Q.**    And in that conversation you testified that Mr.

4    Martinez referenced Mr. Hidalgo is putting some money into

5    this deal?

6    **A.**    Yes, sir.

7    **Q.**    Is that correct?  When you interviewed Mr. Martinez,

8    he never told you that Mr. Hidalgo put any money into this

9    deal, did he?

10   **A.**    I did not ask.

11   **Q.**    And he did not tell you that, did he?

12   **A.**    He did not.

13   **Q.**    And you don't know if his statements in this

14   conversation are true?

15   **A.**    I do not.

16   **Q.**    You have no idea whether he was making these

17   statements to somehow bolster himself with Mr. Carter, do

18   you?

19   **A.**    I do not.

20   **Q.**    In actuality whether or not Mr. Hidalgo put any

21   money in it, we don't know?

22   **A.**    We just have the calls, and then the surveillance of

23   him actually leaving 128 Meadows Drive going north on the

24   Interstate.

25   **Q.**    But that does not suggest or prove that Mr. Hidalgo

1   put any money into purchasing cocaine though?

2   **A.**    It would be in the calls.

3   **Q.**    Based on what Mr. Martinez is telling Mr. Carter?

4   **A.**    That's correct.

5   **Q.**    And that's all you base that on?

6   **A.**    That's correct.

7   **Q.**    And you also interviewed Mr. Carter --

8   **A.**    I did.

9   **Q.**    -- correct?  And did he indicate to you that Mr.

10  Hidalgo put some money into that particular deal?

11  **A.**    I didn't ask.

12  **Q.**    He didn't tell you, did he?

13  **A.**    He did not.

14  **Q.**    And I know that this was asked I think on cross

15  examination, and I wrote it down as you said that the bag

16  -- the duffel bag in the van that Mr. Hidalgo was driving,

17  it's similar.  What do you mean that the bag is similar?

18  **A.**    Well, I mean I'm sure the bag had some kind of

19  serial number on it from the one we saw being exchanged to

20  the one that's in the car.  It looks -- the surveillance

21  (inaudible) says a duffel bag was being exchanged, and we

22  found a duffel bag in the car.

23  **Q.**    Okay.

24  **A.**    That's what I mean by similar.  I can't say it's the

25  exact bag, but the evidence would lead me to believe that

1    it is the bag.

2    Q.    In your interview of Mr. Martinez and with Mr.

3    Carter, neither one of them indicated to you that or how

4    many times Mr. Hidalgo may have transported money, did

5    they?

6    A.    I didn't ask and they didn't say.

7    Q.    And I think we established this early on, what we're

8    sure about is on the 25th of September and I guess the

9    19th conversation of September where I presume Mr.

10   Martinez is saying that he would send paw-in-law; is that

11   correct?

12   A.    Is your question -- I don't understand the question.

13   Q.    Those are the dates that we can establish that Mr.

14   Hidalgo may have transported some money?

15   A.    No.  I think there's other dates where he says he's

16   going to send his paw-in-law.  That we -- that we have

17   played for the Court.  There's a text message on September

18   the 10th talking about sending paw-in-law from who I

19   believe is Fatman.  But those are two of the dates.

20   Q.    As it relates to the September 10th date, is there

21   any surveillance that Mr. Hidalgo went to Atlanta?

22   A.    There's surveillance that he came back from Atlanta.

23   Q.    And that surveillance when you say suggests he came

24   back from Atlanta, where does the surveillance start?

25   A.    South of Cordele.

1    Q.    And that's the basis for why you believe he went to

2    Atlanta?

3    A.    That and the indications of the phone calls.

4    Q.    And I think you testified on cross that there are

5    hundreds of hours -- hours of surveillance in this case?

6    A.    Yes, sir.

7    Q.    And none of those surveillance indicate that Mr.

8    Hidalgo was in possession of any weapons, do they?

9    A.    Not that I recall.

10            MR. HAUGABROOK:  I think that's all I have, Your

11   Honor.

12            THE COURT:  All right.  Why don't before I see

13   if the government has any redirect and we go back around

14   again, whoever wants to -- I know, Agent Luke, you've been

15   on the stand a while, let's stand up and stretch and

16   everybody is invited to get the circulation going.

17       (Stretch break)

18            THE COURT:  All right.  Ms. Bowen, is there any

19   redirect from the government?

20            MS. BOWEN:  There is, and I will try to be

21   brief.

