```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
 2                    VALDOSTA DIVISION

 3              _____

    THE UNITED STATES OF AMERICA,   :
 4                  PLAINTIFF   : Case No. 7:14-CR-48(HL)
    VS                              :
 5                                  :      January 13, 2015
    JUAN SANCHEZ HIDALGO, ANDREW    :
 6  D. CARTER, JUAN P. CUEVAS       :    Valdosta, Georgia
    JOSÉ A. MARTINEZ                :
 7                  DEFENDANT.   :
    _____
 8
                 DETENTION HEARING CONTINUED
 9
           BEFORE THE HONORABLE THOMAS Q. LANGSTAFF
10          UNITED STATES MAGISTRATE JUDGE, PRESIDING

11  APPEARANCES:

12  FOR THE GOVERNMENT:            JULIA BOWEN, AUSA
                                   US ATTORNEY'S OFFICE
13                                 P.O. BOX 1702
                                   MACON, GA 31202-1702
14
    FOR DEFENDANT JUAN S. HIDALGO:  NATHANIEL HAUGABROOK
15                                 102 E. ADAIR STREET
                                   VALDOSTA, GA 31601
16
    FOR DEFENDANT ANDREW CARTER:   NICOLE WILLIAMS
17                                 323 PINE AVE, STE 203
                                   ALBANY, GA 31701
18
    FOR DEFENDANT JOSE A. MARTINEZ:  ROBERT WALKER
19                                 P.O. BOX 247
                                   OCILLA, GA 31774
20
    FOR DEFENDANT JUAN P. CUEVAS:   RICKY COLLUM
21                                 P. O. BOX 1867
                                   MOULTRIE, GA 31776
22  ELECTRONICALLY RECORDED
    _____
23
                    TAMMY W. FLETCHER
24                   P. O. BOX 539
                  MACON, GA 31202-0539
25                   (478-752-3497)
```

```
1                      I N D E X

2                     ROBERT STOKES

3   DIRECT EXAMINATION
        BY MS. WILLIAMS. . . . . . . . . . . . . . .     4
4
    CROSS EXAMINATION
5       BY MS. BOWEN . . . . . . . . . . . . . . . .     9

6                   SERGIO MARTINEZ

7   DIRECT EXAMINATION
        BY MR. WALKER  . . . . . . . . . . . . . . .    15
8
    CROSS EXAMINATION
9       BY MS. BOWEN . . . . . . . . . . . . . . . .    24

10  REDIRECT EXAMINATION
        BY MR. WALKER. . . . . . . . . . . . . . . .    31
11
                   JAQUALINE TELLEZ
12
    DIRECT EXAMINATION
13      BY MR. HAUGABROOK. . . . . . . . . . . . . .    36
.
14  CROSS EXAMINATION
        BY MS. BOWEN . . . . . . . . . . . . . . . .    58
15
    REDIRECT EXAMINATION
16      BY MR. HAUGABROOK. . . . . . . . . . . . . .    67

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2      January 13, 2015
 3           THE COURT:  All right.  Good afternoon to
 4   everyone.
 5           COUNSEL COLLECTIVELY:  Good afternoon.
 6           THE COURT:  Let me take a moment to remind
 7   counsel and the witnesses that the Rule was invoked
 8   yesterday, so if there are any witnesses in the courtroom
 9   who counsel expects or might testify, please ask them to
10   wait outside.
11           And for the record, today is January 13.  It's
12   2:30 p.m.  This is a continuation of a hearing that began
13   yesterday in the case of United States of America versus
14   Andrew David Carter, Jr., José Alfredo Martinez, and Juan
15   Sanchez Hidalgo, being case number 7:14-CR-48.
16           Ms. Dorminey, our interpreter, is present again.
17   And, Ms. Dorminey, the Court will remind you that you are
18   still under oath.
19           All right.  We left yesterday evening with the
20   government resting its case.  So now we are ready for the
21   defendants' presentations, if any defendant has evidence
22   to offer, and we will go in the order we've been going.
23           So, Ms. Williams, we'll start with you on behalf
24   of Andrew David Carter.  Any evidence you wish to present?
25           MS. WILLIAMS:  Yes.  I would like to call a
```

1    witness, Robert Stokes.  I think he's outside.

2         THE COURT:  Welcome, Mr. Stokes.  And the Court

3    -- I can't remember if I did this, but let me just perfect

4    the record.  This is case 7:14-CR-48.  Ms. Bowen appears

5    for the government.  Ms. Williams is here for Mr. Carter.

6    Mr. Walker is here for Mr. Martinez.  And Mr. Haugabrook

7    is here for Mr. Hidalgo.

8         All right.  Ms. Williams, you may proceed.

9                       **ROBERT STOKES**

10     Witness, having first been duly sworn, testified on

11                    DIRECT EXAMINATION

12   BY MS. WILLIAMS:

13   Q.    Mr. Stokes, would you -- would you state your name

14   for the record.

15   A.    My name is Robert Stokes.

16   Q.    And how are you employed?

17   A.    I'm employed at Moultrie Tech currently.

18   Q.    And how long have you been working at Moultrie Tech?

19   A.    About a year and a half.

20   Q.    And what exactly is your job description?

21   A.    I'm an adjunct instructor at Moultrie Tech.

22   Q.    And what classes do you teach?

23   A.    Comp literacy, computer systems.

24   Q.    Do you have any other jobs?

25   A.    Yes, ma'am.  I'm also serving as an elder at the

1    (inaudible) Church, and I'm a part-time bailiff at Tift

2    County Sheriff's Office.

3    Q.    Okay.  And how long have you been a part-time

4    bailiff with the Tift County Sheriff's Office?

5    A.    About two years now.

6    Q.    Okay.  You're also retired; is that correct?

7    A.    Yes, ma'am.  Air Force, retired.

8    Q.    And what was your job and rank before you retired

9    from the Air Force?

10   A.    I was a computer officer, programmer, and also a

11   communicator systems analyst.  I was a retired Captain.

12   Q.    And how long were you in the military?

13   A.    Just one month shy of 26 years.

14   Q.    Okay.  Now, how do you know Andrew Carter?

15   A.    He's my nephew and I -- over the years, I would see

16   him quite often.

17   Q.    Okay.  And where do you live?  And don't give me the

18   exact address, but if you could, give me the town and the

19   state.

20   A.    I live in Omega, Georgia.  I was born and raised

21   there.  I recently moved back about four years ago from

22   San Antonio, Texas.

23   Q.    Okay.  And since you've been back for the past four

24   years how often would you see your nephew, Andrew Carter?

25   A.    Anywhere from three to four times a week.

1    Q.    Okay.  And prior to you moving back to Omega,

2    Georgia, how often would you visit?

3    A.    We would -- for every holiday season, we would

4    return back to Omega, and for special occasions like

5    birthday celebration and graduations, things like that.

6    Q.    Okay.  Now, you said that Mr. Carter is your nephew.

7    A.    He is.

8    Q.    Are you related to his mother or to his father?

9    A.    Sisters and brother, yes, ma'am.

10   Q.    Okay.  Now, do you know where Mr. Carter lives?

11   A.    Yes, ma'am, I do.

12   Q.    And what city and state does he live in?

13   A.    He live in Omega, Georgia, also.

14   Q.    Does he have any other family members that live in

15   that general area?

16   A.    Yes, ma'am, lots of family.

17   Q.    Could you name some of those family members?

18   A.    Yes.  He has an aunt that lives in Tifton, Georgia,

19   also in Omega.  He also has a cousin that lives up

20   approximately one mile, half a mile from him.  He has a

21   sister that lives about the same distance from him.  He

22   has another cousin there as well, a cousin-in-law, that

23   lives in Omega.  And in Tifton, which is where we do all

24   our shopping and everything, he has an aunt -- he has two

25   aunts that lives there and a couple of uncles.

1    Q.    Okay.  How long has Mr. Carter lived in Omega,

2    Georgia?

3    A.    All of his life.

4    Q.    Now, do you know Mr. Carter to travel frequently

5    outside the State of Georgia?

6    A.    No, ma'am.

7    Q.    What is the nature of your relationship with Mr.

8    Carter?

9    A.    Well, I'm his uncle, and when I moved back, I didn't

10   employ him, he just volunteered to help me.  In order to

11   get my -- make my residence livable, he came and helped me

12   with my roof, and I would see him.  When I needed some

13   heavy lifting -- because, as I grow older, my back doesn't

14   serve me well -- so he's always volunteered to come out to

15   help.

16   Q.    Okay.  Now, have you ever seen Mr. Carter with any

17   drugs?

18   A.    No, ma'am.

19   Q.    Have you ever seen him with any firearms or weapons?

20   A.    No.  I have seen him with -- I think his father had

21   a pellet gun in the house, so I've seen him with that.  I

22   was aware that he had a weapon because his dad told me

23   that he was going -- I tried to buy some protection for my

24   own home when I got there, and his dad said, no, that he

25   was going to give it to the boys.  That was about it.

1    Q.    Okay.  Now, have you ever seen him engage in any

2    kind of physical fight?

3    A.    Never.  I've never seen him engaged or enraged in

4    any kind of way.

5    Q.    Now, are you afraid of Mr. Carter?

6    A.    No, ma'am, absolutely not.

7    Q.    If he were given a bond, would you be willing to

8    allow him to live with you?

9    A.    Yes, ma'am.

10   Q.    Now, have you ever been arrested for anything?

11   A.    Never.  Nothing.

12   Q.    Now, do you have any reason to believe that Mr.

13   Carter would harass or intimidate any witnesses?

14   A.    No, ma'am, I don't.  He always seemed to be a good

15   natured person, especially respectful to me.  I've never

16   noticed him to be that type of person.

17   Q.    Now, do you believe that he would flee the

18   jurisdiction?

19   A.    No, ma'am, I don't.  I don't think he has anywhere

20   to go.

21   Q.    Do you know of any reason why he wouldn't appear for

22   court?

23   A.    No, ma'am, I don't.

24   Q.    Now, Mr. Carter has about three children; is that

25   correct?

1    A.    Yes, ma'am.

2    Q.    Have you observed him with his children?

3    A.    Yes, ma'am, I have.

4    Q.    And what type of father is he?

5    A.    Oh, he's a good father.  I know with his oldest

6    daughter.  I've seen her -- him taking her different

7    places and I've seen her going to him when she needed

8    things.  And I have noticed when there was a crisis

9    situation with her that he was not the kind that was

10   violent or anything towards her, always -- when I was

11   around, he always talked to her and communicated with her.

12   I've seen him upset, mad with her, but I've never seen him

13   act out on his reaction toward her.

14            MS. WILLIAMS:   I have no further questions of

15   this witness.

16            THE COURT:  All right.  Ms. Bowen, any cross?

17            MS. BOWEN:  Yes, sir.

18                      CROSS EXAMINATION

19   BY MS. BOWEN:

20   Q.    Good afternoon, sir.  My name is Julia Bowen, and I

21   represent the United States of America.

22   A.    Good afternoon.

23   Q.    I just have a couple of questions.

24   A.    Yes, ma'am.

25   Q.    I believe you said that Sarah Carter is your sister?

1    A.    Yes, ma'am.

2    Q.    And Sarah Carter lives at 1569 Georgia Avenue?

3    A.    That's correct.

4    Q.    And also recently in time residing in the house with

5    her were Kayla Carter and Diamond Carter?

6    A.    That's correct.

7    Q.    Now, I believe you said that you would visit three

8    to four times a week with Andrew.  Where would those

9    visits take place?

10    A.    I would see him at his mother's house when I would

11    go over.  My mother-in-law's house is one block over, so

12    when I would go through to visit with her, my wife and I,

13    if he would be standing around, I would stop and talk to

14    him.  And when I was in Texas I would communicate with him

15    about his career and some things that was happening, and

16    he would bring his wife over at the time, and every time I

17    would come home, he would come over and visit with me at

18    my mother-in-law's house.

19    Q.    Okay.  So the two locations then that you've noted

20    one of them is 1569 Georgia Avenue?

21    A.    That's correct.

22    Q.    And you indicated that for the past four years, if I

23    have it correct, you have visited there or at your

24    mother-in-law's three to four times a week?

25    A.    Yes.

1    Q.    Are you aware during those visits of the dealing of

2    crack cocaine from that residence by Sarah Carter and

3    Andrew Carter?

4    A.    No, ma'am.  I am -- I preach -- I'm a preacher also,

5    so they've always -- when I'm around, they're respectful

6    towards me.  I have never noticed any kind of activity or

7    things like that occurring when I was there.  I've never

8    seen it.

9    Q.    Okay.  You mentioned some aunts and some cousins in

10   the Tifton area.  Is Maurice Todd Carter Andrew Carter's

11   brother?

12   A.    Yes, ma'am.

13   Q.    And does he live, I believe, in Cook County?

14   A.    No.  He lives in Colquitt.

15   Q.    Colquitt.  And we've established Sarah Carter is his

16   mother, Diamond is his daughter, Kayla Carter is his

17   sister?

18   A.    Yes.

19   Q.    And Latoris Waters is his girlfriend and also, prior

20   to recent events, lived with him at 186 Crosland Lenox

21   Road?

22   A.    Yes, ma'am.

23   Q.    Are you aware that all of those individuals, those

24   family members, are indicted in this drug trafficking

25   conspiracy together?

1    A.    Yes, I am.

2    Q.    Now, you talked about him coming over to help you

3    with your roof or work on your house?

4    A.    Yes, ma'am.

5    Q.    How recent in time was that activity?

6    A.    That was when I first arrived back in -- four years

7    ago.

8    Q.    Okay.  You mentioned, I think, a handgun that might

9    have been at the residence of now Sarah Carter, but also

10   previously Andrew Carter, Sr., resided there prior to his

11   being deceased; is that correct?

12   A.    That's correct.

13   Q.    Are you aware that on the execution of a search

14   warrant at that residence this prior year, September 25th,

15   2014, that there was a handgun found and that handgun was

16   stolen?

17   A.    No.  I was told afterwards that a handgun had been

18   found in the house, but not that it was stolen.

19   Q.    You mentioned that, in your opinion, Andrew Carter

20   is a good father?

21   A.    Yes, ma'am.

22   Q.    And are you aware, taking into calculation in

23   forming that opinion, that he employed his daughter,

24   Diamond Carter, to courier drugs for him?

25   A.    No.  I know she had a car and he purchased her one,

1    but never.

2    Q.    Thank you, sir.  One other question.  Speaking of --

3    I think I asked you about the firearm in the house.  Are

4    you aware that two other firearms were found in the

5    residence at 1569 Georgia Avenue?

6    A.    Yes, ma'am.  I was told there was more than one

7    weapon found.

8    Q.    Thank you, sir.  And I think we've -- you've

9    testified that three adult women lived there, but doesn't

10   also a child reside in that home?

11   A.    Yes, ma'am.

12   Q.    Thank you, sir.

13         THE COURT:  Anything further, Ms. Williams?

14         MS. WILLIAMS:  No, Your Honor.

15         THE COURT:  Mr. Stokes, thank you, sir.  You may

16   step down.

17         Ms. Williams, any further evidence on behalf of

18   Mr. Carter?

19         MS. WILLIAMS:  No.  Well, I had one other

20   witness.  I'm not sure if he returned today, which would

21   have -- May we take a look and see if he's outside?

22         THE COURT:  Sure.

23   (Aside)

24         MS. WILLIAMS:  My other witness, which would have

25   been Troy Lindsey, is not present.  He did inform me

1    yesterday that he may not be able to return due to a

2    conflict, but if I may just proffer what he would have

3    testified to because he was, in fact, here yesterday.

4         THE COURT:  Tell me his name again.

5         MS. WILLIAMS:  His name is Troy Lindsey, and he

6    is a pastor at the St. John's Missionary Church.  He's

7    been a pastor at that church for approximately 12 years.

8    He would testify that my client, Mr. Carter, attends that

9    church, that he generally attends with the mother of his

10   child, Latoris Waters, and that he also sees my client at

11   family gatherings.  St. John's Missionary Church is a

12   family church.  It is a rather small church with

13   approximately 150 individuals on the roll, so it is a

14   pretty close knit church.  That my client, Mr. Carter, has

15   been attending that church for approximately one year,

16   that he would allow my client to assist with offering and

17   praying over the money at church.  He would also state

18   that he has never seen Mr. Carter with drugs, with any

19   weapons, or engaging in any type of physical fights, and

20   that in addition to seeing him at church he saw him at

21   family gatherings.  He is not a member of Mr. Carter's

22   family, he is a close friend of the Waters family, and so

23   when they would have dinners, he would attend the dinners

24   and my client would be present.  And that is what Mr.