22            THE COURT:  All right.

23                    REDIRECT EXAMINATION

24   BY MS. BOWEN:

25   Q.    Agent Luke, I do recognize you've been on the stand

1   for a while.  I'm going to try to take these in order so

2   we'll go Mr. Carter, Mr. Martinez, and Mr. Hidalgo.

3   A.    Okay.

4   Q.    So first I ask you some questions in regards to Mr.

5   Carter.  I believe you were asked about historical

6   information that you received from confidential

7   informants?

8   A.    Yes, ma'am.

9   Q.    During the course of the investigation all the way

10  up through the wiretap intercepted communications, was the

11  information provided by the confidential sources that

12  Andrew Carter was receiving his cocaine or at least some

13  of his cocaine from José Martinez corroborated either

14  through surveillance, traffic stops, or statements

15  actually both from Andrew Carter and, I believe, José

16  Martinez?

17  A.    Yes, ma'am.

18  Q.    Now, I think there was question about if you'd

19  listened to every single call.  Now, I -- I don't expect

20  that you could probably put an exact number, but would it

21  be fair to characterize the quantity of calls during this

22  30 day period as voluminous?

23  A.    Yes.

24  Q.    Now, there was some indication -- I think you

25  testified that the power records at 186 Crosland Lenox

1    Road were in the name of Andrew Carter?

2    A.    That's correct.

3    Q.    Similarly in the master bedroom of his house there

4    were some diabetes medications?

5    A.    Yes, ma'am.  During -- during the course of the

6    investigation we learned that Andrew Carter has diabetes,

7    and he has to take insulin shots.  He was actually

8    hospitalized, I believe, at least on one occasion during

9    the course of the wire intercept, and he has to take

10   insulin.  And that was located beside the firearm.

11   Q.    And that was the Taurus PT 140, .40, serial number

12   -- which we don't need the serial number, but the handgun

13   that was located in the bedroom was close in proximity to

14   the diabetes medication that belonged to Andrew Carter?

15   A.    That's correct.

16   Q.    Now, speaking about the Futch Road residence where

17   Andrew Carter and I believe Latoris Waters, who is his

18   girlfriend, previously resided, I believe you testified

19   that an AR-15 was recovered at that location?

20   A.    Yes, ma'am, I did.

21   Q.    And is it similar in type and appearance to,

22   although it be not a great depiction, but you have seen

23   the surveillance of it captured in Government's Exhibit

24   10?

25   A.    To me I believe it's the same -- same firearm.

1    Q.    And based upon your review of that entire

2    surveillance footage it is your knowledge that the

3    vehicle, the gold Tahoe, had been driven by José Martinez

4    during this investigation?

5    A.    Yes, ma'am.  I had observed him driving the vehicle

6    prior to that day.

7    Q.    And it was present on that day, I believe that was

8    April 10th, 2014, when Andrew Carter steps out of his

9    house with the AR-15 and another package in his hand?

10   A.    Yes, ma'am.

11   Q.    Now, the Dodge dually, and I realize this is a

12   reference to the style of bodies, it's a Dodge Ram truck?

13   A.    Yes, ma'am.  It's a Dodge Ram truck.

14   Q.    Okay.  And had this vehicle previously been seen in

15   this investigation?

16   A.    It has.  It had been.  The vehicle has been observed

17   by -- driven by Andrew Carter and distributing cocaine at

18   1569 Georgia Avenue in the dirt alley beside his mother's

19   house.  That was a common area for customers of the Andrew

20   Carter organization to meet with Andrew Carter to obtain

21   cocaine.

22   Q.    Now, when Andrew Carter was arrested or taken into

23   custody at the Love's Travel Mart in Tifton, I believe you

24   testified on direct that he fled?

25   A.    He did.  He busted a window or broke the door, the

1    rear door, when he was trying to go through it.

2    Q.    All right.  So in the path of his flight there was a

3    set of doors, and as a result of his flight, those doors

4    got broken?

5    A.    Yes, ma'am.

6    Q.    Now, let's move on to Mr. José Martinez.

7    A.    Okay.

8    Q.    There was mention of Jessica Tellez, and I want to

9    make sure it's clear for the Court, this is the wife of

10   José Martinez?

11   A.    Yes, ma'am.

12   Q.    And she's also indicted in this conspiracy as well?

13   A.    Yes, ma'am.

14   Q.    And she was in the vehicle that was -- that was

15   stopped on September 25th, 2014?