25   Lindsey would have testified to with respect to Mr.

1    Carter.

2          THE COURT:  All right.  Thank you, Ms. Williams.

3    Do you rest on behalf of Mr. Carter?

4          MS. WILLIAMS:  I would.  In closing, I would just

5    argue some information that the Court is already aware of

6    that is included in the Bail Report.

7          THE COURT:   All right.  I'll give you an

8    opportunity to do that when the evidence is closed.

9          All right.  So we then move to Mr. Martinez.  Mr.

10   Walker, any evidence on behalf of your client?

11         MR. WALKER:  Yes, sir, Your Honor.  Testimony

12   from Mr. Sergio Martinez.

13         THE COURT:  All right.

14         MR. WALKER:  Sergio Martinez.

15         THE COURT:  Good afternoon, Mr. Martinez.

16         WITNESS S. MARTINEZ:  How are you doing?

17         THE COURT:  Well, thank you, sir.  All right.

18   Mr. Walker, you may proceed.

19         MR. WALKER:  Thank you?

20                    **SERGIO MARTINEZ**

21    Witness, having first been duly sworn, testified on

22                     DIRECT EXAMINATION

23    BY MR. WALKER:

24   Q.   Mr. Martinez, if you would, state your full name for

25   the record, please.

1    A.    Sergio Martinez.

2    Q.    Mr. Martinez, I hate to have to ask you, but what is

3    your age?

4    A.    8/11/61.  I'm 53 years old.

5    Q.    All right.  And what -- where do you live?  Not the

6    specific address, but the town and -- and community that

7    you live?

8    A.    It's really in Colquitt County, but it's -- they

9    claim it to be an Omega address, but I live in Colquitt

10   County, because it's more toward Tift County.

11   Q.    And how long have you lived in that area?

12   A.    I would say over 25 years or better.

13   Q.    And are you employed?

14   A.    Yes, sir.  I'm self-employed.  I'm a labor

15   contractor, farm labor contractor.

16   Q.    When you say farm labor contractor, what does that

17   entail?  What do you specifically do?

18   A.    I work out on the farm, and also as well on the

19   cotton gins during the fall -- during cotton season.  I

20   work like 65, 70 miles round in Tifton.

21   Q.    And as a labor contractor how many people do you

22   employee at these different places?

23   A.    I would say between 120, 130, somewhere in that

24   neighbor.

25   Q.    Are you -- do you have any children yourself?

1    A.    Yes, sir.  I have ten children.

2    Q.    And do they live close by you?

3    A.    Yes, sir.  My youngest child is four years, and my

4    oldest is 35 years.  But they -- they all live around the

5    Omega community.

6    Q.    And do you have any brothers or sisters?

7    A.    Yes, sir.

8    Q.    How many siblings do you have?

9    A.    We're 12 brothers and two sisters.

10   Q.    Do they live close to you?

11   A.    Yes, sir.  Everybody around the Omega community,

12   within a few miles.

13   Q.    Of course, if you would, tell the Court how you know

14   Mr. José Martinez -- José Martinez.

15   A.    He's my brother.  He's been with the family in the

16   same community for years, all his life.

17   Q.    And does -- does he work with you?

18   A.    Yes, sir.

19   Q.    How long has he been employed with you or working

20   with you?

21   A.    Recently I would say three to four years, but most

22   of his entire life he has worked partial time on the

23   weekends when he was working in town, up in the farm, you

24   know, but recently in this past few years, he had been

25   working in the farm with me.

1    Q.    And how long has he lived in the Omega community?

2    A.    It's been more than 20 years I know.

3    Q.    Are you aware of where he went to school?

4    A.    Yes.  He attended Colquitt County and Tifton County

5    schools.

6    Q.    And does he have any children?

7    A.    Yes, sir.  He's got two children with the first wife

8    and two with his second wife, which is liking they say

9    adopted but not adopted legally.

10   Q.    And are you familiar with his second wife?

11   A.    Yes, sir.

12   Q.    What's her name?

13   A.    Jessica.  Ms. Jessica.

14   Q.    Tellez?

15   A.    Tellez Martinez, yeah.

16   Q.    And you understand that she's charged in this case

17   along with Mr. Martinez; do you not?

18   A.    Yes, sir.

19   Q.    And is she out on bond presently on -- in this case?

20   A.    To my knowledge, yes.

21   Q.    And in relation to her home and Mr. José Martinez's

22   home and your home, how far is that?  What's the distance?

23   A.    I would say between five to seven miles at the

24   most.

25   Q.    And prior to Mr. Martinez being arrested did -- did

1    you have an opportunity to visit with him on a regular

2    basis?

3    A.    Well, yes, sir.

4    Q.    How often would you see Mr. Martinez?

5    A.    Just about every day or -- or very, very recently.

6    I mean, I would say we would always get together at the

7    house or my mom's house, which my mom is already passed

8    away, but we call it our mom's house.  We always get

9    together, regardless, on the weekends and stuff like

10   that.  Not only on daily basis, but especially on the

11   weekends.

12   Q.    And does Mr. Martinez, does he attend church

13   anywhere?

14   A.    We have what we call a little chapel there at home,

15   at 6147, that we claim our church.  When we don't go to

16   the church, Catholic church, we do our prayers there at

17   home, just before we even go to work or on the way back,

18   we always stop and do our prayers, and even on the

19   weekends.

20   Q.    Let me ask you this, I hate to, but have you ever

21   been in trouble with the law?

22   A.    No, sir.

23   Q.    Now, there -- you have a sister named Aracley

24   Rivera; is that correct?

25   A.    Yes, sir.

1   Q.    And she has had some problems in the past, has she

2   not, with -- Strike that.  Has she ever had any problems

3   in the past in relations to any -- being a victim of any

4   crime?

5   A.    Yes, sir.

6   Q.    Would you tell the Court about that?

7   A.    She was abducted back -- I can't remember the year

8   exactly, but it's been more than ten years if I'm not

9   mistaken or somewhere in that neighborhood.

10  Q.    And to your knowledge was there any correlation

11  between that abduction and Mr. José Martinez, your

12  brother?

13  A.    No, sir.  Not to my knowledge because I would say

14  that I was never informed through any federal agent or

15  nothing.  The only time I was informed was through Mr.

16  Gary Vowell that they had found her in Atlanta, and that

17  was -- that was it.  I only spoke to an agent, federal

18  agent, one time, and it was a lady, but I can't remember

19  her name.

20  Q.    Let me ask you this, during the time period in which

21  you visited with your brother, have you ever seen him with

22  a firearm?

23  A.    No, sir.

24  Q.    Have you ever seen him with any type of firearm,

25  explosive, weapon, anything like that?

1    A.    No, sir, none whatsoever.

2    Q.    Have you ever seen him with any type of drugs or any

3    drug paraphernalia?

4    A.    No.  Definitely not.

5    Q.    Now, you're aware that Mr. Martinez spent some time

6    in the penitentiary, state penitentiary; is that right?

7    A.    That's correct.

8    Q.    All right.  And do you know anything about his

9    sentence?

10   A.    I think he was having, if I'm not mistaken, 25 years

11   and did seven and a half, if I'm not mistaken.

12   Q.    What's your understanding of how he got out early?

13   Do you know?

14   A.    No.  But I guess with good behavior, I don't know.

15   He was out on parole.

16   Q.    And since that time, that would have been somewhere

17   2011.  Does that sound about right?

18   A.    Yes, sir, somewhere in that.

19   Q.    Since that time, has he been employed with you and

20   worked?

21   A.    Yes, sir.

22   Q.    And could you tell the Court where he's worked for

23   you?

24   A.    Yes, sir.  He has worked not only as a regular

25   laborer but as the foreman taking care of crews in

1    different farms, wherever I would send him to in the

2    surroundings of Tifton.

3    Q.    You say the surroundings of Tifton, would that be in

4    Tifton?

5    A.    No.  I would say -- like I said, we always have work

6    all the way up to Cordele, Americus, and Smithville, same

7    thing, as well as Chula, Brookfield, and -- and the

8    surrounding little towns around Omega.

9    Q.    Let me ask you this, would that require Mr. Martinez

10   to travel in the morning and the evening?

11   A.    Oh, yes, sir.

12   Q.    And during those travels would he otherwise be in

13   trucks to haul produce, that type stuff?

14   A.    Oh, yes, sir.  Yes, sir.

15   Q.    And so it wouldn't be unusual for him to be

16   traveling with a group of other people that may be working

17   for you; is that right?

18   A.    That's right, sir.

19   Q.    Has he ever worked up the Cordele area?

20   A.    Well, yes, sir.  Yes, sir.  Definitely.

21   Q.    Has he ever worked up in the Americus area?

22   A.    Yes, sir.  Smithville, Americus.

23   Q.    And during that time period would he get up in the

24   morning, leave his house?  Would you give me his schedule

25   as it relates to getting up and coming home or would he

1    stay in those areas where he worked?

2    A.    Normally we get up around 5:30, 5:00 o'clock in the

3    morning and start picking up laborers so we can be ready

4    to go at daylight, and sometimes we don't get back home

5    until around 8 or 9:00 o'clock.  It's all accordingly.

6    Q.    And during any of these trips and travels have you

7    ever seen him with any type of weapons on him?

8    A.    No, sir.  Definitely not.

9    Q.    No type of drugs on him?

10   A.    No, sir.

11   Q.    Do you believe that Mr. Martinez, if this Court was

12   inclined to give him a bail, would flee the jurisdiction

13   of the Court or otherwise fail to appear when he's

14   required to?

15   A.    We'll make sure that he appears every time that he's

16   called.

17   Q.    If this Court was inclined to grant him a bond would

18   he, Mr. Martinez, be welcome to stay in your house?

19   A.    Yes, sir, at any time.  At any time.

20   Q.    With the number of people that you employ, the

21   number of family members that live close there to you, do

22   you believe that you could actively monitor Mr. Martinez's

23   going and coming so you would otherwise know where he's

24   at, at all times?

25   A.    Yes, sir.  We would do our best.  Yes, sir.

1    Q.    And would you take that on yourself, your

2    obligation, to make sure you could account for his

3    whereabouts at all times?

4    A.    Yes, sir.  I sure will.

5    Q.    Do you believe that Mr. Martinez would pose a

6    significant risk to any person in the community?

7    A.    No, sir.

8    Q.    Do you believe that Mr. Martinez would pose any

9    significant risk to any property in the community?

10   A.    No, sir.

11   Q.    Would you believe that -- do you believe that Mr.

12   Martinez would pose a significant risk or a risk to

13   obstruct the administration of justice?

14   A.    No, sir.

15   Q.    Are you asking the Court to grant him a reasonable

16   bond?

17   A.    I sure would, sir, with all my heart.

18         MR. WALKER:  No further questions at this time,

19   Your Honor.

20         THE COURT:  All right.  Ms. Bowen, cross?

21                     CROSS EXAMINATION

22   BY MS. BOWEN:

23   Q.    Good afternoon, sir.

24   A.    Good afternoon, ma'am.

25   Q.    If I understand correctly, I believe you said you

1   are a laborer contractor?

2   A.    Yes, ma'am.  Farm labor.

3   Q.    Farm labor contractor.  And what's the name of your

4   business?

5   A.    Martinez Harvesting.  Sergio.  Of course, in the

6   surrounding areas they know me by Sergio Martinez,

7   contractor.

8   Q.    And you're the boss?

9   A.    You may say in locally I am, but with special forces

10  for farm labor that we recruit from Mexico, (inaudible)

11  two ways, somebody else is in charge with them, one of my

12  sisters and my brother.

13  Q.    Okay.  Is that brother José Martinez?

14  A.    No, ma'am.

15  Q.    Okay.  So José Martinez, that brother, works for

16  you?

17  A.    Yes, ma'am.

18  Q.    And what does he do for you?

19  A.    He supervises over crews and sometimes drive buses

20  with produce.  Whatever is necessary, in other words.

21  Q.    Okay.  How many crews does he supervise?

22  A.    Normally it all depends if I -- he takes care of,

23  like, 25 people.  And if he moves from one place to

24  another, it'll be to my knowledge or I'll -- I'm the one

25  that guides them and tell them where -- where they need to

1    carry the labor.

2    Q.    Okay.  So if you have to give him direction, y'all

3    aren't together, he's reporting in to you?

4    A.    Not necessarily.  We speaking only -- excuse me --

5    only during plantations, if I may correct myself because

6    we plant over 3,000 acres of watermelon.

7    Q.    Okay.  All right.  And what time of year is that?

8    A.    That's in March.  We start in March all the way to

9    April, the first or second week of April.

10   Q.    Okay.

11   A.    And then we start cleaning patches or stuff like

12   that or whatever is necessary for the watermelons, any

13   vines afterwards, and then harvesting the watermelons up

14   unto middle of July.

15   Q.    Okay.  So if I'm understanding you correctly, you

16   employee approximately 110 to 130 laborers?

17   A.    Yes, ma'am.

18   Q.    And there are 25 people on a crew?

19   A.    Not necessarily.  You asked me with José, if I'm not

20   mistaken.

21   Q.    Okay.

22   A.    It all depends on the amount of acreage that needs

23   to be done or the farm that we are working at the time.

24   Q.    Okay.  So, for instance, in watermelon planting

25   season --

1    A.    Yes, ma'am.

2    Q.    -- how many people would be on a crew?

3    A.    Just like I said, ma'am, it all depends on the size

4    of the work that we have to do, the acreage to plant, and

5    so forth.  But we normally have for -- to be more

6    specific, if I may?

7    Q.    Sure.

8    A.    It could be up to three or four crews or it could be

9    two crews.  It's all according.

10   Q.    Okay.  So to be effective, I guess, then in your job

11   you have to have several crews?

12   A.    That's correct.

13   Q.    And you have to have several individuals who

14   supervise, direct, and lead these crews?

15   A.    Yes, ma'am.

16   Q.    And your brother is one of these people who --

17   A.    Yes.

18   Q.    -- directs these crews?  Now, when you -- you go to

19   work or José goes to work, does he come to a place of

20   business or does he just get in his truck and head off to

21   work?

22   A.    It all depends.  One day before, if we don't get

23   through with a job or if he happens to get through with

24   that job, I'll call him and tell him, hey, look, you got

25   to go to this other farm and be there tomorrow with the

1    same crew or I'm going to send you some more or less,

2    whatever's necessary.

3    **Q.**    Okay.

4    **A.**    But it's always through me.

5    **Q.**    Always through you?

6    **A.**    Yes.

7    **Q.**    And that may be a telephone contact?

8    **A.**    Yes.

9    **Q.**    Okay.  And I think you described this has been the

10   way that you've been working for the past four years?

11   **A.**    With José.  With José, yes.

12   **Q.**    These questions are, yes, with José.  Now, I think

13   you were asked on direct about the kidnapping of your

14   sister?

15   **A.**    Yes, ma'am.

16   **Q.**    Would the year 2004 seem correct to you?

17   **A.**    Like I don't recall the exact year, but if that

18   would be somewhere close.

19   **Q.**    Okay.  And are you aware that shortly thereafter in

20   that same year that your brother was arrested for and

21   eventually sentenced to 25 years for trafficking in

22   cocaine?

23   **A.**    Yes, ma'am.

24   **Q.**    And that he was eventually paroled in 2011?

25   **A.**    Right.

1    Q.    And taken off of parole in 2013?

2    A.    Yes, I believe.

3    Q.    Oh, and I remember one other question.  I'm sorry,

4    Mr. Martinez.  So to -- and this is only because I don't

5    know a lot about farming, what kind of crops do you plant

6    in July, August, that time of year?

7    A.    Normally it's pulling -- cleaning cotton patches,

8    but this year we -- I want to say last year, not this year

9    --

10   Q.    Okay.

11   A.    -- we planted cabbage that -- that we don't normally

12   do in Cordele and Smithville.  We plant, I think it was --

13   if I'm not mistaken somewhere in the neighborhood of 50 or

14   60 acres on foot.

15   Q.    Did you say on foot?

16   A.    Yes, ma'am.

17   Q.    That sounds pretty labor intensive?

18   A.    Yes, ma'am.  Hard labor.

19   Q.    So 50, 60 acres on foot of cabbage.  Did you rely on

20   your brother to get that job done?