16   A.    That's correct.

17   Q.    And the bag, this black duffel bag that we've heard

18   testimony about, and I believe it's depicted in

19   Government's Exhibit 13 -- correct me if I'm wrong.  This

20   black bag was seen being transferred by Jessica Tellez to

21   Juan Sanchez Hidalgo?

22   A.    It's Government's Exhibit 14.

23   Q.    Fourteen.  Thank you.

24   A.    And, yes, ma'am, as I've testified the surveillance

25   officers saw a bag being transferred, a duffel-type bag,

1  and there's a duffel-type bag in his vehicle.

2  Q.    Now, I believe I may have asked you this on direct,

3  but just in case I did not, you testified as to three

4  meetings between Andrew Carter and José Martinez.  I

5  believe those dates were April 10th, May 11th, and August

6  11th of this year?

7  A.    Yes, ma'am.

8  Q.    Or, excuse me, we're in 2015 -- last year, 2014?

9  A.    Yes, ma'am.

10 Q.    Were those the only meetings that took place between

11 José Martinez and Andrew Carter?

12 A.    No, ma'am.

13 Q.    I believe you were asked on cross about who owns the

14 Ford F-150 that is white-in-color?

15 A.    F-250 is white color.  Yes, ma'am.

16 Q.    Thank you.  I'm sorry.  Pickup trucks are not my

17 area of expertise.  Now, this white Ford F-250 throughout

18 the course of the investigation who did you see driving

19 this vehicle?

20 A.    José Martinez.

21 Q.    And, in fact, he was stopped and arrested in this

22 vehicle on September 25th, 2014?

23 A.    That's correct.

24 Q.    Let's move on to Mr. Hidalgo.  I believe you

25 testified that Andrew Carter in his statement -- actually

1    before I ask you that, let me put this in better context.

2    Now, Andrew Carter and José Martinez both spoke to you?

3    A.    Yes.

4    Q.    And we're talking about a time frame, at least

5    what's charged in the indictment, of January 2013 through

6    October 2014?

7    A.    Yes, ma'am.

8    Q.    How long did you speak to these two gentlemen?

9    A.    Less than two hours each.  Or approximately two

10   hours.  On Andrew Carter, I initially spoke with him and

11   he wanted to speak with his mother and girlfriend, and so

12   I stopped the interview to allow him to speak with them

13   for a short period of time, for approximately 30 minutes.

14   And then I spoke with him.  And on José Martinez, we

15   started the interview, we stopped the interview, we came

16   back to the interview.  I can't remember the exact time.

17   Q.    Okay.  So to put that timeframe in context, you

18   testified way back in the beginning of your direct that

19   you've worked a previous drug trafficking investigation

20   and wiretap investigations?

21   A.    Yes, ma'am.

22   Q.    And as a result of those investigations have you had

23   an opportunity to debrief individuals who wished to

24   cooperate regarding their involvement in the drug

25   conspiracy?

1    A.    I have.  And in this case I was trying to get a

2    broad overview of the conspiracy and understand or ask

3    certain questions I knew that were broad in scope.  I have

4    not done a thorough debriefing like I would normally do,

5    and that I plan on doing in this type of investigation.

6    Q.    And would that be fair to say because it's in the

7    early stages of any cooperation or statements they might

8    make?

9    A.    Yes, ma'am.

10   Q.    So a full debrief of all the questions that might be

11   asked would take much longer?

12   A.    It will take over a day.

13   Q.    However, in that short broad overview, as you

14   characterize it, Andrew Carter did talk about Mr. Juan

15   Sanchez Hidalgo, the paw-in-law of José Martinez?

16   A.    He did.

17   Q.    And he indicated both that he would courier drugs

18   and money?

19   A.    He indicated that he was mostly a money courier.

20   Q.    Right.  And I guess I should be precise.  He

21   provided a price per kilogram for which Mr. Hidalgo might

22   transport cocaine?

23   A.    Yes, ma'am.  He charged me what the price he would

24   charge.  Did I ask him has he ever transported cocaine?  I

25   don't believe so.

1   Q.    And is it typical, based on your knowledge and

2   experience and -- of this case as well that drivers of

3   cocaine and/or money will have a certain price per unit,

4   if you will?