21   A.    Not only him, all of us as a group, yes.  It takes a

22   lot of hard labor.

23   Q.    So it would be a bad time for anybody to take a

24   vacation or take leave or leave the State?

25   A.    If it's during working time.  It all depends on the

1   -- on the dates.

2   **Q.**    And the dates I'm asking you about are in July and

3   August when you've just described it being a very labor

4   intensive time for y'all planting 50 to 60 acres on foot

5   of cabbage?

6   **A.**    Yes, ma'am.

7   **Q.**    And just one last question, when you're out during

8   the day, I think you testified sometimes 5:30 a.m. until 8

9   p.m. at night you may be on the road.  I think you said it

10  was a 60 mile area?

11  **A.**    Yes, ma'am.

12  **Q.**    So there's a certain amount of leeway, freedom to

13  make calls and take care of other business?

14  **A.**    Everybody has freedom to do whatever they want to in

15  their -- in their own time.  Not only does it provide for

16  myself as well as the same thing as the workers.  When you

17  work out on the farm, you don't -- you don't stop them

18  from carrying a phone or anything whatsoever or -- or

19  stand up whenever they feel like standing up or

20  stretching.  You don't --

21  **Q.**    Okay.  Thank you, Mr. Martinez.  You answered my

22  question.

23          THE COURT:  All right.  Mr. Walker, anything

24  further for Mr. Martinez?

25          MR. WALKER:  Just a few, Your Honor, if I could.

REDIRECT EXAMINATION

BY MR. WALKER:

Q.    Mr. Martinez, I think you stated you planted a large
amount of watermelons; is that right?

A.    Yes, sir.

Q.    And that normally occurs -- y'all start putting in
plastic somewhere around -- clearing the fields somewhere
around March of each year; isn't that right?

A.    Yeah.  That's correct, sir.

Q.    And isn't it true in Georgia that you want that crop
to come off prior to July the 4th, don't you?

A.    Oh, yes, sir, definitely.

Q.    The reason for that is you've got a higher market
during that time period prior to the 4th; isn't that
right?

A.    Correct.

Q.    And these watermelon growers that you otherwise grow
watermelons for, they require you to load trucks and bins;
is that right?

A.    That's correct, sir.

Q.    And each one of those bins have a certain count of
watermelon -- a certain number of watermelons; isn't that
right?

A.    Yes, sir.

Q.    And you may otherwise have telephone calls that tell

1    you I need nine bins; isn't that right?

2    **A.**    Oh, yes, sir, very constantly.  45s, 36s, or 60s

3    what we call them.

4    **Q.**    You may say you need 31 bins; is that right?

5    **A.**    Yes, sir.

6    **Q.**    They may say you need a half of a bin to fill an

7    order, say, for Walmart; is that fair to say?

8    **A.**    That's correct.  Or to finish up a load.

9    **Q.**    All right.  Now, in addition to that, I assume that

10   after the rush is off for July the 4th, that people try to

11   take a little time off; is that fair to say?

12   **A.**    Yes, sir, definitely.

13   **Q.**    Because they've been working a lot trying to get

14   those -- those crops in for these people to ship out

15   before the 4th; is that right?

16   **A.**    One day before the 4th of July you -- you stop most

17   of the harvesting and then get started after the 4th of

18   July because they ain't too many trucks to haul the

19   production.

20   **Q.**    Okay.  And have you ever witnessed or saw or recall

21   a time when José would, after 2011, would leave the State

22   of Georgia on a regular basis?

23   **A.**    No, sir.

24   **Q.**    Now, are you familiar with where José was born?

25   **A.**    Yes, sir.  He was born in Eagle Pass, Texas.

1   Q.    And does he frequent Mexico?

2   A.    No.  I don't think if -- throughout his whole life,

3   maybe one or two times being in Mexico, and just in the

4   border.

5   Q.    Are you familiar with or do you know if José has a

6   passport?

7   A.    Not to my knowledge, no.

8   Q.    Now, currently you're working where?

9   A.    I work Shellman and the surrounding areas, Bronwood,

10  Americus, Cordele, and the surrounding little towns in --

11  around Tifton.  Right now we have 36 people working in

12  SuperTree Farms Nursery in Shellman.  We got 16 people

13  working in Americus, Sumter Producers Cotton Gin.  We done

14  got through with Mr. Ronnie Lee in Bronwood.  We done got

15  through in Sylvester, Worth County Gin.  And we almost

16  through in -- in Brookfield, in Brookfield.

17  Q.    Who you -- who you working for in Sylvester?  Who

18  were you working for in Worth County?

19  A.    Mr. Ron Coley.

20  Q.    All right.  What about Americus?

21  A.    Americus, the Minor brothers.

22        MR. WALKER:  No further questions, Your Honor.

23        THE COURT:  Anything further, Ms. Bowen?

24        MS. BOWEN:  No, Your Honor.

25        THE COURT:  Mr. Martinez, outside of work,

1    socially how often do you see your brother, José?

2         WITNESS S. MARTINEZ:  We see him just about every

3    day, sir, and on the weekends we see him -- get together

4    at my mom's house or either at my house, my -- or any of

5    my brother's house.  We normally get together just about

6    every weekend.  We like seeing each other throughout the

7    weekdays.

8         THE COURT:  There's an allegation in this case

9    that your brother is involved in some sort of drug

10   distribution conspiracy.  It's just an allegation.  Of

11   course, not making a determination today as to whether he

12   is or is not, that's for another day.  But the Court does

13   have a concern that if he was involved in that, that the

14   use of a phone and freedom while he's out on one of these

15   crews may allow him to continue such activity if he was

16   inclined to continue it if he's been doing it up to now.

17   Is there any assurance you could give the Court as to how

18   you could prevent him from using his cell phone to contact

19   people in the drug business and to continue doing what

20   he's alleged to have been doing?

21        WITNESS S. MARTINEZ:  The way that I can do it,

22   sir, is put him, like -- like I said a while ago with Omar

23   Spencer.  He is not only -- he used to work as a foreman

24   but as a regular laborer, and if I have to put him as a --

25   in a certain position where we can keep an eye on him,

1    we'll be more than gladly, sir, to supervise over him, and

2    take that phone or whatever is close to him so he can

3    dedicate to what -- to work.

4          THE COURT:  I take it if -- if he was released

5    you would take him back in your employ?

6          WITNESS S. MARTINEZ:  Yes, sir, definitely.  In

7    the areas where the Court, if it allows me to, whatever is

8    more convenient for him, we try to do so, to meet --

9          THE COURT:  All right.  Thank you, sir.

10          WITNESS S. MARTINEZ:  Yes, sir.

11          THE COURT:  All right.  May this witness step

12    down?

13          MR. WALKER:  Yes, sir.

14          MR. HAUGABROOK:  Yes, Your Honor.

15          THE COURT:  All right.  Mr. Martinez, thank you,

16    sir.

17          All right.  Mr. Walker, any further evidence on

18    behalf of José Martinez?

19          MR. WALKER:  No, sir, Your Honor.

20          THE COURT:  All right.  Mr. Haugabrook, that

21    moves us to Mr. Hidalgo.  Any evidence on behalf of your

22    client?

23          MR. HAUGABROOK:  Yes, Your Honor.  We will call

24    at least one witness in this case, Jacqueline Tellez.

25          THE COURT:  Good afternoon, ma'am.

```
 1            WITNESS TELLEZ:  Good afternoon.
 2            THE COURT:  You may proceed, Mr. Haugabrook.
 3            MR. HAUGABROOK:  Thank you, Your Honor.
 4                      JAQUALINE TELLEZ
 5       Witness, having first been duly sworn, testified on
 6                      DIRECT EXAMINATION
 7     BY MR. HAUGABROOK:
 8     Q.    Ms. Tellez, would you state your full name for the
 9     record, please.
10     A.    Yes.  Jacqueline Sophia Tellez.
11     Q.    And what city do you live in, Ms. Tellez?
12     A.    Tifton, Georgia.
13     Q.    How long have you lived in Tifton?
14     A.    I've been there 15 years.
15     Q.    Are you married?
16     A.    Yes.
17     Q.    Have any children?
18     A.    Yes, sir.
19     Q.    How many children do you have?
20     A.    I have two children, a boy and a girl.
21     Q.    And how old are they?
22     A.    My daughter is nine years and my son is five.
23            THE COURT:  Hold on one minute.  Mr. Lawrence,
24     will you move that microphone a little bit closer to her
25     and maybe down and closer.  Thank you.
```

BY MR. HAUGABROOK:

**Q.**    Are you employed?

**A.**    Yes, sir.

**Q.**    And where are you employed?

**A.**    I work in a store.

**Q.**    Which store do you work in?

**A.**    GD (inaudible) store.

**Q.**    And what type of business is that?

**A.**    It's a convenience store.

**Q.**    How long have you been working there?

**A.**    Three years.

**Q.**    What is your position at that convenience store?

**A.**    I'm the store manager.

**Q.**    You testified that you live in the Tifton area.  Are you familiar with Mr. Hidalgo?

**A.**    Yes, sir.

**Q.**    How are you familiar with Mr. Hidalgo?

**A.**    He's my uncle, but I always seen him like a father to me.

**Q.**    And where does your uncle live?

**A.**    He lives with my aunty.

**Q.**    And who is your aunt?

**A.**    Carmen Ramirez.

**Q.**    And do they live in the Tifton area as well?

**A.**    Yes, sir.

1    Q.    What type of residence does your uncle live in?

2    A.    It's a single wide mobile home.

3    Q.    How old is -- how old is that mobile home?

4    A.    It's maybe in the '70s -- it's, like, more than 30

5    years old.

6    Q.    Does anybody else live in that residence besides Mr.

7    Hidalgo?

8    A.    Yes, him and Carmen.

9    Q.    Anybody besides the two of them?  I'm sorry.

10   A.    No, sir.

11   Q.    And how long has Mr. Hidalgo lived at that

12   residence?

13   A.    A little -- a little bit more than a year and a

14   half, maybe.

15   Q.    Prior to residing in Tifton, where did Mr. Hidalgo

16   live?

17   A.    In El Paso, Texas.

18   Q.    And do you know how long he lived at El Paso?

19   A.    Yes, I remember.  I was born in '87, and I know he's

20   been there long, long time.

21   Q.    Are you familiar with his parents?

22   A.    Yes.

23   Q.    Are his parents still alive?

24   A.    No, sir.

25   Q.    Do you know if he came to the United States with his

1    parents?

2    **A.**    As far as I know.

3    **Q.**    Do you know about what age he came to the United

4    States with his parents?

5    **A.**    Probably nine years old.

6    **Q.**    And did you learn that information, you know,

7    through family discussions and stuff?

8    **A.**    Yes, sir.

9    **Q.**    Do you have any reason to doubt or to question that

10   that's how he came to the United States?

11   **A.**    No, sir.

12   **Q.**    What would be the approximate fair market value on

13   the residence where he and his sister live?

14   **A.**    Maybe a $1,000.

15   **Q.**    Does your uncle own any vehicles?

16   **A.**    A small vehicle.  It's a small truck.

17   **Q.**    Do you know how old that truck is?

18   **A.**    It's old.  It's like 80-something.

19   **Q.**    Does he own any other vehicles besides that truck?

20   **A.**    No, sir.

21   **Q.**    Does your uncle own any residence other than where

22   he lives with his sister there in Tifton?

23   **A.**    No, sir.

24   **Q.**    As far as you know does he own any residence or any

25   vehicles in El Paso?

1   A.    No, sir.

2   Q.    As it relates to family members, I know he's your

3   uncle, do you all have any other relatives in the Tifton

4   area?

5   A.    Yes, sir.

6   Q.    Roughly how many members in your family live in the

7   Tifton area?

8   A.    Maybe around 20 all together.

9   Q.    Other than his sister, Ms. Ramirez, does he have any

10  other relative -- any other siblings?

11  A.    Yes, sir, my mother.

12  Q.    And your mother is -- is?

13  A.    (Inaudible) Sanchez.

14  Q.    And where is your mother?

15  A.    She's here.

16  Q.    And where does she live?

17  A.    She lives in Tifton.

18  Q.    You mentioned that you all have approximately about

19  20 family members?

20  A.    Yes, sir.

21  Q.    Do you have any other family members outside of

22  Tifton?

23  A.    No, sir.

24  Q.    Do you have any family members in Texas?

25  A.    No, sir.

1    Q.    As far as you know does Mr. Hidalgo have any other

2    relatives outside of Tifton?

3    A.    No, sir.

4    Q.    Does Mr. Hidalgo have any children?

5    A.    Yes, sir.

6    Q.    And how old are those children?

7    A.    One is 36 and the other one is 31.

8    Q.    And do you know where those children reside?

9    A.    They live in Mexico.

10   Q.    Have they been to Tifton?

11   A.    No, sir.

12   Q.    As far as you know does Mr. Hidalgo travel back and

13   forth to Mexico?

14   A.    Not really.

15   Q.    In the past few years have you known him to travel

16   to Mexico?

17   A.    Just one time.

18   Q.    Was he there any extended period of time?

19   A.    No more than a month.

20   Q.    As it relates to Texas, does he go back and forth to

21   Texas at all?

22   A.    Not very often.

23   Q.    Is he out there for very long?

24   A.    No.

25   Q.    Since he -- when did he move to Tifton?

1    **A.**    I remember he moved to Tifton in around 2013.

2    **Q.**    Since moving to Tifton has he been back to Texas?

3    **A.**    Just one time I remember, but he went and back.  He

4    came back as soon as I remember, you know.  He wasn't

5    there for a long time.

6    **Q.**    As far as you know does your uncle have -- does he

7    have a passport?

8    **A.**    No, sir.

9    **Q.**    Has he been outside of Tifton any extended period of

10   time as far as you know?

11   **A.**    No, sir.

12   **Q.**    Does he own any sort of property whatsoever outside

13   of Tifton?

14   **A.**    No, sir.

15   **Q.**    Does he own any property in Tifton?

16   **A.**    He owns a truck.

17   **Q.**    And that's the 30 year old truck that you mentioned?

18   **A.**    (No audible response).

19   **Q.**    You mentioned that you were aware of his parents and

20   they are deceased and his kids, you're aware of his

21   siblings, one of which is your mother.  Do you all get

22   together often?

23   **A.**    Yeah, sometimes.  On Sundays we usually get together

24   at any of us house, you know, my cousin, my sister, my

25   aunty.

1   Q.   Do you all have a very close knit family?

2   A.   Yes, sir.

3   Q.   Do you visit with Mr. Hidalgo and his sister?

4   A.   Yes, sir.

5   Q.   How often have you been to his -- the residence that

6   they share?

7   A.   Often.

8   Q.   In terms of visiting that residence have you ever

9   observed any guns in that residence?

10  A.   No, sir.

11  Q.   Any drugs in that residence?

12  A.   No, sir.

13  Q.   And you say you've been in the Tifton area about 15

14  years, correct?

15  A.   Yes.

16  Q.   And you have a good idea or compass in terms of how

17  the community feels?

18  A.   Yes.

19  Q.   Do you know people that know Mr. Hidalgo?

20  A.   Yes, sir.

21  Q.   A lot of people that know him?

22  A.   Yes.

23  Q.   What is his reputation in the community?

24  A.   It's really good.

25  Q.   Is he a peaceful sort of guy?

1    A.    Yes.

2    Q.    Reliable?

3    A.    Yeah.

4    Q.    Dependable?

5    A.    Yes.

6    Q.    You ever heard about your uncle being a violent

7    person in the community?

8    A.    Yeah.

9    Q.    You've heard about him being violent in the

10   community?

11   A.    Violent, how you -- how you mean that?

12   Q.    Does he have a reputation for being violent,

13   committing --

14   A.    Valid?

15   Q.    Violent.

16   A.    Okay.  No.  I thought you said valid reputation.

17   Q.    Valid.  Oh, okay.  No, violent.

18   A.    No.  He's not violent at all.

19   Q.    You ever known him to carry a gun?

20   A.    Not at all.

21   Q.    Have you ever heard of anyone in the community that

22   may have said that he carried a gun?

23   A.    Not at all.

24   Q.    You ever known him to injure anyone?

25   A.    No.

1    Q.    Pull a gun on anyone?

2    A.    No.

3    Q.    A knife?

4    A.    No.

5    Q.    Does he care and support for the household that he

6    lives in?