5   A.    Yes, ma'am.

6   Q.    All right.  Speaking specifically about Fatboy or

7   Mr. Juan Pablo Cuevas as he was later identified, would he

8   arrange for deliveries of currency and deliveries of -- or

9   rather pickups of drugs to take places at separate

10  locations?

11  A.    Yes, ma'am.  We learned that the currency was mainly

12  transported to his apartment which is accessed by a gated

13  parking garage, and then the -- whoever would bring up the

14  money, mostly Juan Hidalgo Sanchez, would travel to this

15  location.  Now, the cocaine would be met -- the driver for

16  the cocaine transportation would be met at a public

17  location off of random Interstate exits in the Atlanta

18  area.

19  Q.    So it was Juan Sanchez Hidalgo who would have the

20  knowledge of where to go to deliver this money, to the

21  source?

22  A.    Yes, ma'am.

23  Q.    Now, I believe we played, and correct me if I'm

24  wrong, seven calls --

25  A.    I think that's correct.

1    Q.    -- during this hearing?

2    A.    Yes, ma'am.

3    Q.    And would it be accurate to say that Mr. Hidalgo or

4    the paw-in-law of José Martinez was referenced in six of

5    those calls?

6    A.    I believe he was referenced in almost all of them

7    but one or two.

8    Q.    In addition to call 4803 which you've talked about

9    and did some math for us in reference to Mr. Hidalgo

10   kicking in that extra amount of money required to bring it

11   up to a 2 kilogram price?

12   A.    Yes, ma'am.

13         MS. BOWEN:  Your Honor, if you'll bear with me a

14   moment, I'm just trying to look at my notes.

15         THE COURT:  Certainly.

16   BY MS. BOWEN:

17   Q.    All right.  So you testified in regards to a

18   Hondessy -- excuse me.  I'm making up words. -- Honda

19   Odyssey minivan, which was blue-in-color?

20   A.    Ma'am, I'm sorry.  The last part of your question?

21   Q.    Yes.  You testified that a blue Honda Odyssey

22   minivan was seen multiple times in this investigation?

23   A.    Yes, ma'am.

24   Q.    And, correct me if I'm wrong, but I believe the

25   dates that are relevant to that and to paw-in-law being

1  put on the road would be September 10th, September 19th,

2  and September 25th?

3  **A.**    That's correct.

4  **Q.**    And those dates match surveillance that are

5  consistent with the calls that we listened to here today?

6  **A.**    Yes, ma'am.

7  **Q.**    In particular on September 10th, 2014 -- actually

8  let me back up.  On September 25th, 2014, you testified

9  that the two vehicles, the one occupied by Mr. Juan

10  Sanchez Hidalgo and the nearly -- the $225,973 and the

11  white Ford F-250 occupied by Jessica Tellez and José

12  Martinez were traveling in a tandem pattern?

13  **A.**    They were.

14  **Q.**    Was it the first time that you had observed this

15  pattern of travel in this investigation?

16  **A.**    No, ma'am.  We had also observed it on September the

17  10th when Juan Hidalgo Sanchez was following James Waters.

18  Now, it was -- it's more his vehicle at the time on

19  September 10th, I did not know who Juan Hidalgo Sanchez

20  was, but it was his vehicle and it was an older Hispanic

21  male in the vehicle driving.

22  **Q.**    When you say his vehicle, you're referencing that

23  blue Honda Odyssey minivan that was stopped --

24  **A.**    Yes, ma'am.

25  **Q.**    -- and he was found in it on the September 25th,

1  2014 date?

2  A.    Yes, ma'am.

3  Q.    All right.  Intercepted communications on that date,

4  what did they indicate about James Waters' reaction to how

5  much cocaine he was delivering back to the Tifton,

6  Georgia, area?

7  A.    When the courier would obtain the cocaine in Atlanta

8  it would sometimes be in a closed box or closed bag.

9  We've had reference to it in this conversation.  And when

10 he learned it was -- it was either 10 or 15 kilograms, I

11 cannot recall, he was shocked and mad because he was not

12 getting paid the right amount of money I believe was his

13 problem.

14 Q.    And when you spoke to José Martinez on September

15 25th, did he place his father's -- his paw-in-law on the

16 road a week before?

17 A.    He did.

18 Q.    And would that be consistent with intercepted

19 communications and surveillance around September 19th?

20 A.    It was.

21 Q.    The communications, we listened to some of them here

22 today, surrounding that September 25th delivery of

23 currency to pay off or pay for a quantity of cocaine, it

24 was clear from them that that money would be going north?