7    A.    Yes.

8    Q.    In terms of any support that he provides, do you

9    know what support he provides to his sister that lives

10   there with him?

11   A.    Well, you know, he used to work and he used to help

12   her a lot because she only clean houses.

13   Q.    Has there ever been a time where Mr. Hidalgo has

14   helped other members of the family?

15   A.    Yes.

16   Q.    In terms of employment are you aware of any places

17   that Mr. Hidalgo has worked in the Tifton area?

18   A.    Yes.  He used to work in a metal company.

19   Q.    Do you know the name of that metal company?

20   A.    Coxsey, something like that.

21   Q.    Is it Cooksey?

22   A.    Yes.

23   Q.    Do you know what he did for that company?

24   A.    I think they carried the metal to the trucks or

25   unload trucks, something like that.

1    Q.    Has he worked anywhere else in the Tifton area?

2    A.    I knew he was working in the watermelon field.

3    Q.    Is that with a gentleman by the name of Sergio?

4    A.    Yes, sir.

5    Q.    And so he's done two jobs that you know of since

6    being in Tifton?

7    A.    Yes.

8    Q.    Has he always maintained some form of employment?

9    A.    Yes, sir.

10   Q.    Has he always worked hard?

11   A.    Yes, sir.

12   Q.    As far as you know has he ever threatened anyone in

13   your community?

14   A.    No, sir.

15   Q.    Have you ever known him to threaten anyone?

16   A.    No, sir.

17   Q.    Have you ever heard of him threatening anyone?

18   A.    No, sir.

19   Q.    As it relates to the community as a whole -- as a

20   whole, have you ever known him to destroy anyone's

21   property in your community?

22   A.    No, sir.

23   Q.    Have you heard about him destroying any property

24   while he lived in Texas?

25   A.    No, sir.

1    **Q.**    As far as you know has your uncle ever applied for a

2    permit to carry a gun?

3    **A.**    No, sir.

4    **Q.**    As far as you know, has he ever purchased a gun?

5    **A.**    No.

6    **Q.**    You ever heard of anyone discussing that he

7    purchased a gun?

8    **A.**    No.

9    **Q.**    Are you aware of any sort of substance abuse issues

10   or problems that your uncle has?

11   **A.**    No, sir.

12   **Q.**    While at the residence where he and his sister

13   reside have you ever seen any drugs there?

14   **A.**    No, sir.

15   **Q.**    As far as any mental issues, does he have any sort

16   of mental or psychological issues that you're aware of?

17   **A.**    No, sir.

18   **Q.**    As far as you know does he take any sort of

19   medication for any mental or physical condition?

20   **A.**    No.

21   **Q.**    You're aware of any criminal history that he has?

22   **A.**    No, sir.

23   **Q.**    Does he have -- did he have a DUI in his past?

24   **A.**    I think a long time ago, a really long time ago.

25   **Q.**    As it relates to that DUI do you recall whether or

1    not he ever had his bond revoked in that case?

2    A.    No, sir.

3    Q.    Was there ever a time that there was a bench warrant

4    issued for his arrest to appear in court?

5          MS. BOWEN:  Objection, Your Honor.  I don't think

6    -- I think the witness testified she could not even recall

7    in the beginning whether or not he got a DUI.  I think she

8    vaguely remembered it, so these other questions, I'm not

9    sure she has a basis for knowledge to respond.

10         THE COURT:  Mr. Haugabrook?

11         MR. HAUGABROOK:  Judge, I think she testified

12   that she was not aware of one.  My question is whether or

13   not she is aware of a bench warrant or anything being

14   issued against him.

15         THE COURT:  All right.  I'll allow it.

16   BY MR. HAUGABROOK:

17   Q.    Are you aware of any bench warrants ever being

18   issued against your uncle?

19   A.    No, sir.

20   Q.    Any police ever come to the residence in Tifton

21   looking for him as far as you know?

22   A.    No, sir.

23   Q.    Since he's been in Tifton have you known him to

24   operate a vehicle while under the influence of any alcohol

25   or drug?

1    A.    No, sir.

2    Q.    And you're aware of the charges that are presently

3    pending against your uncle?

4    A.    Yes, sir.

5    Q.    And you were in court last week and you heard that

6    the potential sentence that he could receive is ten years

7    or more if convicted?

8    A.    Yes.

9    Q.    Understanding what the charges are against your

10   uncle, does that in any way affect how you feel towards

11   your uncle?

12   A.    No, sir.

13   Q.    Is your uncle still welcomed in his sister's home as

14   far as you know?

15   A.    Yes, sir.

16   Q.    Is he welcomed in your home?

17   A.    Yes, more than welcome.

18   Q.    Based on the charges do you feel that he would be a

19   threat to your family if he got out on bond?

20   A.    Not at all.

21   Q.    Are you willing to act as what I would call a third

22   party custodian, report to the Court any violations that

23   he would commit if he got out on bond?

24   A.    Yes, sir.

25   Q.    Are you willing to do all that you can to make sure

1   he appears in court if he gets a bond?

2   A.   Yes, sir.

3   Q.   You understand he's a grown man though, right?

4   A.   Yes, sir.

5   Q.   You can't make him do anything, can you?

6   A.   I cannot make him do anything, but I know him.  I

7   know he won't do anything that the Court don't tell him to

8   do.

9   Q.   You're willing to maintain daily or regular contact

10  with him to make sure that he keeps a job?

11  A.   Yes.

12  Q.   In this case, in preparing to come here today, have

13  you and your family checked on possible employment for Mr.

14  Hidalgo?

15  A.   Yes, sir.

16  Q.   And do you -- can you tell the Court where he might

17  be employed if he got a bond in this case?

18  A.   Yes.  He might get a job in A&V Auto Sales.

19  Q.   And is that a -- did you provide me with a letter

20  from A&V Auto?

21  A.   Yes.

22  Q.   That stated that they would hire him if he gets out

23  on bond?

24  A.   Yes, sir.

25  Q.   That he would work 40 hours a week?

1    A.    Yes, sir.

2    Q.    Making about $8 an hour as a laborer?

3    A.    Yes, sir.

4    Q.    As it relates to any bond in this case, if the Court

5    would grant Mr. Hidalgo a bond, are you and your family

6    willing to put up any property that you all have to secure

7    that bond?

8    A.    Yes, sir.

9    Q.    And you and I have talked about this, and you're

10   aware that if the Court would grant bond and you would

11   secure that bond with any of your personal property that

12   if he fled the jurisdiction, didn't appear, that your

13   property could be lost?

14   A.    Yes, sir.

15   Q.    You're aware of that?

16   A.    Yes.

17   Q.    You've talked with your family about this; have you

18   not?

19   A.    Yes, sir.  I talked --

20   Q.    And they're aware that if he fled or did not appear

21   that they could lose their property?

22   A.    Yes.

23   Q.    Are you all still willing to use your property to

24   secure any bond in this case?

25   A.    Yes, sir.

1    Q.    Are you willing to do that because you trust him to

2    come back to court?

3    A.    Yes, sir.

4    Q.    Have any concerns that he would flee the

5    jurisdiction if he got a bond?

6    A.    No, sir.

7    Q.    You concerned that he would leave the jurisdiction

8    and go back to Texas?

9    A.    No.

10   Q.    As it relates to Texas has he, since being here in

11   Tift -- in the Tifton area, expressed any desire to go

12   back to Tifton, go back there and live?

13   A.    To Tifton?

14   Q.    To Texas?  I'm sorry.

15   A.    No, sir.

16   Q.    Has he expressed any desire to go to Mexico?

17   A.    Not at all.

18   Q.    As far as you know he has not lived in Mexico since

19   he was a little boy; is that right?

20   A.    Yes, sir.

21   Q.    Are you aware of the conditions that his two sons

22   live in, in Mexico?

23   A.    Yes, sir.

24   Q.    Would you describe to the Court where they live and

25   the conditions under which they live?

1    A.    It's just a small room.  It's -- this is like a big,

2    big room.  It's just a little room.  As far as I know,

3    it's just like a small house, I think.  They live in a one

4    room.  It's the living room, the bedroom and everything

5    together.  They don't even have like walls.  It's just one

6    room by itself.

7    Q.    And how are you familiar with the layout there?

8    A.    Because they talk to me sometimes, long time.  I

9    haven't seen them since 2000, I guess.

10   Q.    Have you seen any photographs of where they live?

11   A.    Yes.

12   Q.    And that's how you are also familiar with the layout

13   where they live?

14   A.    Yes.

15   Q.    If he was given bond in this case do you have any

16   concerns that he would threaten any witnesses --

17   A.    No, sir.

18   Q.    -- involved in this case?

19   A.    No.

20   Q.    Are you -- do you have any concerns that he would

21   obstruct justice in this case?

22   A.    No.

23   Q.    Interfere with any sort of ongoing investigation?

24   A.    No.

25   Q.    If he would be granted bond and allowed to go back

1    to the Tifton area do you believe that the community would

2    fear him coming back there?

3    A.    No, sir.

4    Q.    As far as you know has your uncle paid taxes since

5    he's been in the United States?

6    A.    Yes, sir.

7    Q.    And I think you provided me with a number of tax

8    returns, did you not, for Mr. Hidalgo?

9    A.    Yes, sir.

10   Q.    Does he have a reputation for being truthful in your

11   community?

12   A.    Yes, sir.

13   Q.    Let me focus a little bit on his finances.  As it

14   relates to any financial stability that your uncle has, is

15   he a person who's flashed a lot of money?

16   A.    No.

17   Q.    As far as you know does he have a lot of money?

18   A.    No.

19   Q.    Have you ever seen him with a lot of money?

20   A.    Not at all.

21   Q.    You've testified that he drives a 1980-something

22   truck?

23   A.    Yes.

24   Q.    Has he ever driven any fancy cars?

25   A.    No.

1  **Q.**    Wear any fancy clothes?

2  **A.**    No.

3  **Q.**    As far as you know is he able to own his own

4  residence?

5  **A.**    No.

6  **Q.**    Does his lifestyle suggest that he has a lot of

7  money?

8  **A.**    No.

9  **Q.**    As it relates to any sort of identification that

10 your uncle possess, I think you provided me with a copy of

11 his permanent residence card; is that correct?

12 **A.**    Yes, sir.

13 **Q.**    A Georgia identification card?

14 **A.**    Yes, sir.

15 **Q.**    And a Social Security card?

16 **A.**    Yes.

17 **Q.**    As far as you know are any of those items forged or

18 fake?

19 **A.**    No, sir.  I would not provide the Court with fake

20 IDs from anybody.

21 **Q.**    And you understand that I submitted those things to

22 the Court attached to a brief that I submitted to the

23 Court, correctly -- correct?

24 **A.**    Yes.

25 **Q.**    And those items that you provided me with, the three

1    items, the identification.  Has your uncle ever been

2    accused of providing false identification to anyone?

3    **A.**     No, sir.

4    **Q.**     And I know I asked you about any passport.  Are you

5    aware of your uncle ever trying to secure any sort of fake

6    passport?

7    **A.**     No, sir.

8    **Q.**     Has he ever been accused of forgery or identity

9    fraud?

10   **A.**     No, sir.

11   **Q.**     Are you and the family willing to, if the Court

12   would grant bond, be willing to pay for a GPS monitoring,

13   put him on a leg monitor so we'll know where he is at all

14   times?

15   **A.**     Yes, sir.

16   **Q.**     The family is willing to pay for that?

17   **A.**     Yes, sir.

18   **Q.**     In your opinion do you think that there's a need for

19   GPS monitoring if the Court says you stay in Tifton and

20   don't leave?

21   **A.**     No, sir, because I know he won't go no where.

22   **Q.**     As it relates to family members, you've been to

23   court now, I think, three days, last Friday, yesterday,

24   and today.  You have other family members that have been

25   with you to court?

1    **A.**    Yes, sir.

2    **Q.**    And are family members here in the courtroom today?

3    **A.**    Yes, sir.

4    **Q.**    And are those individuals directly behind me?

5    **A.**    Yes, sir.

6    **Q.**    And I believe they're probably four or five people

7    here?

8    **A.**    Yes, sir.

9    **Q.**    And they are here to support Mr. Hidalgo?

10   **A.**    Yes, sir.

11   **Q.**    They have no concerns about him fleeing this

12   jurisdiction either?

13   **A.**    No, sir.

14   **Q.**    In fact, there were more people here last Friday in

15   support of him, wasn't there?

16   **A.**    Yes, sir.

17   **Q.**    Due to scheduling they could not be here today?

18   **A.**    Yes, sir.

19   **Q.**    So your entire family continues to support Mr.

20   Hidalgo; is that correct?

21   **A.**    Yes, sir, because we love him.

22   **Q.**    Are you going to continue to support him if he's

23   given a bond?

24   **A.**    Yes, sir.

25   **Q.**    You'll watch out for him?

1    A.    All the time.

2    Q.    Make sure he's in court whenever the Court directs

3    him to come?

4    A.    Yes, sir.

5    Q.    And do you believe that whatever conditions of bond,

6    if the Court sees fit to set a bond, that Mr. Hidalgo

7    will, in fact, abide by those conditions?

8    A.    Yes, sir.

9          MR. HAUGABROOK:  That's all I have, Your Honor.

10         THE COURT:  All right.  Ms. Bowen, before you

11   cross -- let me just in an abundance of caution because I

12   see Mr. Stokes out there.  I don't see Mr. Martinez.  Of

13   course, we have Ms. Tellez here, but this is directed to

14   defense counsel just so you understand, and I have not

15   made any decision.  But if you put up a witness and make a

16   representation or the witness does that the Defendant can

17   live with them or they'd be a third party custodian, make

18   sure that person doesn't leave until we have a decision.

19         All right.  Ms. Bowen, cross examination.

20                   CROSS EXAMINATION

21   BY MS. BOWEN:

22   Q.    Good afternoon, Ms. Tellez.

23   A.    Good afternoon.

24   Q.    You testified on direct that you are employed?

25   A.    Yes.

1    Q.    And is this full-time employment?

2    A.    Yes, ma'am.

3    Q.    And how many hours a week do you work?

4    A.    Sometimes I work 50 hours a week.

5    Q.    Eighty?

6    A.    Fifty.

7    Q.    Fifty.  And you mentioned that you have two

8    children?

9    A.    Yes, ma'am.

10   Q.    I think you said a nine year old and a five year

11   old?

12   A.    Yes, ma'am.

13   Q.    I would imagine that they take up a lot of the time

14   that you're not at work?

15   A.    Yes, ma'am.

16   Q.    And you maintain your own household?

17   A.    Yes, ma'am, me and my husband.

18   Q.    So you and your husband and your two children live

19   together?

20   A.    Yes, ma'am.

21   Q.    What hours do you work now?

22   A.    I work from 8 in the morning to mid-day, then I go

23   home and do what I have to do at home, I go pick up my

24   children, then I go back to work around 6:30, 7:00, then I

25   close at midnight.

1   Q.   So most of your day from 8 a.m. to midnight you're

2   either at work or you're at your home or doing duties

3   related to your household management?

4   A.   Yes, ma'am.

5   Q.   And how long have you been keeping this schedule, if

6   you will?

7   A.   How long I been doing that?

8   Q.   Uh-huh.

9   A.   I started with that hours, like, maybe a year ago.

10  Q.   And before that were you also working at this

11  convenience store?

12  A.   Yes.  But I used to work only from 3 in the

13  afternoon until 9 p.m.  I wasn't the manager back then.

14  Q.   So you worked, what's it, six hours a day?

15  A.   Yes, ma'am.

16  Q.   And then the rest of your time would be with your

17  family?