25 A.    Yes, ma'am.

1    Q.    And that José Martinez and his paw-in-law, Juan

2    Sanchez Hidalgo, would be involved in that delivery?

3    A.    Yes, ma'am.  We -- we thought it was going to occur

4    on September 24th, and we had the surveillance assets in

5    place to follow them on September 24th, but learned that

6    they were not going to travel until September 25th.

7              MS. BOWEN:   That's all I have, Your Honor.

8              THE COURT:   All right.  Let's see.  Ms.

9    Williams, anything further from you?

10             MS. WILLIAMS:  No, Your Honor.

11             THE COURT:   Mr. Walker, anything further?

12             MR. WALKER:  No, Your Honor.

13             THE COURT:   And, Mr. Haugabrook, anything

14   further?

15             MR. HAUGABROOK:  Just a couple of questions,

16   Your Honor.

17                      RECROSS EXAMINATION

18   BY MR. HAUGABROOK:

19   Q.    Agent Luke, you testified that the Defendant had --

20   Mr. Hidalgo had knowledge of where to go to deliver the

21   money?

22   A.    Yes, ma'am.  Yes, sir.  I'm sorry.

23   Q.    Any knowledge the Mr. Hidalgo would have had about

24   where to deliver the money would have been given to him by

25   someone else in this conspiracy, wouldn't it?

1    A.    That's what I have to assume.  Yes, sir.

2    Q.    He didn't know -- he wasn't just going somewhere on

3    his own to conduct some drug transaction, was he?

4    A.    No.  I would say people were directing his path and

5    just -- it was a common spot for the money to go through

6    this parking garage from what we've learned, but the

7    actual cocaine to be picked up was usually a public place

8    that was not common -- that was not the same place over

9    and over.

10   Q.    And the place wherever this cocaine was supposed to

11   be picked up did not -- was not a place where Mr. Hidalgo

12   was?  He went to a separate place, correct?

13   A.    That's correct.

14   Q.    Okay.  Now, as it relates to September 10th, the

15   government asked you about Mr. Hidalgo following James

16   Waters?

17   A.    Yes.

18   Q.    Based on the wire intercepts and your investigation,

19   overhearing conversations I presume, no one directed Mr.

20   Hidalgo to follow James Waters, did they?

21   A.    I just know that the conversation was my

22   father-in-law is following your father-in-law or something

23   along those lines.

24   Q.    You don't know where they got -- where they got in

25   contact with each other at, do you?

1   A.    I do not.  No, sir.

2   Q.    And was that observed by any law enforcement agency?

3   A.    The surveillance of them driving south, yes, sir.

4   Q.    And where was that -- where did that surveillance

5   start?

6   A.    Around Cordele.

7   Q.    Does any of the surveillance indicate that that just

8   may have been happenstance, and I say that because Mr.

9   Hidalgo goes one place to drop the money off and Mr.

10  Waters went to another place, it could have been

11  fortuitous that they happened be in Cordele about the same

12  time?

13  A.    I know they were complaining about James Waters'

14  driving.  Do I know when he started following or what the,

15  I guess, circumstances around that is, no, sir.

16  Q.    And nobody directed Mr. Hidalgo to follow James

17  Waters from Atlanta back to Tifton, did they, as far as

18  you know?

19  A.    No.  Not that I can recall right now.

20        MR. HAUGABROOK:  That's all I have, Your Honor.

21        THE COURT:  All right.  May Agent Luke step

22  down?

23        MS. BOWEN:  Yes, Your Honor.  Thank you.

24        THE COURT:  All right.  Agent Luke, thank you,

25  sir.  It's been a long day for you.

1          Is there going to be any further evidence from

2     the government, Ms. Bowen?

3          MS. BOWEN:  No, Your Honor.

4          THE COURT:  Government rests?

5          MS. BOWEN:  Yes, Your Honor, saving argument.

6          THE COURT:  All right.  Well, it's been a long

7     day, and it's already 5:40 looks like.  So what we're

8     going to do, the government has rested.  We're going to

9     recess until 9:30 tomorrow morning, and we'll pick up

10    there with each Defendant, give you an opportunity to put

11    on whatever evidence you want to.

12         Mr. Lawrence just reminded me I need my

13    interpreter.  What's your availability for tomorrow, Ms.