18  A.   Yes, ma'am.

19  Q.   Those being your two children and your husband?

20  A.   Yes, ma'am.

21  Q.   Now, I think you testified on direct that Mr.

22  Hidalgo, you view him as a father?

23  A.   Yes, ma'am.

24  Q.   And he has been in Tifton for a year and a half?

25  A.   Maybe -- maybe a little bit more, but I can't

```
 1    remember exactly what time -- when he got here.
 2    Q.    Less than two years?
 3    A.    Yes, ma'am.
 4    Q.    And during that time the two of you have never
 5    resided together?
 6    A.    What --
 7    Q.    Y'all did not life together?
 8    A.    No, ma'am.
 9    Q.    You testified on direct with abundant familiarity
10    about multiple aspects of his life?  That's correct?
11    A.    Yes, ma'am.
12    Q.    Before he moved to Tifton you were still living in
13    -- Let me rephrase that.  You've resided in Tifton for how
14    long you said?
15    A.    Fifteen years.
16    Q.    Fifteen years.  He's been here for less than two
17    years?
18    A.    Yes, ma'am.
19    Q.    So would the majority of your contact with Mr.
20    Hidalgo -- I think you said y'all get together on the
21    weekends?
22    A.    Yes, ma'am.
23    Q.    On Sundays in particular, have Sunday dinners?
24    A.    Yes.  Well, actually, it's Sunday breakfast.
25    Q.    Sunday breakfast.  Okay.  How long do those
```

```
 1    breakfast last?
 2    A.    We could be in the house for maybe three hours or
 3    all day together.
 4    Q.    And would this constitute probably your primary
 5    contact with Mr. Hidalgo due to your busy schedule?  Is
 6    this when you most frequently would see him?
 7    A.    (No audible response).
 8    Q.    So three hours on Sunday mornings?
 9    A.    Yes, ma'am.
10    Q.    Now, these breakfast on Sundays, Jessica Tellez,
11    she's your sister?
12    A.    Yes, ma'am.
13    Q.    And I imagine she would also be at these breakfast?
14    A.    Yes, ma'am.
15    Q.    And her husband is José Martinez?
16    A.    Yes.
17    Q.    And you're familiar with him as well?
18    A.    Yes, ma'am.  We're family.
19    Q.    And how long have you known José Martinez?
20    A.    When he met my sister.
21    Q.    And how long ago was that?
22    A.    Three years ago.
23    Q.    Are you familiar with a blue Honda Odyssey minivan
24    that Mr. Hidalgo drives?
25    A.    Blue?
```

1    Q.    A light blue?

2    A.    Yeah.

3    Q.    Are you familiar with that vehicle?

4    A.    (No audible response).

5    Q.    And you're familiar that Mr. Hidalgo drives that

6    van?

7    A.    Sometimes.  It's my aunty's minivan.

8    Q.    And when you say your aunty, are you referring to

9    Carmen?

10   A.    Carmen.

11   Q.    Are you aware that Mr. Hidalgo takes frequent trips

12   to Atlanta?

13   A.    No, ma'am.

14   Q.    I think you testified on direct that Mr. Hidalgo

15   supports the household where he lives.  And the people

16   that live in that household are himself and your Aunt

17   Carmen?

18   A.    Yes, ma'am.

19   Q.    You also mentioned his two grown children who live

20   in Mexico?

21   A.    Yes, ma'am.

22   Q.    You mentioned that he had prior employment I believe

23   working in metal?

24   A.    Yes, ma'am.

25   Q.    When was that employment?

1    A.    When he got here after, like, three weeks I think he

2    started working there.  I don't remember really good, but

3    I think that's when he started working in there.

4    Q.    Okay.  How long did he work there after his arrival

5    here in Tifton less than two years ago?

6    A.    I can tell you, like, six months or something like

7    that.

8    Q.    Okay.  So following that did he immediately go into

9    working for Mr. Martinez in agriculture or was there a

10   break or how long did he do that?

11   A.    There was a break.

12   Q.    Okay.  A break.

13   A.    Yes.  I think that's when he went to see his sons

14   and came back.

15   Q.    Okay.  So he gets here less than two years ago, he

16   works at the metal place, if you will, for about six

17   months, goes back to Mexico, and I think you said he was

18   there for a month?

19   A.    Less than that.  He went to meet his grandchildren

20   because he didn't know them.

21   Q.    Okay.  He comes back and then he gets a job working

22   in agriculture?

23   A.    Yes.

24   Q.    Okay.  Now, how long did he have that job?

25   A.    I have no idea.  I knew he was working in there.

1    Q.    Did he have that job in 2014?

2    A.    Yes, ma'am.

3    Q.    Did he have it -- how many months in 2014, to your

4    knowledge?

5    A.    To my knowledge it's not really good because I

6    didn't used to talk to him every day.

7    Q.    Okay.  So perhaps you're not that familiar then with

8    his source of income, what he does on a day to day basis?

9    A.    Exactly.  I don't know exactly what he does day to

10   day.  I know he used to work in the agriculture thing, but

11   I don't know how many hours or anything like that.

12   Q.    Okay.  Are you aware then -- I think you testified

13   that you're not -- excuse me -- you don't have any

14   knowledge about him having access to any significant

15   amount of money?

16   A.    No, ma'am.

17   Q.    Would you consider $225,000 significant?

18   A.    Of course.

19   Q.    And are you aware that on September 25th, 2014, Mr.

20   Hidalgo was arrested in sole possession of $225,000?

21   A.    Yes.  I saw the paper they gave me to read.

22   Q.    I think you mentioned that there was a job

23   opportunity for Mr. Hidalgo?

24   A.    Yes, ma'am.

25   Q.    But this is an opportunity and he has not previously

1    worked at this place of business?

2    A.    No, ma'am.

3    Q.    I think you testified on direct that you would make

4    sure that he did what the Court told him to do?

5    A.    Yes, ma'am.

6    Q.    Okay.  But you work approximately 50 hours a week,

7    you have a husband, you have two small children, you

8    maintain your own household; is that correct?

9    A.    Yes, ma'am.

10   Q.    And you've just said that you were not familiar what

11   he does on a day to day activity?

12   A.    I talk to my aunty every day, to Carmen, and I

13   always ask her about my uncle.

14   Q.    Okay.

15   A.    Because we are a really close family.

16   Q.    All right.  So you rely on the communication via

17   telephone and others and to, I guess, make that

18   determination or ascertain where he is and what he's

19   doing?

20   A.    Yes.  I know him, and I know he won't do nothing he

21   don't supposed to do.

22   Q.    Would you say the same thing about your sister?

23   A.    Yes, ma'am.  That's my sister.

24   Q.    Right.  I understand that.  Would you say the same

25   thing about José Martinez?

1    A.    Yes, ma'am.

2    Q.    Are you also aware that they were arrested on that

3    same date following Mr. Hidalgo with the money on the way

4    to pay for cocaine?

5    A.    I don't know exactly about that.  I find out they

6    were in custody because they call me around 9:00 p.m.  I

7    didn't even know what was going on.

8    Q.    So is it fair to say that whatever the facts may be

9    or whatever someone may tell you, what you see and hear is

10   that they are your family?

11   A.    Yes, ma'am.

12         MS. BOWEN:  That's all I have.

13         THE COURT:  All right.  Anything further, Mr.

14   Haugabrook?

15         MR. HAUGABROOK:  Just briefly, Your Honor.

16                    REDIRECT EXAMINATION

17   BY MR. HAUGABROOK:

18   Q.    Ms. Tellez, the fact that you all are family does

19   that in any way affect whether or not you're willing to

20   make sure that they abide by any -- or Mr. Hidalgo abides

21   by any conditions that the bond -- that the Court may set

22   in terms of a bond?

23   A.    Can you repeat that?

24   Q.    Are you willing to make sure, as best you can, that

25   Mr. Hidalgo would abide by any bond conditions in this

1    case?

2    A.    Yes, sir.

3    Q.    On cross examination the government asked you about

4    your aunt who is Mr. Hidalgo's sister.  Carmen is here in

5    the courtroom; is she not?

6    A.    Yes, sir.

7    Q.    She does not speak English, does she?

8    A.    No, sir.

9    Q.    And you have talked with her about this case,

10   correct?

11   A.    Yes, sir.

12   Q.    And you stay in frequent contact with her?

13   A.    Yes, sir.

14   Q.    And I think you just testified pretty much on a

15   daily basis?

16   A.    Yes, sir.  We can -- we might speak, like, two,

17   three times a day.

18   Q.    And you inquire about Mr. Hidalgo?

19   A.    Yes.

20   Q.    Has she ever told you anything about Mr. Hidalgo

21   being in possession of any drugs or guns or anything like

22   that?

23   A.    No, sir.

24   Q.    The employment opportunity with A&V, do you have any

25   reason to doubt that he would not be hired there?

1   A.    No, sir.

2   Q.    Do you believe that the gentleman that provided you

3   the letter will in -- will, in fact, hire him?

4   A.    Yes, sir.

5   Q.    The $225,000 that was found in the van that Mr.

6   Hidalgo was driving, do you know anything about that?

7   A.    No, sir.

8   Q.    Has Mr. Hidalgo lived any sort of lifestyle to

9   suggest that he has $225,000?

10  A.    Not at all.

11  Q.    Now, you also talked about seeing your uncle on

12  Sunday?

13  A.    Yes, sir.

14  Q.    Do you have the occasion to talk with him over the

15  phone during the week from time to time?

16  A.    Sometimes.

17  Q.    And just kind of chit chat, how he's doing, how you

18  all are doing?

19  A.    Yes, sir.  It's just like a father.  Always

20  protecting us.

21  Q.    And when you say that, although you work, you still

22  talk with him and communicate with him?

23  A.    Yes, sir.

24  Q.    And that's during the week other than on Sunday

25  mornings?

1    A.    (No audible response).

2    Q.    And I think you described the Sunday morning get

3    togethers, sometimes three hours, sometimes all day?

4    A.    Yes, sir.

5    Q.    The fact that you work 50 hours a week and have your

6    own family to attend to, would you still have time to

7    check on Mr. Hidalgo?

8    A.    Yes, sir.

9    Q.    Would you be willing to sacrifice some of your

10   personal time to make sure that he does what he needs to

11   do by way of complying with any bond conditions in this

12   case?

13   A.    Yes, sir.  That's what I'm doing right now.

14   Q.    Is your family in any way going lacking at this

15   point because you're taking time to be here?

16   A.    No.

17   Q.    Are you in any way losing any favor on your job

18   because you've taken off three days to be in court?

19   A.    No, sir.

20   Q.    Will you be able to do that in the future?

21   A.    Yes, sir.

22   Q.    And I think you testified that you are, in fact, the

23   store manager?

24   A.    Yes, sir.

25   Q.    So they've entrusted you greatly, correct?

1    **A.**    Yes, sir.

2            MR. HAUGABROOK:  That's all I have, Your Honor.

3            THE COURT:  All right.  Anything further, Ms.

4    Bowen?

5            MS. BOWEN:  No, Your Honor.

6            THE COURT:  All right.  Ms. Tellez, thank you,

7    ma'am.  You may step down.

8            All right.  Mr. Haugabrook, anything further on

9    behalf of Mr. Hidalgo?

10           MR. HAUGABROOK:  Nothing, Your Honor.

11           THE COURT:  All right.  Very well.  Any rebuttal,

12   Ms. Bowen?

13           MS. BOWEN:  No.

14           THE COURT:  I think we're ready to close then.

15   Let's see, Ms. Bowen, the government still has the burden.

16   Do you want to reserve?

17           MS. BOWEN:  Yes, sir.

18           THE COURT:  All right.  We'll go in the order

19   we've been going for any closing remarks that counsel may

20   want to make.  Ms. Williams, I'll start with you.

21   **DEFENDANT CARTER CLOSING ARGUMENT**

22           MS. WILLIAMS:  I would ask that you would set a

23   bond for Mr. Carter.  I understand that the government

24   filed a motion to detain.  I also understand that the

25   government has, in fact, invoked the rebuttable

1   presumption based on the nature of the charges with

2   respect to Mr. Carter.

3          However, I will submit that during this detention

4   hearing we have submitted evidence that the Court can

5   rely on, to believe that there are conditions in which --

6   or which the Judge could, in fact, set a bond for Mr.

7   Carter.

8          We heard from an uncle, Mr. Stokes.  He indicated

9   that my client has lived in the Omega, Georgia, area for

10  his entire life.  Mr. Carter is approximately 37 years of

11  age.  From the bail report we know that he has three

12  children.  Mr. Stokes also indicated that Mr. Carter has

13  many family members in the Omega and Tifton area.

14         That Mr. Carter does not frequently travel

15  outside the State of Georgia, and that he frequently sees

16  Mr. Carter on a daily basis, that he's known him his

17  entire life, and based on the relationship that he had

18  with Mr. Carter, that he would not be concerned about Mr.

19  Carter being a flight risk.

20         In addition, he did not feel that Mr. Carter

21  would be a danger to the community.  He was not afraid of

22  my client.  He had never seen my client with any drugs,

23  and he had never seen my client engaged in any fights or

24  any physical altercations with anyone.

25         Additionally, Mr. Stokes testified that if my

1    client were given a bond, that he would be willing to

2    allow my client to reside with him.  Now, Mr. Stokes is

3    his uncle.  This is an individual that is retired from the

4    military.  At this time he works as an adjunct professor

5    and a bailiff.  He has never been arrested before.  I

6    would submit that the Court could rely on Mr. Stokes'

7    judgment based on his character.

8         Mr. Carter, although charged with a serious

9    offense, these are mere allegations at this time and he

10   still enjoys the presumption of innocence.

11        I understand that the Court does, in fact, have

12   to take into account the nature of the charge.  However,

13   there are other factors for the Court to consider when

14   making a decision with respect to whether or not to grant

15   a bond for my client.  I would submit that based on Mr.

16   Stokes's testimony that there is enough evidence for the

17   Court to find that the -- that Mr. Carter has, in fact,

18   rebutted the presumption that he would be a danger to the

19   community or a flight risk.

20        Additionally, I proffered on behalf of Pastor

21   Lindsey that my client attended church, that he trusted

22   Mr. Lindsey (sic), that he'd never seen him with any drugs

23   or with any weapons, and that he would allow him to assist

24   with offering and also praying over the money.

25        I would suggest that if the Court were inclined

1    to grant a bond for Mr. Carter that the Court would

2    require Mr. Carter to reside with his uncle, Mr. Stokes,

3    who is currently in the courtroom at this time.

4         We'd also ask that the Court would consider an

5    ankle monitor if the Court were concerned.  I definitely

6    understand from a review of the Pretrial Services Report

7    that my client has some criminal history, but I do believe

8    that an ankle monitor would, in fact, limit my client's

9    travel, especially if that monitor required a stringent

10   curfew in addition to pretrial supervision.

11        We would suggest that the Court require my client

12   to also submit to random drug screens.

13        I believe that with those conditions and any

14   others that the Court would require such as that he not

15   have any weapons, which we would not have any reason for

16   him to have any, of course.

17        That the Court could rest assured that my client

18   would, in fact, report to Court as instructed and that he

19   would not commit any crimes or pose a danger or a threat

20   to the community.

21        THE COURT:  Thank you, Ms. Williams.  All right.

22   Mr. Walker.

23   **DEFENDANT MARTINEZ CLOSING ARGUMENT**

24        MR. WALKER:  Thank you.  For the sake of brevity,

25   Your Honor, my argument will basically mirror Ms. Williams

1    as it relates to Mr. Martinez's, and we would submit to

2    the Court that -- that the only difference is that there

3    exists no evidence whatsoever that's been presented before

4    this Court that my client has ever had -- in possession a

5    firearm at any time during the alleged charges.

6           In addition, as it relates to the evidence

7    submitted before the Court is that my client did have a

8    small amount of contraband on his person when he was

9    stopped.

10          However, Your Honor, we would submit that he's

11   entitled to a bond.  You've heard from his brother, albeit

12   a family member.  That's oftentimes all that we have.  And

13   as the Court may recall, Mr. Martinez, Sergio Martinez,

14   indicated he had 11 siblings along with an additional ten

15   or so children that live in close proximity to his home

16   including Mr. and Mrs. Martinez Tellez, and refer to José

17   Martinez as relation to close proximity, along with other

18   family members.

19          You've heard testimony that they -- they attend a

20   private church, all family-oriented, and work together.

21          Mr. Martinez -- Mr. Sergio Martinez, there's been

22   no evidence here to impugn his character and rely -- we

23   submit you can rely on his character and his ability over

24   the past 53 years, he's not been in any trouble, he's --

25   he maintains a successful business, and he otherwise

1    employs over a hundred individuals.

2         He indicated to the Court that he would otherwise

3    do whatever it took to assure this Court and to take on

4    the obligations to assure this Court that he would

5    otherwise make sure that Mr. José Martinez abided by any

6    rules or stipulations that the Court may fashion and

7    order, if he was otherwise granted bond, to include

8    allowing him to live in his home.