14    Dorminey?

15         INTERPRETER:  If I can get to work --

16         THE COURT:  Well, let me put it this way, I've

17    got lawyers from out of town, witnesses, so you tell me

18    what will work for you, and that's when the rest of us is

19    going to have to go.  Can you tell me you'll be available

20    some time tomorrow?

21         INTERPRETER:  I will be --

22         THE COURT:  We've probably got two hours left.

23         INTERPRETER:  -- available some time tomorrow.

24         THE COURT:  Huh?

25         INTERPRETER:  Yes, sir.  Some time tomorrow I

1    will be.

2            THE COURT:  Well, you tell me what's best --

3    9:30, 2:30.

4            INTERPRETER:  2:30 would work.

5            THE COURT:  2:30 is better for you?

6            INTERPRETER:  Yes, sir.

7            THE COURT:  How about 2:00?

8            INTERPRETER:  I can -- I think I can swing that.

9            THE COURT:  Is that too tight?

10           INTERPRETER:  No.  I think that will work.

11           THE COURT:  All right.  The Defendants will

12   remain in the custody of the Marshal, and we will recess

13   until 2 p.m. tomorrow.

14           Ms. Bowen, just in case any Defendants want

15   Agent Luke recalled for any reason or rebuttal or

16   whatever, will Agent Luke be here tomorrow?

17           MS. BOWEN:  He will be here.

18           THE COURT:  All right.  Very well.  Ms.

19   Williams, do you need to be heard?

20           MS. WILLIAMS:  Your Honor, my only concern is

21   that I actually have two witnesses that are outside now.

22   I'm not sure if they'll be able to return tomorrow.  May I

23   step out and just let them know what's going on so I can

24   let the Court know whether or not that's going to be an

25   issue?  Because they drove over today, and I know one of

1    them has a job, so I'm not sure about his schedule.  And I

2    had given them notice, like, last week about today, and so

3    he had made arrangements for today.

4         THE COURT:  I've got a little wiggle room, but

5    you heard the interpreter.  My guess is Ms. Dorminey is

6    available in the afternoon, so if it helps somebody to

7    start at 2:30 or 3.

8         Am I right, Ms. Dorminey, just can't start any

9    earlier?

10        INTERPRETER:  Yes, sir.

11        THE COURT:  If somebody has a reason to start

12   later tomorrow, obviously I don't want to be sitting here

13   again at a quarter to six tomorrow, but, sure, I'll give

14   you a minute to see if 2:00 is a problem.  Just keep in

15   mind I can probably start as late as 3, and that's about

16   it.

17        MS. BOWEN:  Your Honor, do you mind if I collect

18   my computer?

19   (Aside)

20        THE COURT:  No, that's fine.  Ms. Williams?

21        MS. WILLIAMS:  My one witness indicated that

22   2:30 would be better for him than 2:00 because of -- like

23   I said, he's working, feels like he could be finished at

24   1:30 and it will take him, I think, about 45 minutes to

25   get over here, and I was, like, well, I'll give you 15

1    minutes so you can park and get settled.

2         THE COURT:  Okay.  All right.  Mr. Lawrence,

3    we'll continue this hearing until 2:30 tomorrow.  I will

4    advise counsel and the witnesses now that -- of course,

5    we're sharing this courtroom now with the Bankruptcy

6    Judge, and he's supposed to come down from Macon tomorrow,

7    so you might want to check.  There's a possibility if

8    we're not in this courtroom, we could be in Judge Abrams'

9    courtroom on the third floor.  Plan on being here, but you

10   want to check with Mr. Lawrence.  He'll know by 2:30.

11        And I apologize, I know witnesses have been

12   sitting here, and y'all would have preferred to get it

13   over with, but the Court is mindful that it has a lot of

14   employees that have been here for a long day too, and

15   frankly, my concentration span starts to dwindle off, so I

16   think it would be good to start fresh tomorrow.

17        We'll see everybody at 2:30.  Ms. Dorminey, our

18   interpreter.  We'll recess until then.

19

20   (Recess)

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Tammy W. Fletcher, Federal Official Court

4    Reporter, in and for the United States District Court for

5    the Middle District of Georgia, do hereby certify that the

6    foregoing is a true and correct transcript to the best of

7    my knowledge and ability from the electronic recording

8    provided in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United

11   States.

12

13              Dated this 3rd day of February, 2014.

14                        *Tammy W. Fletcher*

15

16        _____

17        TAMMY W. FLETCHER, CCR
          FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25