9         I would submit to the Court that the government

10   has somewhat tried to elicit some type of testimony that

11   would indicate that there's some -- may be some violence

12   as it relates to the -- a previous case regarding Mr. José

13   Martinez's sister.  But I would submit to you, Your Honor,

14   that Mr. Sergio Martinez, who obviously is close to his

15   family, testified before Your Honor that he had no

16   evidence of that other than a -- a conversation with, I

17   think, a Gary Vowell that was not indicative of any type

18   of relation to -- to any type of prior history or charge

19   that Mr. José Martinez had.

20        In addition, I would state to the Court that if

21   he was otherwise concerned with such type of violence,

22   especially if it's his family, why would he invite his

23   brother into his home to assure this Court that he would

24   abide by any stipulations that the Court would otherwise

25   grant to him if given bond.  I don't think he would.

1          He sits here before you, Your Honor, and stated

2     in this court, and he's here.  I think he may have stepped

3     out earlier as the Court noted based upon the fact that I

4     did not indicate that he otherwise was released, and I

5     think he thought he was still under the Rule, Your Honor.

6     However, he is here and he's here to do whatever he can to

7     assist his brother.

8          And we would submit, at this particular time,

9     these are mere allegations, and he ought to be afforded

10    the opportunity.  His wife, Ms. Tellez, obviously she's a

11    -- a Defendant in this case, and she is living down the

12    road.  They have -- Mr. José Martinez has two children

13    from a previous marriage and has two children living in

14    his home with his wife now.  He desperately needs to be at

15    home during this time period, to continuous employment to

16    help prepare for his defense in this case.  And we would

17    submit to the Court that any -- any stipulation as it

18    relates to GPS monitoring or requiring him to otherwise

19    live with his brother in his home, to be under constant, I

20    guess, surveillance of his brother, that Mr. Sergio

21    Martinez would take on that obligation.

22         And we believe that a curfew, if that would be

23    what the Court required or otherwise limited Mr. José

24    Martinez' employment to the immediate Tifton area for his

25    employment, that those type of conditions would otherwise

1   be satisfactory, otherwise that would allow him to be

2   released on bond.

3        I believe the Court will recall the testimony was

4   that -- that there was no history of any violence, there

5   was no -- any threat of any particular person, that Mr.

6   Sergio Martinez testified that he -- he did not pose a

7   significant risk to any person or property in the

8   community, and he would appear when he was required to.  I

9   think the -- there was some innuendo as a vacation to

10  Texas on one occasion.  But the Pretrial Services Report

11  indicates that my client has made a trip to Mexico, I

12  believe, one time, some 20 years ago to visit his

13  grandparents.  He has no passport and he does not travel

14  outside the State of Georgia on a regular basis other than

15  that one occasion that was referred to of going to Texas.

16       With that, Your Honor, we would -- we would ask

17  the Court to set a bail -- a reasonable bond on behalf of

18  Mr. Martinez and we would abide by any conditions so

19  fashioned before the Court.  Thank you, Your Honor.

20       THE COURT:  Thank you, Mr. Walker.  Mr.

21  Haugabrook.

22  **DEFENDANT HIDALGO CLOSING ARGUMENT**

23       MR. HAUGABROOK:  Thank you, Your Honor.  Judge,

24  as I -- as I looked at this case right before coming over,

25  it sort of dawned on me as it relates to the requirements

1  under 18 USC 3142.  I really want to address the Court

2  from two standpoints.  First, to deal with this probable

3  cause issue that's outlined in 3142.

4        As the Court is aware when the rebuttable

5  presumption kicks in, that code section states that it

6  shall be presumed that no condition or combination of

7  conditions will reasonably assure the appearance of the

8  person as required in the safety of the community if the

9  judicial officer finds there is probable cause to believe

10  that the person committed an offense that's ten years or

11  more.

12        And I mention that first, Your Honor, simply

13  because in this case it's alleged that my client is

14  involved with some drug conspiracy.  And, of course, it is

15  incumbent at this point that the Court do find or does

16  find that probable cause -- that he actually engaged or

17  committed that offense that's outlined in Count One.

18        As it relates to conspiracy, as the Court is well

19  aware -- and I'm not going to try and argue this, Your

20  Honor, as though I'm in front of a jury, but I think it is

21  worth noting because of the probable cause language in

22  that statute as it relates to this case from a conspiracy

23  standpoint, I think it's incumbent upon the government to

24  present some evidence to fulfill that obligation of

25  probable cause that Mr. Hidalgo has actually engaged in a

1    conspiracy here.

2          The prongs to a conspiracy is that the government

3    must show not only that he gave drugs to some other person

4    knowingly to distribute them, but it also requires that

5    there be an agreement between my client and some other

6    individuals.  And I would cite to the Court United States

7    v. Lennick, L-E-N-N-I-C-K, 18 F.3d 814 at 819.

8          And I bring that to the Court's attention because

9    in this case, Your Honor, I don't think that there's any

10   evidence that the government has put before this Court

11   that even suggests that my client conspired with anyone to

12   pool his money, his resources to purchase any amount of

13   cocaine.  There's no evidence whatsoever that he had an

14   agreement to buy or distribute any cocaine.

15         So from a probable cause standpoint, Your Honor,

16   I do believe that I -- I certainly would ask the Court to

17   look at that section of 3142 as it engages in its analysis

18   as to whether or not my client should be granted bond in

19   this case.

20         When asked of the agent on the stand whether or

21   not Mr. Hidalgo sold, possessed, transported any cocaine,

22   I think the answer was there was no evidence to support

23   that.

24         When I asked him was there any evidence that he

25   encouraged anyone to buy, sell, transport, engage in any

1    sort of drug activity, he could not provide that to the

2    Court.

3         I asked whether or not my client was a middle

4    man, had he orchestrated any sort of drug deal, whether --

5    and I think the agent used the word broker a deal.  He

6    said, no.

7         So, Your Honor, I would submit to this Court that

8    based on the testimony of Agent Luke in this case, and I

9    brought this out very clearly on cross examination, what

10   we have here as it relates to Mr. Hidalgo is that he was a

11   money courier.

12        And the issue with that, Your Honor, is that I

13   don't think there was any evidence to present -- that was

14   presented to this Court that my client knew anything about

15   the drugs.

16        As to the testimony, if I remember correctly,

17   Your Honor, was that there was a Hispanic female who put a

18   bag in my client's vehicle.  Hence, wasn't any testimony

19   that my client touched the bag, opened the bag, looked in

20   the bag, had anything to do with it.  Now, whether or not

21   he should have known what's in the bag, Your Honor, I -- I

22   would submit to this Court that's a -- probably an issue

23   for a jury to decide.

24        But in terms of today, I just don't believe, Your

25   Honor, that the government has met that probable cause

1    burden as it relates to my client.

2         Now, the government may argue that certainly my

3    client was a money carrier.  But there are statements on

4    the wiretaps that suggest that maybe he was involved.

5    But, again, Your Honor, those statements that were made

6    that the agent testified about were conversations that

7    were between Mr. Martinez and Mr. Carter in this case,

8    nothing to suggest that my client was present, nothing to

9    suggest that my client knew those statements were being

10   made, didn't authorize those statements to be made.  Those

11   were just statements made between two individuals who are

12   alleged to be involved in this conspiracy.

13        This is the government's motion to detain my

14   client, and the burden to prove that there is some

15   probable cause that exists to show a conspiracy rests on

16   the government, Judge.  They, in fact, testified through

17   Agent Luke that they did debrief Mr. Carter and Mr.

18   Martinez.  And I believe the agent testified that those

19   debriefings or brief interviews were about two hours each.

20        Well, these individuals have been in custody,

21   Your Honor, since September the 25th or September 26th,

22   three and a half months.  They certainly could have gone

23   back and shored up whether or not Mr. Hidalgo had any

24   knowledge about drugs being purchased in Atlanta.  They

25   have not done it.  The burden, again, rests with the

1  government.  They could have taken the time in at least

2  three and a half months, Your Honor, to go back to make

3  sure that Mr. Hidalgo was involved with the conspiracy or

4  whether he was, as the agent testified, a money courier.

5  They didn't do it, Your Honor.

6       And so for that reason, Judge, from the first

7  standpoint of probable cause, I don't believe that it's

8  been met.  And for those reasons, Judge, I would submit to

9  the Court that the Court does not find that there's been

10  probable cause to even suggest that my client was involved

11  in a conspiracy.  What the evidence at this point suggests

12  is that he was caught with $225,000 in a bag given to him,

13  placed in that vehicle, without any evidence that he

14  looked in -- in it, and he was stopped.  That's it.

15       Now, Judge, presuming that the Court believes

16  that there is probable cause, that no conditions have been

17  met or can be set in this case to assure my client's

18  presence or that he's not a danger, the rebuttable

19  presumption kicks in.  And that being said, the burden is

20  now placed on us to present evidence or to produce some

21  evidence, Judge, to rebut that presumption.

22       And I'll start with the danger, Your Honor,

23  because I think that's probably the easiest one to deal

24  with.  Dangerousness from my client's standpoint, there is

25  nothing to suggest that he's a danger.  No weapons in this

1    case, Your Honor.  Nothing was ever found on him by way of

2    weapons.  Testimony that was presented to you by Ms.

3    Tellez, Judge, she's never known him to carry a weapon.

4         I asked the agent is there anything in my

5    client's criminal history of violence?  Nothing.  In fact,

6    the Pretrial Services Report indicates only a DUI from

7    2004, Judge.

8         He's cooperated.  When he was pulled over, he

9    immediately pulled to the side of the road, did not try to

10   run, did not try to fight, didn't provide any false name,

11   didn't give any aliases.  He simply cooperated with them.

12        Now, the government must show by clear and

13   convincing evidence that somehow he's a danger to the

14   community.  And some of the cases that I would cite to the

15   Court is one out of this particular Circuit by the former

16   Chief Judge Wilbur D. Owens, US versus Jeffries, 679

17   F.Supp. 1114 found at page 1118, states that the

18   government must show by clear and convincing evidence that

19   the Defendant will continue to traffic in drugs if he's

20   released on bond.  So it's not that we can look back at

21   something he's done in the past, if the burden is on the

22   government to present to this Court or should have

23   presented to this Court that if my client gets out on bond

24   he's going to go and traffic in drugs.

25        Judge Owens, in that opinion, said it must be

1   clear and convincing.  There's nothing here, Your Honor.

2   I asked the agent about whether or not my client was

3   affiliated with anyone in the past with drugs?  Did not

4   know.

5        I would submit to the Court, Your Honor, that my

6   client has not been affiliated with anyone in the drug

7   activity prior to this incident.

8        I think the government has just failed to

9   establish any evidence before this Court, Your Honor, that

10  my client would do -- engage in any sort of illegal

11  activity.

12       As the Court will recall I asked the agent, do

13  you have any evidence, is there anything to suggest that

14  if my client gets out he's going to be violent, he's going

15  to commit a criminal act, he's going to engage in any

16  further criminal activity?  He didn't know.  Yet he's the

17  lead agent who's investigating this matter.  No evidence

18  that my client has ties to anyone else that might be in

19  the drug business.  No evidence in the past of drug

20  activity, Judge.

21       So from that standpoint I don't believe, Your

22  Honor, that the government has met that burden as outlined

23  by Chief Judge Wilbur D. Owens in US v. Jeffries.

24       We presented testimony that my client is

25  peaceful, he's gentle, he's never carried any weapons,

1    never been violent in the past, never destroyed anyone's

2    property, never threatened or intimated anyone, never

3    injured anyone, never pulled a gun or a knife on anyone.

4    There's absolutely nothing here, Your Honor, to suggest

5    that Mr. Hidalgo is a danger to the community or to any

6    person.

7           Therefore, the government has failed, in my

8    opinion, Judge, to carry its burden of persuasion on this

9    point, and the Defendant has presented sufficient evidence

10   to rebut that presumption.

11          Again, Judge, it's just simply nothing here to

12   suggest that my client has done anything but possess money

13   that was given to him by another party involved in this

14   case.

15          Looking at the flight risk, and I presume the

16   presumption, Judge, is going to be he's facing a ten year

17   sentence and, therefore, there's no presumption or

18   conditions that this Court could set.  Statutorily, Judge,

19   I think that is absolutely correct.  That is what the

20   statute says for this particular offense; however, I would

21   submit to this Court in reality, as this Court is well

22   aware, if my client is convicted in this case with no

23   criminal history other than a DUI in 2004, if he's

24   convicted, Judge, I think the Court would be well within

25   its purview to consider the fact that the acceptance of

1    responsibility would kick in and safety valve.

2         We've outlined this, Judge, in our brief for the

3    Court that we filed on Friday, that in my conversations

4    with probation to confirm that, if he is convicted based

5    on what's alleged in Count One, and that's the only count

6    that my client has been charged with, acceptance of

7    responsibility and safety valve would put him at 70 to 87

8    months.  That's a far cry, Your Honor, from life.  It's

9    not a far cry from ten years, but it certainly is six to

10   seven years, it's much less than the ten years that is

11   presumed in this case.

12        I presume, Your Honor, there's some concern about

13   my client's ties to Texas.  That's where he came in terms

14   of the Pretrial Services Report with his parents when he

15   was nine years old.  I think in the government's brief

16   they allege that my client himself came to the United

17   States illegally.  I would submit to the Court, Your

18   Honor, being from south Georgia that if my parents told me

19   I'm going to California at the age of nine, I'm going to

20   California, I have no say so in the matter.  So it's not

21   that he came to the United States illegally, if that's, in

22   fact, the case.  We've not heard any evidence to that,

23   that's been presented.  He came at the age of nine when he

24   was a child, Your Honor.  After he got here, became a man,

25   he applied for his permanent resident card.  We attached

1    that, Your Honor, to our brief to show to the Court that

2    he is a permanent resident in the United States at this

3    point.

4         He owns no property in Texas, Your Honor.  He's

5    traveled to Texas certainly because he lived there most of

6    his life since being here in the United States.  But he

7    doesn't have any relatives there, doesn't have any

8    property there.  According to his niece that testified he

9    has no concerns, no admiration, no desire to return to

10   Texas.  And, Your Honor, he certainly does not have any

11   desires to return to Mexico and live in what Ms. Tellez

12   described as horrendous conditions.

13        He does have two sons there, but according to the

14   Pretrial Service Report, Your Honor, there's very little

15   contact with those kids.  Well, not kids, they're grown

16   men.  So, Your Honor, from that standpoint, I certainly

17   don't believe that there should be any concern as it

18   relates to him going back to Texas, and certainly not to

19   Mexico.

20        And as I set forth in my brief that I filed last

21   week, Your Honor, from the Mexico standpoint, certainly

22   we've got an extradition treaty with Mexico.  If the Court

23   is concerned about him going to Texas, certainly that's

24   within the borders of the United States, the Marshal

25   service can certainly find him and bring him back.  In

1    addition the Court could certainly limit, as I've seen the

2    Court do in numerous of my cases before this Court,

3    restrict my client's travel, and make it so that he only

4    remains here in the State of Georgia.

5            In closing and wrapping this up, Your Honor, the

6    other factors that are set forth in 3142, my client

7    doesn't own a passport, doesn't have any travel documents

8    to travel outside or to any other state.  He has strong

9    ties to Tifton.  All of his relatives, with the exception

10   of his two sons that are in Mexico, everyone, Your Honor,

11   reside in Tifton.  He has employment here or employment

12   opportunity.

13           In his past there are no bench warrants, no

14   failure to appear.  Certainly I think that probation would

15   have outlined for the Court if my client had failed to

16   appear or if there was a bench warrant.  I've looked at

17   his criminal history, even talked with the agent about it

18   on cross examination.  There's just nothing there that

19   suggests and I think confirms, Your Honor that my client

20   abides by what the conditions that the Court sets upon

21   him.

22           He dealt with that DUI successfully.  Ms. Tellez

23   testified about him being responsible.  He's well liked in

24   the community.  Again, Your Honor, from the -- from those

25   factors that are in subsection (g) of 3142, he's only

1    facing, if convicted in this case, by my calculations, of

2    being six to seven years.  Didn't try to flee, he

3    cooperated in this case, didn't put up a fight, has no

4    felony convictions, no substance abuse issues.

5         One of the other factors under subsection (g),

6    Your Honor, is the weight of the evidence.  And that's why

7    I said it was important from a probable cause standpoint.

8    I think that the weight of the evidence in this case, Your

9    Honor, is very weak.

10         What we have, again, is Mr. Hidalgo being a money

11   courier.  No evidence, Your Honor, that he's handled,

12   packaged, distributed, sold any drugs in this case.

13   Nothing even suggests, Your Honor, that he encouraged

14   anyone to get in the drug business or to have anything to

15   do with any cocaine.

16         I think two of the strongest points, Your Honor,

17   that suggests that the weight of the evidence in this case

18   is pretty weak against my client and also support my

19   arguments here is the government's own exhibits, Exhibits

20   Number 2 and Exhibits -- Exhibit Number 8.

21         If my client is, as the government suggests, a

22   conspirator, Judge, when we listen to the tape and looked

23   at the transcript as it relates to Exhibit Number 2, I

24   think Mister -- it's alleged that Mr. Martinez was talking

25   to someone out in Texas, trying to get some better

1    connection.  Well, he's talking allegedly to Mr. Carter.

2            In that transcript, page 3 of Exhibit 2, I think

3    Mr. Martinez tells Mr. Carter about these folk want

4    everything, they want to know who my partner is.

5            Interestingly, Your Honor, he does not identify

6    Mr. Hidalgo as his partner.  That's the government's own

7    exhibit.

8            Mr. Martinez says they want to know everything,

9    I've got to tell them where we live.  Allegedly Mr. Carter

10   says, "Even me?"  But when he asks about partner, he does

11   not identify Mr. Hidalgo.

12           In Exhibit 8, Your Honor, there's conversations,

13   again, allegedly between Mr. Martinez and Mr. Carter

14   talking about going to get some cocaine, I presume, on a

15   Friday.  That transcript is very clear.  Mr. Martinez says

16   my driver is not available on Friday.  He does not say my

17   paw-in-law, does not say Mr. Hidalgo is not available.  He

18   says my driver, and allegedly asks Mr. Carter can he send

19   his paw.  If my client, again, Your Honor, was part of the

20   drug conspiracy, had anything to do with cocaine, the

21   purchasing, packaging, transporting cocaine, I believe

22   that conversation would have said something to the effect

23   "Mr. Hidalgo is my partner" meaning out here in Texas.

24   Oh, we need to go get this cocaine on Friday, let me send

25   my paw-in-law to get this cocaine.  He doesn't do that,

1    Your Honor.

2         I think the government's own exhibits here

3    clearly indicate that my client is simply a money courier

4    on a couple of occasions, that being the 25th and the 19th

5    of September.

6         Your Honor, I think in this case, and

7    respectfully, I ask the Court to also take under -- take

8    into consideration, and we've set this out in our brief as

9    well, the fact that bond has been granted to four

10   individuals in this case already.  Those individuals are

11   James Waters, Latoris Waters, Kayla Carter, Diamond

12   Carter.  I mention them, Your Honor, and I understand that

13   each case rests on its own merits.  But I do bring it to

14   the Court's attention simply because in this case my

15   client is only charged in the conspiracy count.

16        These four individuals that I just listed, Your

17   Honor, not only are listed in the conspiracy count, but

18   they are also listed in several other counts as possessing

19   four or five weapons and maintaining a drug house.  My

20   client is not charged with that, Your Honor.  And I would

21   submit to the Court that cuts against the danger argument

22   as well.

23        And if the Court would consider bond in a case

24   where these four individuals have multiple guns,

25   maintaining a drug house, certainly, Your Honor, I would

1    ask the Court respectfully to consider a bond in this case

2    for Mr. Hidalgo, who is not charged with ever having a

3    gun, ever doing any violence.  Fifty-eight year old man,

4    hard working, family man, who lives a very meager life,

5    Your Honor.  A 30-year-old trailer he lives in that might

6    be worth $1,000.  Drives a 30-year-old 1985 Chevy S10.

7    Doesn't sound like to me, Your Honor, he has very much

8    resources, and that certainly cuts against the argument

9    that the government has laid out.

10          Your Honor, I think we have met and overcome the

11   rebuttable -- rebuttable presumption in this case.  I

12   think we've demonstrated quite sufficiently that he's not

13   a flight risk.  He's got sufficient ties.  He's not a

14   danger.  Having done so, the burden shifts back to the

15   government, and that burden is the burden of persuasion.

16   I don't think that they've met that burden, Your Honor.

17   There's no clear and convincing evidence that he's a

18   danger, that he's going to flee.

19          I would ask the Court in this case, Your Honor,

20   respectfully to consider setting a very similar bond as

21   the Court has set in the other four cases, a $10,000,

22   whether it be secured or unsecured, bond or secured ten

23   percent.

24          I would ask the Court to also consider GPS

25   monitoring.  Ms. Tellez testified that they are willing to

1    -- to pay for that.

2          Judge, we could look at home confinement, regular

3    reporting to probation.  I think all of those things are

4    available to this Court.

5          I think we've got credible evidence before this

6    Court.  I think there's a lack of evidence by the

7    government to carry their burden in this case, and I will

8    sit down on this note that was outlined in US v. Salerno,

9    481 US 739, where our Supreme Court said, "In our society

10   liberty is the norm and detention prior to trial or

11   without trial is the carefully, carefully, limited

12   exception."

13         Based on that, Your Honor, I would certainly ask

14   the Court to consider our brief in conjunction with our

15   arguments here today, deny the motion that the government

16   has filed for detention, and reasonably set forth a bond

17   for Mr. Hidalgo, a simple money courier.  Thank you, Your

18   Honor.

19         THE COURT:  Thank you, Mr. Haugabrook.  And

20   before we hear from the government, I'll invite everyone

21   to stand up and stretch a minute.  We've been going two

22   hours.

23      (Stretch break)

24         All right.  If everybody can have a seat, we'll

25   hear from Ms. Bowen on behalf of the government.

1     **GOVERNMENT CLOSING ARGUMENT**

2        MS. BOWEN:  Your Honor, before I begin the

3 argument, the government does not suggest that Mr. Hidalgo

4 is a co-conspirator in a significant, more than 5 kilogram

5 cocaine conspiracy and 280 grams of cocaine base

6 conspiracy.  That has been found by a properly empanelled

7 Grand Jury, that probable cause determination has already

8 been made.  We're not here, and we have not been here

9 yesterday, to proceed in a preliminary evidence hearing.

10 Probable cause has been established by a properly returned

11 indictment.

12        We are here to consider whether or not these

13 three Defendants are able to be bonded by this Court

14 because of the crimes which they are charged with, as

15 already been noted.  There is a presumption in play, and

16 that presumption is that there is no condition or no set

17 of conditions that can assure that the Defendants will

18 come to court when required or will not be a danger to the

19 community.  And it's up to the Defendants to rebut that

20 presumption.

21        And I would ask the Court when considering the

22 evidence that was presented to rebut that presumption to

23 put it in context.  All of the individuals that came to

24 testify on behalf of these three Defendants: Mr. Stokes

25 for Mr. Carter, Mr. Martinez for Mr. Martinez, that's

1   Sergio Martinez on behalf of José Martinez, and Ms.

2   Jessica -- excuse me -- Ms. Jacqueline Tellez on behalf of

3   Mr. Hidalgo.  Throughout their testimony they laid a

4   foundation of daily or frequent contact with these

5   individuals.

6          I think Mr. Stokes it was in the context of

7   visiting with Andrew either at his mother-in-law's house

8   or at Sarah Carter's house, which is 1569 Georgia Avenue,

9   as Your Honor is familiar.  Sergio Martinez, daily

10  contact, working together.  And Ms. Tellez saying that she

11  kept in frequent contact.  And then they testified in

12  great familiarity about their lives.  However, this

13  familiarity was established and testified to as being in

14  place during the course of this conduct.

15         So these three men who sit before you were asked

16  if they could be, I guess, minded by other adults to

17  prohibit them for continuing to engage in the criminal

18  conduct for which they are charged.

19         I believe Mr. Martinez may have said it best when

20  he says, "They have the freedom to do what they want."

21  And, in fact, while working for his brother, Mr. Martinez

22  did have the freedom to do what he wanted.  Mr. Carter had

23  the freedom to do what he wanted.

24         Your Honor will recall the testimony from Sarah

25  Carter's detention hearing about the daily dealing of

1    crack cocaine from 1569 Georgia Avenue, where Mr. Stokes

2    testified that he would visit with Andrew Carter, but yet

3    he testified he did not see any drug activity.

4         The same for Ms. Tellez.  She testified that she

5    works a lot, she's a hard worker.  She takes care of her

6    family, and she calls and she speaks with Carmen, another

7    grown woman, to check up on this grown man while he's out

8    driving back and forth to Atlanta in that blue minivan

9    with a significant amount of money, that is drug money.

10        I submit to the Court that that is completely

11   inadequate to rebut the presumption that these three

12   gentlemen are not a risk to our community.

13        And I don't want to belabor the point because I

14   know we've been here a while, but before I move to the

15   factors, I think you asked Mr. Martinez, Your Honor, how

16   Mr. Martinez, that being José, could be prohibited from

17   using the phone.  If they take away his phone, is he going

18   to get another phone, is he going to use someone else's

19   phone.  There is no way that another individual can watch

20   Mr. Martinez 24/7 short of incarceration.

21        That is the government's position, that the

22   presumption has not been rebutted by the evidence

23   presented here today.  Even if the Court disagrees, it

24   remains in play, and it remains in play militating against

25   these Defendants release.

1          And then we go to the factors, which Your Honor

2    is aware is outlined at 18 USC 3142.  And I believe that

3    on these factors as well, the Defendants should not be

4    granted a bond.  And I'm going to try to take them in a

5    somewhat organized fashion, Your Honor.  And we'll start

6    with Andrew Carter.

7          And applying to all three of these, it is

8    established precedent in this jurisdiction that an

9    indictment for drug trafficking is strong evidence

10   standing alone of danger to our community, and that's US

11   v. Allen at 891 F.Supp. 594, which is a 1995 case, and

12   that's also an Eleventh Circuit case.  So the indictment

13   alone is a large drug conspiracy involving firearms and

14   these three Defendants is strong evidence.  But the

15   government did not stop there.

16         The government put Agent Luke on the stand.  We

17   played calls for Your Honor, we showed you photographs,

18   and that itself is just a smidge of the entire evidence

19   against these three gentlemen.

20         Now, from that evidence that the Court -- that we

21   presented to the Court as it pertains to Andrew Carter we

22   know, factor one, it involves a controlled substance

23   offense.  It also involves firearms.  So that factor is

24   met as to Andrew Carter, as to José Martinez and as to Mr.

25   Juan Sanchez Hidalgo.

1          Factor two, the weight of the evidence against

2     the person.  Reasonable minds can disagree about the

3     weight of the evidence; however, I will remind Your Honor

4     about the calls that we played and the substance of those

5     calls.  I believe we played eight calls total or rather we

6     played seven and Agent Luke testified about an eighth,

7     that would be 4803 in regards to how much money it was

8     going to take to make the 2 kilo buy from Mr. Fatboy.  On

9     those calls, there were Andrew and José talking.  These

10    are the two gentlemen who are running their enterprise,

11    and this is a daily thing.

12          So we have their family members, who obviously

13    love them as they should, testifying to daily contact, but

14    these gentlemen, through the calls, and I think the dates

15    were August 31st, September 2nd, September 4th, September

16    11th, September 17th, September 19th, September 24th, and

17    September 25th, this is a daily thing.  To run an

18    expansive drug trafficking organization, you have to have

19    daily contact.  You've got to keep in touch with your

20    supplier.  You've got to put people on the road.  You've

21    got to go and get more supply.  So they're in constant

22    contact with each other.

23          And what are they talking about?  They're talking

24    about getting cocaine, buying cocaine, making crack

25    cocaine, and who's going to go and pick it up or who's

1      going to take the money to go and get it.

2              So the weight of the evidence submitted by the

3      government is strong.

4              And let me address Mr. Hidalgo.  The idea that he

5      is just a money courier, it makes me think about I think

6      it's the saying that an army moves on its stomach.  So

7      those individuals who move that food in those convoys from

8      the troops to wherever they are, are essential to the

9      success of the army.  Without individuals like Mr.

10     Hidalgo, who can be trusted with nearly a quarter of a

11     million dollars, a drug trafficking organization would not

12     flourish.  And not only does he get trusted with that much

13     money, he is a father-in-law figure, he's family, he's

14     trusted to know where the supplier lives, how to get

15     there, his apartment number, and then he's trusted with

16     nearly a quarter of a million dollars.  So he's not just a

17     money courier.

18             In addition, the Court will recall Agent Luke

19     testified that Andrew Carter talked about the price per

20     kilogram that Andrew knew that Mr. Hidalgo charged to

21     transport cocaine --

22             MR. HAUGABROOK:  I'm going to object, Your Honor

23     --

24             MS. BOWEN:  -- of 500 to 600 dollars.

25             MR. HAUGABROOK:  -- to that.  I think that is an

1   improper characterization of that testimony.

2        MS. BOWEN:  Your Honor, that's exactly what Agent

3   Luke testified.  I asked him about if Andrew Carter had

4   provided a price per kilogram that Mr. Hidalgo charged and

5   if that was common.

6        MR. HAUGABROOK:  I think the testimony from the

7   agent was that that would be a price range for a person

8   who transported cocaine.  Now unless I've mistaken Agent

9   Luke's testimony I do not believe he said that that's what

10  Mr. Hidalgo charged to transport cocaine.

11       THE COURT:  All right.  Mr. Haugabrook, your

12  objection is noted.  The Court will resolve that conflict

13  when it retires to review its notes.

14       MS. BOWEN:  The government's point being, Your

15  Honor, that he was not just a money courier, that he would

16  also move cocaine for this organization.  And even the

17  phrase to be just a money courier, we're not talking about

18  small amounts of money.

19       And that also leaves off the point that Mr.

20  Hidalgo contributed his own funds to the purchase of this

21  kilograms of cocaine.

22       Your Honor will recall Government's Exhibit 6

23  talks about the supplier needing 2 tomorrow, but he said

24  he needs for us to send 2 tomorrow, Agent Luke testified

25  to that.

1           And then we have the calls 4803 and Government's

2    Exhibit 7, which is 4811, where Agent Luke did the math

3    for us.  We knew that José, following the takedown of this

4    enterprise, he offered a price per kilogram of $36,000;

5    Andrew offered a price of $39,000; we took the more

6    conservative, $36,000.  We knew from call 4803 that Andrew

7    had put in 30, José had put in 17, and the difference

8    needed to make that amount was $24,000.  And it is clear

9    from those exhibits, which I know Your Honor has before

10   you, that paw-in-law was going to make up that difference.

11          And let me also state that on these calls, of

12   course, José refers to him as his paw-in-law.  He is

13   familiar with Andrew Carter.  They run a business

14   together, they speak to each other, sometimes daily, and

15   he's not going to say Mr. Hidalgo, he's going to say my

16   paw-in-law.

17          Now, as to the third factor, the history and

18   characteristics of the person.  Your Honor has the bail

19   reports in front of you.  I will note for the Court as to

20   Andrew Carter that he did flee on the night that he was

21   arrested.  In fact, his flight was so vigorous that he

22   broke the back door of the Love's Travel Mart.  Your Honor

23   can also see that he has numerous convictions and arrests.

24   I'll note for Your Honor that the 1996 possession of

25   cocaine conviction he was on probation during the time of

1    this offense as well as the 2009 theft by receiving stolen

2    property.  So while he's out running his business relating

3    to drug trafficking he's on probation for at least two

4    other offenses.

5            Mr. Martinez, he has been to prison for

6    trafficking in cocaine.  He went to prison in 2004.

7    Shortly after, Your Honor will recall the testimony from

8    Agent Luke, the kidnapping of his sister, Aracley Rivera.

9    That kidnapping was drug related.  He went to prison in

10   2004.  Due to the generosity of the Department of

11   Corrections, he got out in 2011.  He was paroled in 2013,

12   I believe it was October of 2013.  The time of this

13   conspiracy is January 2013 through October 2014.  So while

14   he's on parole, he's again running a drug trafficking

15   business.

16           Now, as to the history and characteristics of Mr.

17   Hidalgo.  We've gone back and forth, back and forth, about

18   his immigration status.  The reason that is relevant, Your

19   Honor, is because it raises the stakes on remaining here.

20   And the reason it raises the stakes is because Mr.

21   Hidalgo, though he came here as a child and certainly if

22   his parents came here, it's reasonable to believe he came

23   here with them and I'm not attributing any ill will or

24   illegality to that to him, but his status is that of an

25   alien, he is not a United States citizen.  And so once,

1   and if, while they are still charges, he is convicted of

2   this crime, it is an aggravated felony under the

3   immigration statutes, and he will be deported.  So

4   therefore, he is subject to being removed back to Mexico.

5         I will also note that he has only been in the

6   Tifton area, I think the testimony from Ms. Tellez was, a

7   year and a half, perhaps a little bit more, but less than

8   two years.  He has significant ties to Texas that are

9   outside this Court's jurisdiction.  So he is incentivized

10  to flee.

11        In addition, any calculations about what he's

12  facing would have to be based on the amount of controlled

13  substances attributed to him, and that has not been done

14  yet.  So it is -- it's premature to say what his guideline

15  range might be.  What the Court should consider is that he

16  is charged with an offense for which the mandatory term of

17  imprisonment is ten years, that's the minimum.

18        And, Your Honor, I just -- I don't want you to

19  forget that phrase "just a money courier" or "just almost

20  a quarter of a million dollars".  That cannot be ignored,

21  and it cannot be mistaken, and it was in Mr. Hidalgo's

22  possession on the way to their supplier.

23        So I think I have said enough, and I will sit

24  down.

25        THE COURT:  All right.  Thank you, Ms. Bowen.

Case 7:14-cr-00048-HL-TQL   Document 253   Filed 02/04/15   Page 105 of 118

105

1   And the Court will take this opportunity to thank each of

2   the witnesses who have testified and the agent and the

3   counsel for their presentations.  I think the Court has

4   been provided as full a picture as it can be provided in a

5   hearing such as this, and I've got a lot to consider, a

6   lot of testimony, exhibits, argument.  So we'll recess.

7   Let's see, it's 20 minutes until 5.  I'm going to shoot

8   for being back with decisions by 5:15.

9          Again, the Court doesn't know what it's going to

10  do, but any witness who is identified as potentially a

11  third party custodian, the Court would appreciate it if

12  they would hang around if the Court ends up going in that

13  direction.

14         All right.  So we'll recess until 5:15.

15  (Recess)

16         THE COURT:  All right.  The Court knows it's

17  late, and I appreciate everybody's patience, but I wanted

18  to make sure I gave due diligence to each Defendant and

19  all the evidence that I've heard.

20         As to all three Defendants, the government

21  enjoyed what's known as a rebuttable presumption, which

22  means just because of the charges in the case the

23  government enjoyed a presumption that stated there are no

24  conditions this Court can set to reasonably assure the

25  safety of the community and the Defendants appearance at

1    future court appearances.  But that presumption can be

2    overcome through testimony.

3            And really all three witnesses who took the stand

4    for the Defendants were very credible, Mr. Stokes, Mr.

5    Martinez, and Ms. Tellez.  And through their testimony,

6    the Court finds that the rebuttable presumption was

7    overcome as to each of the three Defendants.

8            Now, once the presumption is overcome it still

9    remains in the case.  The Court is still supposed to

10   consider it when it considers the other factors in the

11   Bail Reform Act.  And I want counsel and the parties to

12   understand that the Court has been through all of the

13   factors, but I'd like to point out to everyone what the

14   Court found were the key facts that led to the Court's

15   decision as to each of the Defendants.

16           As to Defendant Carter, while Mr. Stokes did a

17   very commendable job regarding his nephew, as so often

18   happens in these cases, the Court can't look at any

19   Defendant in a vacuum, it has to look at its entire

20   history.  And the biggest negative that Mr. Carter has, of

21   course, is his criminal history.  His criminal history

22   indicates that he was on probation for two different

23   offenses, from two different courts at the time that

24   there's probable cause that he was engaged in a drug

25   conspiracy in this case.

1        If, in fact, it is ultimately found that he was

2    engaged in a drug conspiracy in 2013 and 2014, then

3    obviously he would have violated the terms of those two

4    different probation or probated sentences.

5        In addition, he's had his parole revoked in a

6    separate case.

7        His criminal history reveals prior drug

8    convictions.  It involves five arrests for wilful

9    obstruction of a law enforcement officer, three of those

10   arrests led to convictions.  Even after his uncle returned

11   to Omega from Texas, Mr. Carter has been charged with a

12   wilful obstruction, a hit and run, and a drug offense,

13   current offense.

14       In addition to that criminal history, of course,

15   the Court has heard the evidence that drugs and guns are

16   involved and Mr. Carter was involved with drugs and guns

17   in this case.  And, of course, there's a photograph that

18   the government has introduced showing Mr. Carter with a

19   semiautomatic weapon engaged in an alleged drug

20   distribution.

21       In addition to all that, there was also evidence

22   that Mr. Carter has fled the police on two separate

23   occasions, including most recently when he was attempted

24   to be put in custody in this case.

25       For all of those reasons, the Court is going to

1    grant the government's motion as to Mr. Carter, and the

2    Court finds by clear and convincing evidence that there

3    are no conditions the Court can set to reasonably assure

4    the safety of the community as to Mr. Carter.

5            As to Mr. Martinez, the government has shown no

6    evidence linking Mr. Martinez to any guns.  As opposed to

7    a codefendant in this case, the Court has no evidence that

8    Mr. Martinez's home was being used to either manufacture

9    drugs or sell drugs from.  On the other hand, it has been

10   established, at least for purposes of this hearing, that

11   Mr. Martinez is above Mr. Carter in the alleged conspiracy

12   to distribute drugs, and while Mr. Carter may be described

13   more as a street level, Mr. Martinez is making the

14   contacts, whether they be in Atlanta or Texas, according

15   to the wire, which concerned the Court.

16           It's not so much the flight risk, because I think

17   his family will keep him in the community, but the Court's

18   concern is evidenced by my question to his brother was,

19   "What can the Court do to reasonably assure the safety of

20   the community?"  What was particularly significant to the

21   Court in Mr. Martinez's case was that, one, I do have

22   evidence presented at this hearing that he's involved in

23   the conspiracy and that he's a higher level than Mr.

24   Carter, or at least he is in a different position when it

25   comes to the distribution.  The evidence shows Mr.

1    Martinez was moving around purchasing cocaine, delivering

2    it to Mr. Carter.

3             The Court was concerned that in one of the

4    intercepted phone calls that the quantity of 10 to 15

5    kilos a week was referenced.  Mr. Martinez, I believe,

6    told the Texas folks that he couldn't move as much as 50,

7    but 10 to 15 kilos a week seemed doable.

8             In addition and probably of most concern to the

9    Court in regard to Mr. Martinez was two items.  One was

10   that Mr. Martinez was convicted of a prior drug

11   trafficking offense in Lee County in 2004 and served seven

12   years of a 25 year sentence, that he was on parole until

13   October of 2013, and that while he was on parole for that

14   prior drug offense, that it is alleged that he engaged in

15   a drug conspiracy, 2013 and 2014.

16            So, Mr. Martinez, if -- if you had not been on

17   parole at the time of this new alleged conspiracy or if

18   this prior drug offense had been in your distant past, you

19   know, earlier than 2004, the Court could have very easily

20   come up with a different result, but the fact that you

21   were on parole and under the Bail Reform Act this Court is

22   specifically told to consider whether any defendant before

23   it is alleged to have been on parole at the time of the

24   alleged new offense, and that indeed appears to be the

25   case.

1        So the evidence before the Court is that you

2   served seven years, got out on parole in 2011, the parole

3   was going to end in 2013, and yet you got involved again

4   in a drug conspiracy.

5        Now, keep in mind, Mr. Martinez, this Court is

6   not making any factual findings regarding the ultimate

7   guilt or innocence, I'm simply charged with considering

8   what's before me to make the best decision I can regarding

9   release or detention.  It's a difficult one because you

10  have so much family behind you and you only have that one

11  conviction, but the truth is it's so recent and the fact

12  you were on parole based on the evidence that's been

13  presented.

14       The Court is also going to grant the government's

15  motion for detention as to Mr. Martinez.

16       As to Mr. Hidalgo, the Court does not have the

17  danger concern it did with the other two Defendants.

18  Instead the question is really the flight risk.  Mr.

19  Hidalgo's only been in south Georgia for two years.

20  Apparently has a romantic interest in El Paso that, the

21  Court takes judicial notice of, is close to the border.

22       The Court is aware of the ICE proceedings that

23  could ultimately, if Mr. Hidalgo is convicted in this

24  case, could lead to his deportation, so there is a reason

25  to flee.

1          On the other hand, as counsel pointed out, I

2     don't have any evidence directly linking Mr. Hidalgo to

3     transporting drugs.  The Court, based on the evidence

4     before it, believes Mr. Hidalgo was simply a courier.  Of

5     course, the Court doesn't come in with blinders on.  It's

6     hard to imagine that Mr. Hidalgo was not aware of what he

7     was transporting.

8          Nevertheless, the ultimate question for the Court

9     is whether there are conditions the Court can set to

10    reasonably assure his appearance at a future court

11    proceeding, and I believe I can.

12         So at this time, Mr. Hidalgo, if you and counsel

13    -- your counsel and counsel for the government will

14    approach the first bench, I'm going to set those

15    conditions for your release.  And the interpreter as well

16    obviously.

17         All right.  And what I'm going to do is indicate

18    the conditions the Court intends to set, and then I'll ask

19    counsel if they wish to be heard on any of the conditions.

20         All right.  First of all, as to Mr. Hidalgo, the

21    Court will order a $15,000 bond secured by ten percent.

22         Mr. Hidalgo, that will require that you pay

23    $1,500 into the registry of the Court.  Should you appear

24    in the future and obey the Court's order, you'll

25    eventually get that money back.  Should you fail to appear

or violate the order that I'm about to read, you could

forfeit the entire amount of $15,000.

In addition to that bond, the Court will enter an

order setting conditions for your release, which I will

now read.

Defendant must not violate any federal, state, or

local law while on release.  You must cooperate in the

collection of a DNA sample if authorized by federal law.

You must advise his supervising officer in writing before

any change in address or phone number.  You must appear in

court as required.  And if convicted, must surrender as

directed to serve any sentence which may be imposed.

You'll be required to sign the bond the Court referred to

earlier.

Additional conditions of release are the

following:

You'll need to submit to supervision by the US

Probation Office.

You'll need to continue or actively seek

employment.  Whether it's with the car dealership or some

other job, the Court expects you to seek employment.

You must surrender any passport he has to the

probation office.  You must not obtain a passport or other

international travel document.  His travel will be

restricted to the State of Georgia unless he obtains prior

1    approval from the US Probation Office.

2           He's not to possess a firearm, destructive

3    device, or other weapon.

4           Not to use alcohol excessively.  Not to use or

5    unlawfully possess a narcotic drug or other controlled

6    substance unless prescribed by a licensed medical doctor.

7           In addition, Defendant will be subject to a

8    curfew from 9 p.m. to 6 a.m.  9 p.m. to 6 a.m. he's

9    restricted to his residence.  He's also subject to home

10   detention, meaning he's restricted to his residence except

11   for employment, education, religious services, medical,

12   substance abuse or mental health treatment, attorney

13   visits, court appearances, court ordered obligations, or

14   other activities approved in advance by his supervising

15   officer.

16          He'll be required to submit to location

17   monitoring, and he'll be required to pay for the cost of

18   that program.

19          Lastly, he's to report as soon as possible to his

20   supervising officer every contact he may have with law

21   enforcement, including any arrest, questioning, or traffic

22   stop.

23          All right.  Ms. Bowen, does the government

24   request any other conditions?

25          MS. BOWEN:  No, Your Honor.  There are no other

1    conditions that the government requests.  I understand

2    that that is the Court's decision, and I don't know if

3    this would be the appropriate time to request the Court a

4    24 hour stay of your order of release so that I might

5    appeal this decision.  Respectfully so, Your Honor, I'm

6    recognizing that it is 10 until 6 and the Clerk's Office

7    is closed, so any security could not be paid until

8    tomorrow regardless of any request of the government for a

9    stay.  So that is the request of the government.

10             THE COURT:  I'll address that once we get through

11   the order.

12             MS. BOWEN:  I did not want to miss the

13   opportunity.  As far as conditions the government has

14   (inaudible) short of its motion for detention.

15             THE COURT:  Mr. Haugabrook, you want to be heard

16   on any of those conditions the Court proposes?

17             MR. HAUGABROOK:  No, Your Honor.

18             THE COURT:  All right.  Mr. Hidalgo, I need to

19   advise you of certain penalties that apply while you're on

20   federal release.  Should you commit a federal felony, the

21   punishment is an additional prison term of not more than

22   ten years.  If you commit a federal misdemeanor, the

23   punishment is an additional prison term of not more than

24   one year.  So if you commit a federal offense while on

25   federal release, there's a penalty on top of any sentence

1   you might receive.

2          Lastly, I need to advise you that it's a crime

3   punishable by up to ten years in prison and a $250,000

4   fine or both to obstruct a criminal investigation; tamper

5   with a witness, victim, or informant; retaliate or attempt

6   to retaliate; intimidate or attempt to intimidate a

7   witness, victim, juror, informant, or officer of the

8   Court.

9          Now, we'll address the government's motion.  Ms.

10  Bowen, of course -- and I'll remind all parties that any

11  order from this Court in a detention order is reviewable

12  by the District Judge de novo, and that applies to any

13  Defendant as well as the government.

14         The law and practice in this District is that if

15  the government moves to have such a release order

16  reviewed, and, Ms. Bowen, you have made that motion.

17         MS. BOWEN:  Yes, sir, I have.

18         THE COURT:  Then this Court's order of release is

19  stayed until the District Judge reviews it and has an

20  opportunity to issue an order.  Of course, that's up to

21  the District Judge whether he orders the transcript or has

22  an entire new hearing.

23         So, Mr. Hidalgo, what that means in plain

24  speaking is that this Court has ordered your release, but

25  the government is entitled to have my decision reviewed by

1    a higher authority.  They've exercised that right, which

2    means my order is stayed, and you'll remain in the custody

3    of the US Marshal until the District Judge issues a

4    decision.

5         Now, Mr. Lawrence, I have detention orders as to

6    the other two Defendants, and I'll get you to file them.

7         Though my order is stayed on the chance that it

8    saves us from a future court appearance, we'll go ahead

9    and execute all the documents that we need to, but then

10   I'll enter an order making it clear that that's stayed.

11        MS. BOWEN:  Thank you, Your Honor.

12        THE COURT:  So, Mr. Hidalgo, you're going to be

13   handed those two documents to sign, so we'll go ahead and

14   get that out of the way.

15        All right.  And just for the record and counsel's

16   benefit, the Court notes that the release documents have

17   been signed and will be filed, but this Court verbally at

18   this time issues an order staying that release and will

19   follow this verbal order with a written order to make it

20   clear that this Court's order of release is stayed until

21   the District Judge reviews it.

22        All right.  So, Mr. Haugabrook, while I've got

23   you up here, anything further today on behalf of your

24   client, Mr. Hidalgo?

25        MR. HAUGABROOK:  Nothing at this time, Your

1   Honor.

2          THE COURT:  All right.  And, Ms. Williams,

3   anything further today on behalf of your client, Mr.

4   Carter?

5          MS. WILLIAMS:  No, Your Honor.

6          THE COURT:  Mr. Walker, anything further today on

7   behalf of Mr. Martinez?

8          MR. WALKER:  No, sir, Your Honor.

9          THE COURT:  Ms. Bowen, anything further from the

10  government as to any of the three Defendants?

11         MS. BOWEN:  No, Your Honor.  Thank you.

12         THE COURT:  All right.  Thank counsel again for

13  your presentations and all the witnesses.  Good luck to

14  all three of the Defendants, and we're adjourned.

15

16  (The proceedings were thereby concluded).

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Tammy W. Fletcher, Federal Official Court

4    Reporter, in and for the United States District Court for

5    the Middle District of Georgia, do hereby certify that the

6    foregoing is a true and correct transcript to the best of

7    my knowledge and ability from the electronic recording

8    provided in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United

11   States.

12

13                    Dated this 3rd day of February, 2014.

14

15                    *Tammy W. Fletcher*

16   _____

17                    TAMMY W. FLETCHER, CCR
                       FEDERAL OFFICIAL COURT REPORTER
18

19

20

21

22

23

24

25